L. Poe Leggette (Wyoming Bar No. 7-4652)
Rosario C. Doriott Domínguez (Admitted *Pro Hac Vice*)
Alexander K. Obrecht (Wyoming Bar No. 7-5442)
BAKER & HOSTETLER LLP
1801 California, Suite 4400
Denver, Colorado 80202-5835
Telephone: 303.861.0600
Facsimile: 303.861.7805
pleggette@bakerlaw.com
rdoriottdominguez@bakerlaw.com
aobrecht@bakerlaw.com

*Attorneys for Amicus Curiae, Independent
Petroleum Association of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **CLOUD PEAK ENERGY, INC.,** *et al.* | ) ) ) | |
| **Petitioners,** | ) ) | |
| v. | ) ) | **Civil Case No. 19-cv-120-S** **[Consolidated with 19-cv-121-S and 19-cv-126-S]** |
| **UNITED STATES DEPARTMENT OF THE INTERIOR,** *et al.* | ) ) ) ) | **Assigned: Hon. Scott W. Skavdahl** |
| **Respondents.** | ) ) | |

## AMICUS CURIAE BRIEF OF INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA IN SUPPORT OF PETITIONERS' JOINT MOTION FOR PRELIMINARY INJUNCTION

Pursuant to the Court's August 5, 2019 Order that granted the Independent Petroleum Association of America ("IPAA") leave to file its proposed amicus curiae brief and related attachments and exhibits (ECF No. 45), IPAA respectfully files the following Amicus Curiae Brief of Independent Petroleum Association of America in Support of Petitioners' Joint Motion for Preliminary Injunction (previously ECF No. 43-1) and Declaration of Dan Naatz in Support of Motion for Leave to File Amicus Brief (previously ECF No. 43-2).

　　　　　　　　　　　　　*/s/ L. Poe Leggette*
　　　　　　　　　　　　　L. Poe Leggette
　　　　　　　　　　　　　Rosario C. Doriott Domínguez
　　　　　　　　　　　　　Alexander K. Obrecht
　　　　　　　　　　　　　BAKER & HOSTETLER LLP
　　　　　　　　　　　　　1801 California, Suite 4400
　　　　　　　　　　　　　Denver, Colorado 80202-5835
　　　　　　　　　　　　　Telephone: 303.861.0600
　　　　　　　　　　　　　Facsimile: 303.861.7805
　　　　　　　　　　　　　pleggette@bakerlaw.com
　　　　　　　　　　　　　rdoriottdominguez@bakerlaw.com
　　　　　　　　　　　　　aobrecht@bakerlaw.com

　　　　　　　　　　　　　*Attorneys for Amicus Curiae, Independent Petroleum Association of America*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of August, 2019, a copy of the following Amicus Curiae Brief of Independent Petroleum Association of America in Support of Petitioners' Joint Motion for Preliminary Injunction was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ L. Poe Leggette*
L. Poe Leggette

L. Poe Leggette (Wyoming Bar No. 7-4652)
Rosario C. Doriott Domínguez (*Pro Hac Vice* Pending)
Alexander K. Obrecht (Wyoming Bar No. 7-5442)
BAKER & HOSTETLER LLP
1801 California, Suite 4400
Denver, Colorado 80202-5835
Telephone: 303.861.0600
Facsimile: 303.861.7805
pleggette@bakerlaw.com
rdoriottdominguez@bakerlaw.com
aobrecht@bakerlaw.com

*Attorneys for Amicus Curiae, Independent*
*Petroleum Association of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **CLOUD PEAK ENERGY, INC.,** *et al.* | ) ) ) | |
| **Petitioners,** | ) ) | |
| v. | ) ) | **Civil Case No. 19-cv-120-S** **[Consolidated with 19-cv-121-S** **and 19-cv-126-S]** |
| **UNITED STATES DEPARTMENT OF THE INTERIOR,** *et al.* | ) ) ) ) | **Assigned: Hon. Scott W. Skavdahl** |
| **Respondents.** | ) ) | |

---

## AMICUS CURIAE BRIEF OF INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA IN SUPPORT OF PETITIONERS' JOINT MOTION FOR PRELIMINARY INJUNCTION

---

# CORPORATE DISCLOSURE STATEMENT

PLEASE TAKE NOTICE, pursuant to Rule 29 of the Federal Rules of Appellate Procedure and Rule 83.6 of this Court's local rules, the undersigned counsel for Amicus Curiae Independent Petroleum Association of America, a non-governmental, non-profit organization, certifies that there is no parent corporation or publicly held corporation that owns more than 10% of its stock.

*/s/ L. Poe Leggette*
L. Poe Leggette

# RULE 29(a)(4)(E) STATEMENT

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure and Rule 83.6 of this Courts Local Rules:  (i) no party's counsel authored this brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person other than IPAA and its members contributed money that was intended to fund preparing or submitting this brief.

*/s/ L. Poe Leggette*
L. Poe Leggette

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................................... i

RULE 29(a)(4)(E) STATEMENT ....................................................................................... ii

IDENTITY AND INTEREST OF IPAA .................................................................................. 1

ARGUMENT .................................................................................................................... 2

    I.   API Is Likely to Succeed on the Merits ........................................................ 3

    a.   The disallowance of sub-sea transportation costs is arbitrary.......................... 4

    b.   Valuing unprocessed gas as processed gas is arbitrary.................................... 6

    c.   The Department failed to consider alternatives. ............................................ 11

    II.  Due to Sovereign Immunity and No Authority to Pay Interest to Lessees on
          Overpayments, Economic Damages Resulting from the Rule Are Non-Recoverable.... 12

    CONCLUSION .................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action on Smoking & Health v. Civil Aeronautics Bd.*,
  699 F. 2d 1209 (D.C. Cir. 1983) ...................................................................11

*Amoco v. Fry*,
  118 F.3d 812 (D.C. Cir. 1997) .............................................................10, 11

*Cal. by and through Becerra v. Dept. of the Interior*,
  381 F. Supp. 3d 1153 (N.D. Cal. 2019) ...........................................................12

*Cent. Valley Chrysler-Plymouth v. Cal. Air Res. Bd.*,
  Case No. CV-F-02-5017, 2002 WL 34499459 (E.D. Cal. June 11,
  2002) ..................................................................................................13

*Chamber of Commerce of U.S. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ........................................................13, 16

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ...............................................................................10

*Continental Resources, Inc. v. Gould*,
  374 F. Supp. 3d 28 (D.D.C. 2019) ...................................................7, 8

*Crowe & Dunlevy, P.C. v. Stidham*,
  640 F.3d 1140 (10th Cir. 2011) ................................................................17

*Dine Citizens Against Ruining Our Env't v. Bernhardt*,
  923 F.3d 831 (10th Cir. 2019) ...........................................................3, 11

*Direct Mktg. Ass'n v. Huber*,
  Case No. 10-CV001546, 2011 WL 250556 (D. Colo. Jan 26, 2011) ................17

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ...........................................................................5

*Food Marketing Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019) ...........................................................................10

*Greater Yellowstone Coalition v. Flowers*,
321 F.3d 1250 (10th Cir. 2003) .......................................................................13

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
92 F.3d 1248 (D.C. Cir. 1996)...........................................................................8

*Kisor v. Willkie*,
139 S.Ct. 2400 (2019)........................................................................................5

*Lane v. Pena*,
518 U.S. 187 (1996)..........................................................................................13

*Marathon Oil Co.*,
90 IBLA 236 (1986) .........................................................................................14

*Messina v. U.S. Citizenship & Immigration Servs.*,
Case No. Civ.A. 05-CV-73409-DT, 2006 WL 374564 (E.D. Mich.
Feb. 16, 2006) ....................................................................................................9

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005)............................................................................................5

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) .........................................................................11

*RxUSA Wholesale, Inc. v. Dep't of Health & Human Servs.*,
467 F. Supp. 2d 285 (E.D.N.Y. 2006) ...............................................................9

*Tennessee Gas Pipeline Co., L.L.C.*,
189 IBLA 108 (2016) .......................................................................................14

**Statutes**

5 U.S.C. § 552(b) ..................................................................................................10

5 U.S.C. § 702 ........................................................................................................13

5 U.S.C. § 705 ..................................................................................................12, 17

18 U.S.C. § 1905 ....................................................................................................10

30 U.S.C. §§ 1711(c), 1713(a), 1717 ....................................................................10

30 U.S.C. § 1721 ...............................................................................................13, 14

30 U.S.C. § 1721a ...................................................................................14

Administrative Procedure Act.................................................................13

FOIA ......................................................................................................10

**Other Authorities**

30 C.F.R. § 1206.20 .................................................................................5

30 C.F.R. §§ 1206.102, 1206.156(a) (2016)...........................................5

30 C.F.R. § 1206.142(b) ..........................................................................8

30 C.F.R. § 1206.142(d) ........................................................................11

30 C.F.R. § 1206.144 .............................................................................10

30 C.F.R. § 1206.152 (2016) .....................................................7, 8, 10, 11

30 C.F.R. § 1206.153 (2016) ...................................................................8

80 Fed. Reg. 614M, 624...........................................................................4

80 Fed. Reg. 624L....................................................................................6

81 Fed. Reg. 43,338 (July 1, 2016). 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17

81 Fed. Reg. 43,339L...............................................................................3

81 Fed. Reg. 43,340L...............................................................................4

81 Fed. Reg. 43,348-49 ..........................................................................10

81 Fed. Reg. 43,359 ...............................................................................13

81 Fed. Reg. 43,369-89 ..........................................................................11

81 Fed. Reg. 43,372R...............................................................................5

81 Fed. Reg. 43,381M...........................................................................7, 8

81 Fed. Reg. 43,381R-43,382L..............................................................11

81 Fed. Reg. 43,385L.............................................................................10

82 Fed. Reg. 36,934 (Aug. 7, 2017)...........................................................................12

## IDENTITY AND INTEREST OF IPAA

IPAA is the leading national upstream trade association representing approximately eight thousand independent oil and natural gas producers and service companies across the United States. (Decl. of Dan Naatz in Support of Mot. for Leave to File Amicus Br. ("Naatz Decl.," attached as Exhibit 2 to Mot.) ¶ 3.) Independent producers generally include non-integrated oil and gas companies that receive nearly all revenue from production at the wellhead. (*Id.*) IPAA's members operate in 33 states and offshore and employ an average of just 12 people. (*Id.*)

One of IPAA's primary purposes is to advocate for its members' interests in continued and responsible oil and gas development before Congress and federal agencies and in the judicial system. (*Id.*) This purpose includes advocating for rational and fair policies on the valuation of royalties on oil and gas from Federal and Indian leases.

On federal, Indian, state, and private land, IPAA's members develop over 91 percent of domestic oil and gas wells, produce 83 percent of domestic oil, and produce 90 percent of domestic natural gas. (*Id.* ¶ 5.)

In the next few weeks, IPAA's members will be required to begin complying with a final rule that the Department of the Interior ("Department") issued entitled Consolidated Federal Oil & Gas and Federal Indian & Coal Valuation Reform, 81

Fed. Reg. 43,338 (July 1, 2016) ("Rule"). Compliance will impose massive unrecoverable costs on IPAA members who lease, produce, transport, pay royalties on, or are otherwise involved with Federal oil and gas. (Naatz Decl. ¶ 5.) IPAA estimates its members are likely to suffer unrecoverable injuries of at least $100 million in compliance costs if the Rule is not preliminarily enjoined. (*Id.* ¶ 23.)

With regard to the Rule itself, IPAA joined with the American Petroleum Institute ("API") and the National Ocean Industries Association in comments on the proposed rule preceding the adoption of the final Rule. (*Id.* ¶ 9.) These comments are dated May 8, 2015, and will be included in the administrative record for these consolidated cases. (*Id.*; *see also* Decl. of Rosario C. Doriott Domínguez ("Doriott Decl.") ¶ 3, Attach. A (May 8, 2015 Comments).)

IPAA has brought, intervened in, or filed amicus briefs in litigation affecting the interests of its members, including cases like this one involving the federal oil and gas royalty program. (Naatz Decl. ¶ 11.) IPAA and its members have an interest in ensuring fair and legal regulation of oil and gas royalties, for which IPAA has advocated through the administrative processes leading to this litigation. To that end, IPAA files this amicus curiae brief in favor of a preliminary injunction as requested by Petitioners' Joint Motion.

## ARGUMENT

Petitioner API is likely to prevail on the merits of its claim that the oil and gas

2

sections of the Rule are arbitrary, and the economic injury to oil and gas producers, including IPAA's numerous members, will be significant, likely, and non-recoverable.

## I.      API Is Likely to Succeed on the Merits

The central theme of API's challenge is that the Rule claims to honor two longstanding precepts of royalty valuation: (1) that the "best indication of value is the gross proceeds received under an arm's-length contract," 81 Fed. Reg. 43,339L,[1] and (2) that, "for purposes of determining royalty, the value . . . is determined at or near the lease." *Id.* at 43,341L. But in all the ways API's petition has illustrated, the Department fails to explain how (1) its invocation of oil and gas values set far from federal leases and (2) its limitations on historically allowed deductions are consistent with its own precepts. An agency's decision will be reversed when it fails to consider "an important aspect of the problem" or fails to base its decision "on a consideration of the relevant factors." *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 858 (10th Cir. 2019) (internal quotations and citations omitted) (vacating decision for failure to consider significant comments). There is an unexplained gulf between the Rule's precepts and its actual requirements. IPAA here supplements API's central theme with the

---

[1]  The Rule will be cited by its pagination in the *Federal Register*. Because pages in the Register are printed in three columns, IPAA will, where helpful, designate the referenced column(s) as left ("L"), middle ("M"), or right ("R").

following points that further demonstrate the procedural and substantive infirmities of the Rule.

**a.       The disallowance of sub-sea transportation costs is arbitrary.**

The Department has arbitrarily eliminated transportation allowances to move oil and gas from deepwater wells, whose wellheads are on the sea floor, through seabed flowlines starting from the lease boundary all the way to the first production platform.  This movement had been recognized as deductible "transportation" since the Clinton Administration, and stated in a policy pronouncement in 1999 called the "Deep Water Policy."  (Doriott Decl. ¶ 5, Attach. C (Deep Water Policy).)  The only reason given for the Rule's change was that the Department previously "intended for the Deep Water Policy to incentivize deep water leasing by allowing lessees to deduct broader transportation costs than the regulations allowed."  81 Fed. Reg. 43,340L.

This sudden change in legal interpretation is incoherent.   When the Department proposed the change, it offered as its only reason that the movement of oil and gas to a point of interconnection of wells on an <u>adjacent</u> lease was "gathering," not transportation.  80 Fed. Reg. 614M, 624.  IPAA objected, noting that deepwater lessees can move production subsea off lease to platforms up to 50 miles away after the production has already been placed in a single flow line.  (Doriott Decl. ¶ 3, Attach. A at 5, 9.)   The import was that "a blanket rule

4

disallowing subsea transportation costs" would be irrational. (*Id.* at 10.) Movement of production off lease has been considered "transportation" for decades. *See* 30 C.F.R. §§ 1206.102, 1206.156(a) (2016) (former rule defining transportation as movement outside of the lease or unit). The Deep Water Policy was fully consistent with that longstanding regulation. (Doriott Decl. ¶ 5, Attach. C (Deep Water Policy).) Incongruously, even the Rule itself still defines transportation to mean movement of oil or gas outside the lease or unit. 30 C.F.R. § 1206.20; 81 Fed. Reg. 43,372R ("transportation allowance" means costs of moving oil or gas "to a point of sale off of the lease" or unit).

Agencies may change positions, but they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). "It follows that an 'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* at 2126 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). It is irrational to continue to define transportation to mean movement of production off lease, then disallow costs for movement off lease on the unexplained ground that the former treatment of that movement as transportation was unlawful. This sudden, unexplained, and detrimental change receives no judicial deference. *Kisor v. Willkie*, 139 S.Ct. 2400, 2417-18 (2019) ("[A] court may not defer to a new interpretation . . . that creates

'unfair surprise' to regulated parties.").

The Department's about face in its interpretation stems from a fatal misunderstanding of subsea production systems. The proposed Rule argued that gathering lines "move lease production to a central accumulation point" and "bring gas by separate and individual lines to a central point where it is delivered into a single line." 80 Fed. Reg. 624L. But the Deep Water Policy accepted that view. "Movement prior to a central accumulation point is considered gathering. A central accumulation point may be a single well, a subsea manifold, . . . or a platform[.]" (Doriott Decl. ¶ 5, Attach. C at 1.) A subsea manifold is a piece of equipment on the seabed receiving oil or gas from multiple wells, commingling it, and sending it to a platform through a single flowline. (*Id.* ¶ 6, Attach. D. (illustration of typical subsea production system showing components).) The Rule fails to explain its new view that subsea manifolds are <u>never </u>central accumulation points. This reversal of interpretation is arbitrary.

###### b.  **Valuing unprocessed gas as processed gas is arbitrary.**

Equally arbitrary is the Rule's treatment of arm's-length sales of gas before it is processed into liquid products such as ethane, propane, and butane. It has been common in the industry to sell natural gas at the wellhead to third parties. The pricing clause in those contracts commonly provides that the lessee is paid on a percentage either of (1) an index price for gas sold downstream from the lease or

6

(2) the proceeds the buyer receives from selling the liquids and "residue gas" that result from processing the gas. These are called "percentage-of-index" ("POI") and "percentage-of-proceeds" ("POP") contracts, respectively.

Under the prior rule, arm's-length sales under these contracts were valued as sales of "unprocessed gas." 30 C.F.R. § 1206.152 (2016). The royalty value for the gas was the gross proceeds the lessee actually received. *Id.* § 1206.152(a)(1), (b)(1)(i) (2016). For example, if the buyer resold liquids and residue gas for $100,000, and the POP clause called for the lessee to receive 80 percent, then the total value on which royalty would be based would be $80,000. If the royalty were one-eighth, then the federal royalty share would be $10,000. To report and pay royalties accurately, the lessee did not need to know what it actually cost <u>its buyer</u> to transport the gas away from the lease or the cost to process it. That was the buyer's business.[2]

The Rule now treats arm's-length sales under POI and POP contracts as sales of "processed gas." *Id.* § 1206.142(a)(2); 81 Fed. Reg. 43,381M. Treating gas sold before processing as processed gas is arbitrary. In *Continental Resources, Inc. v. Gould*, 374 F. Supp. 3d 28 (D.D.C. 2019), the Department attempted to value an allegedly non-arm's-length sale of gas sold before processing under a POI contract

---

[2] To the extent the Department will claim *post hoc* that its "marketable condition" rule is relevant to its decision, see page 11, *infra*, footnote 5.

7

as if it were processed gas. Among other flaws, the Court found the Department's decision not only "textually and logically inapposite" but also "nonsensical . . . because Continental sold unprocessed gas and, thus, the proceeds of sales of processed gas would never be comparable." *Id.* at 35. The Department has valued unprocessed gas separately from processed gas. *Compare* 30 C.F.R. § 1206.152 (2016) (unprocessed) *with* 30 C.F.R. § 1206.153 (2016) (processed). Treating similar things differently is the very soul of arbitrariness. *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996). The converse is equally true: without explanation, treating <u>similarly</u> things that the Department has historically treated as <u>dissimilar</u>—processed and unprocessed gas—is just as arbitrary.

Under the new Rule, a lessee must report on the buyer's full proceeds (not just the lessee's percentage share) and must separately file for allowances to reflect the buyer's costs of transportation and processing.[3] 30 C.F.R. § 1206.142(b); 81 Fed. Reg. 43,381M. IPAA members objected, pointing out that the Department was imputing to the lessee the revenues and costs of the buyers of the gas. (Doriott Decl. ¶ 4, Attach. B at 3 ("This is not a minor course correction; it is a sea change.").) Not the least of the problems was that the lessee lacks access to its buyer's actual

---

[3] Lessees must now retroactively file for the allowances going back to January 1, 2017. As will be explained below, this retroactive filing will be impossible because lessees lack the required information.

costs of processing and transportation. (*Id.* ("[I]t would be next to impossible for a lessee to determine the amount of any transportation or processing allowance to which it is theoretically entitled.").)

In response, the Department was evasive and vague. Defending its new position, the Department said, "[I]f a company is in compliance under the previous rules . . . this change should not be overly burdensome. This change increases data transparency . . . and allows us to better monitor allowances and account for royalty interest more quickly and accurately." 81 Fed. Reg. 43,348R. This statement is senseless. Under the prior rule, the lessee did <u>not</u> have to report its buyer's costs, so "compliance under the previous rules" has little bearing on the burden of the new Rule.

And it is incomprehensible to assert that requiring access to data the lessee lacks "increases data transparency." It rather increases "data impossibility." It is the true essence of arbitrariness to expect a regulated entity to do what the agency knows is impossible. *Messina v. U.S. Citizenship & Immigration Servs.*, Case No. Civ.A. 05-CV-73409-DT, 2006 WL 374564, at *6 (E.D. Mich. Feb. 16, 2006) ("It is arbitrary and capricious to require compliance with a regulation when compliance is impossible"); *see also RxUSA Wholesale, Inc. v. Dep't of Health & Human Servs.*, 467 F. Supp. 2d 285, 305 (E.D.N.Y. 2006) (granting preliminary injunction of regulation requiring re-sellers of prescription drugs to certify the

9

pedigree of drugs the distributors sold because the manufacturers and authorized distributors from whom the re-sellers obtained the drugs were not required to maintain pedigree records).

The Department thinks it has a solution. It has the power to compel buyers to disclose their cost data to the Department. 81 Fed. Reg. 43,348-49; *see* 30 U.S.C. §§ 1711(c), 1713(a), 1717. It has decided that if the lessee cannot do it, then the Department will determine the lessee's allowable costs of processing and transportation—using *inter alia* any "[i]nformation available . . . to ONRR." 30 C.F.R. § 1206.144; 81 Fed. Reg. 43,383; *see* 30 C.F.R. § 1206.152(g)(3) (transportation costs), 1206.159(e)(3) (processing costs); 81 Fed. Reg. 43,385L (transportation costs), 43,387R (processing costs).

The problem with this "solution" is the Due Process Clause. The Department must give lessees the information on which it relies to support its valuation, as any attempted "deprivation of a protected property interest" must comport with Due Process. *Amoco v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997) (Department must disclose data underlying its royalty demands to lessees). But the buyer's cost information cannot be disclosed to the lessees. It is protected by 18 U.S.C. § 1905 and by 5 U.S.C. § 552(b). *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364-65 (2019) (buyer can bar disclosure under FOIA); *Chrysler Corp. v. Brown*, 441 U.S. 281, 317-19 (1979) (buyer can bar disclosure under 18 U.S.C.

10

§ 1905). Denying lessees access to the very information they require in order to challenge or comply with ONRR's determined valuation amounts to a denial of due process of law. *Amoco*, 118 F.3d at 819 ("Notice and meaningful opportunity to challenge the agency's decision are the essential elements of due process.").

The Department has thus "failed to consider an important aspect of the problem" that necessary data is unavailable.[4] *Dine Citizens Against Ruining Our Env't*, 923 F.3d at 858. And it has failed to respond to a significant comment. *Action on Smoking & Health v. Civil Aeronautics Bd.*, 699 F. 2d 1209, 1216-17 (D.C. Cir. 1983) (reversing agency action where the agency failed to respond to significant comments). Either failing renders the Department's action arbitrary.[5]

### c. The Department failed to consider alternatives.

The Rule is a wholesale repeal, restatement, and renumbering of the valuation

---

[4] The Rule does allow lessees to avoid calculation of transportation <u>and</u> processing costs by using an "index based" valuation. 30 C.F.R. § 1206.142(d); 81 Fed. Reg. 43,381R-43,382L. That option is <u>not</u> available, however, to lessees who sell at arm's length. *Id.*

[5] Of course, sales of unprocessed gas under POI and POP contracts were still subject to the requirement that the lessee was responsible for putting production into marketable condition without cost to the lessor, *see* 30 C.F.R. § 1206.152(i) (2016), although what "marketable condition" required in any given market was sometimes disputed between the Department and its lessees. That issue remains unaltered under the Rule. Note, however, that while the Rule mentions the "marketable condition" issue, 81 Fed. Reg. 43,348R, it does not claim that the burdens of determining marketable condition are different under the old rule and the new Rule, or that the marketable condition rule is the reason behind the change. Under *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994), "an agency's action must be upheld, if at all, on the basis articulated by the agency itself."

regulations for oil and gas.  *See* 81 Fed. Reg. 43,369-89.  As API has explained, the

Department repealed the Rule.  82 Fed. Reg. 36,934 (Aug. 7, 2017) ("Repeal

Rule").  On judicial review, the United States District Court for the Northern

District of California vacated the Repeal Rule. *Cal. by and through Becerra v. Dept.*

*of the Interior*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019).  Among the flaws the court

found, it faulted the Department for not considering lesser alternatives to full repeal.

*Id.* at 1168-69.

That fault may be laid equally at the feet of the Rule itself.  No analysis of

alternatives was done for the Rule.  No consideration, for example, was given to

something less than a blanket denial of subsea transportation costs, or to valuation

of gas sold before processing by some method that does not compel a lessee to lose

all transportation and processing allowances because it cannot obtain information

from its buyer on actual costs.  Furthermore, in its recent Dear Reporter Letter,

ONRR conducted no analysis of alternative compliance methods rather than

requiring imminent compliance for three years of retrospective royalty reporting.

The Rule suffers the same shortcoming for all issues API and IPAA have raised.

The entire Rule should be stayed under 5 U.S.C. § 705 and preliminarily enjoined.

## II.   **Due to Sovereign Immunity and No Authority to Pay Interest to Lessees on Overpayments, Economic Damages Resulting from the Rule Are Non-Recoverable.**

The "irreparable harm requirement is met if a plaintiff demonstrates a

significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (emphasis omitted). "Monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (internal quotations and citation omitted). A finding of irreparable injury has been based on the cost of compliance when coupled with the inability to recoup those costs should the challenge to the agency action ultimately be successful. *See Cent. Valley Chrysler-Plymouth v. Cal. Air Res. Bd.*, Case No. CV-F-02-5017, 2002 WL 34499459, at *7 (E.D. Cal. June 11, 2002).

Here, IPAA's members cannot seek monetary damages because under the Administrative Procedure Act, Congress opted not to waive its sovereign immunity for monetary damages. 5 U.S.C. § 702; *see Lane v. Pena*, 518 U.S. 187, 196 (1996). ONRR additionally lacks a source of authority and a source of funds for paying or crediting the payment of interest to lessees on any royalty payments ultimately determined to constitute an overpayment. *See* 30 U.S.C. § 1721; FAST Act, Pub. L. No. 114-94.

The Department admits the Rule will subject lessees to increased costs through additional royalty collections. *See* 81 Fed. Reg. 43,359 ("The net impact of these amendments is an estimated annual increase in royalty collections of

between $71.9 million and $84.9 million."). On the low end of ONRR's estimates, the Rule will increase annual royalty burden by an average of $37,447.92 per company. *See id.* at 43,367 (stating 1,920 companies submit royalties).

It is true if the Rule is later overturned, lessees can seek refunds of their overpayments. *See* 30 U.S.C. § 1721a. But the Department is without authority to give interest on those refunds. *See id.* § 1721; FAST Act, Pub. L. No. 114-94.[6] IPAA estimates its 1,050 royalty paying members would lose approximately $26,314,106 in unrecoverable interest that members will have to pay before the end of 2019. (Naatz Decl. ¶ 28.) That is approximately $25,000 per member. Where "there is no authority for payment of interest to the lessee on any royalty payments ultimately determined to constitute an overpayment," such "lost interest constitutes irreparable harm." *Tennessee Gas Pipeline Co., L.L.C.,* 189 IBLA 108, 114 (2016); *see Marathon Oil Co.*, 90 IBLA 236, 246-47 (1986).

But lost interest costs tell the lesser portion of the irreparable harm confronting IPAA members. The Rule creates costs through an immense burden on human capital, requiring substantial commitments of in-house staff time or the engagement

---

[6] On December 4, 2015, then-President Barack Obama signed the FAST Act, Pub. L. No. 114-94. Section 32301 of the FAST Act struck 30 U.S.C. §§ 1721(h) and (i) as well as the fourth sentence of (j). Pub. L. No. 114-94, Sec. 32301. Former Sections 1721(h) and (j) empowered and obligated ONRR to pay or credit interest on royalty overpayments. The FAST Act eliminated ONRR's source of authority and source of funds for paying or crediting overpayment interest.

of third-party consultants, and forcing the procurement of new software and procedures. The steps needed to comply will vary by IPAA member, but companies likely will be required to: (i) identify their complete portfolio of individual leases impacted by each Rule change; (ii) determine accounting and reporting system changes needed to satisfy the new Rule; (iii) dedicate personnel and financial resources to implement those changes, including potentially hiring additional staff or contractors; and (iv) internally validate all changes to ensure compliance in royalty valuation, reporting, and payment. (Naatz Decl. ¶ 17.) Converting sophisticated systems, purchasing software, and training personnel for ongoing production, as well as amending prior reports, requires months of continuous diversion of full-time staff resources from other tasks, as well as expenditure of significant financial resources in fees for external contractor services. (*Id.* ¶ 20.) IPAA estimates that the average per company compliance cost is in the range from $100,000 to $330,000—with most estimates over $250,000. (*Id* ¶ 22.) These losses will be incurred before this year is over.

These additional compliance burdens are not merely theoretical. The Department of the Interior estimates ONRR receives 5.6 million lines of royalty reports a year. (*Id.* ¶ 19.) For the retrospective portion of the Rule—*i.e.*, reversing and re-reporting three-years of data prior to 2020— IPAA members will have to reverse 11 million lines and rebook 11 million lines of data. (*Id.* ¶ 21.) While some

larger companies may employ software to automate the compliance process, smaller operators—the primary members of IPAA—will need to make changes manually. (*Id.* ¶ 20.) Each line requires approximately one minute to enter. (*Id.* ¶ 21.) Assuming all 22 million lines are reversed and rebooked manually, IPAA members will lose 366,667 hours or 15,278 days of employee time. (*Id.*) Although not all IPAA members will manually reverse and rebook, that time is forever lost for the tasks those employees are supposed to accomplish in the ordinary course of business. (*Id.*) These are precious employee hours that IPAA's members—which employ on average just 12 people—cannot needlessly spare. The Rule will irreparably harm IPAA's members by forcing the reversal and rebooking of three years of prior royalty data and requiring the preparation for future compliance. Having polled its members and estimated these compliance costs, IPAA estimates that the cost of reversing and rebooking 22 million lines of data before 2020 is likely to exceed $100,000,000. (*Id.* ¶ 23.) The costs will double if the Rule is vacated and lessees have to re-reverse and re-rebook 22 million lines again.

The Tenth Circuit and district courts within it have granted preliminary injunctions for compliance costs far less than those imposed by the Rule. *Edmondson*, 594 F.3d at 756, 770-71 (affirming a preliminary injunction based on the finding that a trade association's members would suffer irreparable harm from compliance costs that might total $1,000 per company per year related to a new

Oklahoma law because such costs were unrecoverable due to sovereign immunity); *Direct Mktg. Ass'n v. Huber*, Case No. 10-CV001546, 2011 WL 250556, at *6-7 (D. Colo. Jan 26, 2011) (granting a preliminary injunction based on the finding that a trade association's members would suffer irreparable harm from compliance costs of $3,100 to $7,000 per company related to new state of Colorado statutory and regulatory requirements because such costs were unrecoverable due to sovereign immunity).

The Rule poses a significant and probable risk of economic harm for the independent oil and gas producers represented by IPAA. "A plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative and will be held to have satisfied this burden." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011).

## CONCLUSION

Petitioners are likely to succeed on the merits of their claim that the Rule is arbitrary. If the Rule is not stayed soon, the massive harm to independent oil and gas producers represented by IPAA will be non-recoverable. The risk of that harm is significant and probable. The Court should stay the Rule under 5 U.S.C. § 705 and then grant Petitioners' Joint Motion for a Preliminary Injunction.

DATED this 2nd day of August, 2019.

/s/ L. Poe Leggette
L. Poe Leggette
Rosario C. Doriott Domínguez
Alexander K. Obrecht
BAKER & HOSTETLER LLP
1801 California, Suite 4400
Denver, Colorado 80202-5835
Telephone: 303.764.4020
Facsimile: 303.861.7805
pleggette@bakerlaw.com
rdoriottdominguez@bakerlaw.com
aobrecht@bakerlaw.com

*Attorneys Amicus Curiae, Independent
Petroleum Association of America*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 83.6 and F.R.A.P. 29, I hereby certify that the foregoing brief is double-spaced and utilizes a proportionally spaced 14-point Times New Roman typeface.  The brief comprises a total of 4151 words.

/s/ L. Poe Leggette
L. Poe Leggette

# CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of August, 2019, a copy of the foregoing Amicus Curiae Brief of Independent Petroleum Association of America in Support of Petitioners' Joint Motion for Preliminary Injunction was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ L. Poe Leggette*
L. Poe Leggette