FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 OCT -8 PM 1: 16

MARGARET BOTKINS, CLERK
CASPER

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

CLOUD PEAK ENERGY INC.; NATIONAL MINING
ASSOCIATION; and WYOMING MINING ASSOCIATION,

      Petitioners,

      v.

UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*,

      Respondents.

**No. 19-CV-120-SWS**
**(Lead Case)**

---

AMERICAN PETROLEUM INSTITUTE;

      Petitioner,

      v.

UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*,

      Respondents.

No. 19-CV-121-SWS
(Joined Case)

---

TRI-STATE GENERATION AND TRANSMISSION ASS'N,
INC.; BASIN ELECTRIC POWER COOPERATIVE; and
WESTERN FUELS-WYOMING, INC.,

      Petitioners,

      v.

DAVID BERNHARDT, in his official capacity as Secretary
of the U.S. Department of Interior; *et al.*

      Respondents.

No. 19-CV-126-SWS
(Joined Case)

---

## ORDER GRANTING PARTIAL PRELIMINARY INJUNCTION

These joined cases come before the Court on Petitioners' Joint Motion for Preliminary Injunction (Doc. 22[1]) and supporting memorandum (Doc. 23). Independent Petroleum Association of America filed an amicus curiae brief in support of the request for preliminary injunction (Doc. 47). Respondents filed an opposition to the motion (Doc. 58). The States of California and New Mexico, Intervenor-Respondents here, filed a joint opposition to preliminary injunction (Doc. 56). Intervenor-Respondents Natural Resources Defense Council, Northern Plains Resource Council, Powder River Basin Resource Council, The Wilderness Society, and Western Organization of Resource Councils (collectively, "Conservation Groups") also filed a joint opposition to a preliminary injunction (Doc. 57). Finally, Petitioner Tri-State Generation and Transmission Association, Inc. provided a notice of supplemental evidence (Doc. 59). The Court held an evidentiary hearing on the matter on September 4, 2019. (Doc. 62.) Having considered the evidence and written testimony presented, the arguments of counsel, and the record herein, the Court finds and concludes Petitioners' request for a preliminary injunction should be granted in part and denied in part.

## BACKGROUND

Oil, gas, and coal producers often enter into leases with the federal government or Indian tribes to produce natural resources from federal lands, offshore areas, and Indian lands. The law generally requires lessees to value the fossil fuels they produce and pay royalties to the federal government on that production by the end of the calendar month

---

[1] All citations to the record are to the lead case, Case No. 19-CV-120, unless otherwise noted.

following the production month.  Respondent Office of Natural Resources Revenue ("ONRR") is a unit of the U.S. Department of Interior, which is statutorily tasked with collecting, verifying, and then disbursing the revenues associated with the production of natural resources on federal and Indian lands and the Outer Continental Shelf.

In May 2011, ONRR published two advance notices of proposed rulemaking.  The first sought public comments and suggestions concerning potential changes to how federal oil and gas were valued for royalty purposes. *Federal Oil and Gas Valuation*, 76 Fed. Reg. 30878 (May 27, 2011).  The second requested public comments and suggestions regarding potential changes to how federal and Indian coal was valued. *Federal and Indian Coal Valuation*, 76 Fed. Reg. 30881 (May 27, 2011).

Following the comment periods as well as six public workshops, ONRR published a proposed rule in January 2015 ("the Proposed Rule"), which sought to change how federal oil, gas, and coal as well as Indian coal would be valued when calculating royalties. *Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 80 Fed. Reg. 608 (Jan. 6, 2015).  In July 2016, following an extended public comment period, ONRR then published the final rule ("the Valuation Rule"), which enacted most of the amendments first set forth by ONRR in its proposed rule. *Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform Rule*, 81 Fed. Reg. 43338 (July 1, 2016) (to be codified at 30 C.F.R. Parts 1202, 1206[2]).  The Valuation Rule effectively changes how lessees calculate the value of the natural resources in order to pay royalties on oil, gas, and

---

[2]  The Court's citations to the Valuation Rule are to the Federal Register because, as of the date of this Order, both www.ecfr.gov and Westlaw still reflect the pre-2016 text of 30 C.F.R. Parts 1202 and 1206.

coal produced from federal lands and offshore leases as well as coal produced from Indian lands.

On December 29, 2016, Petitioners originally filed challenges to the Valuation Rule in this Court.[3] However, those Petitions were voluntarily dismissed in November 2017 due to the "repeal" of the July 1, 2016 Valuation Rule. (16-CV-319, Doc. 23).

In early 2017, ONRR postponed the Valuation Rule's effective date and then undertook the rulemaking process to pass another rule ("the Repeal Rule") that repealed the Valuation Rule, leaving the former valuation methods unchanged. *Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 82 Fed. Reg. 36934 (Aug. 7, 2017). However, in October 2017, the States of California and New Mexico, joined by the Conservation Groups as intervenor-plaintiffs, filed suit in the Northern District of California to challenge the Repeal Rule under the APA. *State of Cal. v. USDOI*, No. C 17-5948 SBA (N.D. Cal. Oct. 17, 2017). On March 29, 2019, the Northern District of California granted summary judgment in the plaintiffs' favor, vacating the Repeal Rule after finding ONRR violated the APA when adopting it. *Id.* at Doc. 72. This effectively reinstated the now-not-repealed Valuation Rule. On June 13, 2019, ONRR issued a "Dear Reporter" letter that announced the Valuation Rule applies to "all federal oil and gas lessees and all federal and Indian coal lessees" from January 1, 2017 forward, and requires full compliance to occur by January 1, 2020. (Doc. 23-3 at p. 1.) "This means that lessees must come into compliance [with the new royalty calculation methods]

---

[3] *Cloud Peak Energy Inc., et al. v. USDOI*, Case No. 16-315; *API v. USDOI*, Case No. 16-316; and *Tri-State Generation and Transmission Ass'n, et al. v. USDOI*, Case No. 16-319.

retrospectively for the last two and a half years and prospectively by January 1, 2020."
(Doc. 23 at p. 11.[4])

The several petitioners before this Court find the Valuation Rule problematic and burdensome. They seek to set it aside under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, arguing it is arbitrary and capricious and exceeds ONRR's authority. Immediately before the Court is Petitioners' request for a preliminary injunction, which would prevent them from having to comply with the Valuation Rule during the pendency of this litigation, thus relieving Petitioners from the "substantial and unnecessary burden" of calculating the royalties owed to the federal government for the development of federal resources under the new valuation methods.

## PRELIMINARY INJUNCTION STANDARD

Preliminary injunctions in this judicial review of administrative action are permitted under the APA, 5 U.S.C. § 705, as well as Federal Rule of Civil Procedure 65(a).

> A preliminary injunction has the limited purpose of preserving the relative positions of the parties until a trial on the merits can be held. It is an extraordinary remedy never awarded as of right. A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal.

> Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

---

[4] The Court cites to the page numbers at the top of each page assigned to the document by the CM/ECF system, as opposed to the page numbers at the bottom of each page assigned by counsel.

*DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269–70 (10th Cir. 2018) (internal citations and quotation marks omitted).

## DISCUSSION

"'[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements' will be considered." *Id.* at 1270 (quoting *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017)).

### 1.   Petitioners have shown likely irreparable harm.

"Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). "It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by money damages." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).

Petitioners first contend they face inevitable, irreparable harm because they "must expend significant sums to attempt full compliance with the [Valuation] Rule by ONRR's prescribed January 1, 2020 date," including the purchase of new or reprogrammed software and the need to hire and/or train personnel to recalculate royalties and re-submit reports from prior years. (Doc. 23 at p. 17.) The parties disagree drastically concerning the extent of the costs of compliance. Gregory Gould, the Director of ONRR, testified via declaration

that "ONRR estimates the annual cost of rereporting across reporters will be $401,000." (Doc. 58-1 at p. 9.) In stark contrast, Dan Naatz, a Senior Vice President of the Independent Petroleum Association of America ("IPAA," an amicus in this litigation) testified via declaration that the IPAA estimates each of its member-companies faces compliance costs of $100,000 to $330,000 for "lost employee time or direct expense for outside consultants to perform the retrospective reversing and rebooking," with all IPAA members incurring a collective compliance cost of at least $100 million. (Doc. 47-2 at p. 6.)

While each side in this case has tried to paint the issue as black or white, courts are split on the question of whether compliance costs alone can constitute irreparable harm. Some federal circuit courts have said that economic outlays cannot amount to irreparable harm:

- Third Circuit: "Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction."
  -*A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 527 (3d Cir. 1976).

- Seventh Circuit: "In addition, injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."
  -*Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (citing *A. O. Smith Corp.*, 530 F.3d at 527).

- Second Circuit: "However, ordinary compliance costs are typically insufficient to constitute irreparable harm."
  -*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (finding the loss of interest on escrowed funds did not amount to irreparable harm) (citing *Am. Hosp. Ass'n*, 625 F.2d at 1321, and *A. O. Smith Corp.*, 530 F.2d at 527-28).

Other circuits have taken a more relaxed approach when the movants are barred from the possibility of recovering their monetary costs down the road:

- Eighth Circuit: "The threat of unrecoverable economic loss, however, does qualify as irreparable harm."
  *-Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996).

- Eleventh Circuit: "In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."
  *-Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (collecting cases).

- Fifth Circuit: "The tremendous costs of the emissions controls impose a substantial financial injury on the petitioner power companies which, in this circuit, 'may also be sufficient to show irreparable injury.' *Enter. Int'l Inc. v. Corp. Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472–73 (5th Cir. 1985). Indeed 'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.' *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (Scalia, J., concurring in part and in the judgment). When determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts....' *Enter. Int'l*, 762 F.2d at 472. **No mechanism here exists for the power companies to recover the compliance costs they will incur if the Final Rule is invalidated on the merits.**"
  *-Texas v. United States Envtl. Prot. Agency*, 829 F.3d 405, 433–34 (5th Cir. 2016) (emphasis added).

- Ninth Circuit: "Economic harm is not normally considered irreparable. However, such harm is irreparable here because the states will not be able to recover monetary damages connected to the IFRs [interim final rules]."
  *-California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019).

Even where preliminary injunctions or stays pending appeal have been denied for lack of irreparable harm, including in cases quoted above, courts often leave open the possibility that monetary injuries can constitute irreparable harm in cases where they are forever unrecoverable.

- D.C. Circuit: "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. **The possibility that adequate compensatory**

or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."
-*Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (emphasis added).

- Seventh Circuit: "Only harm that the district court cannot remedy following a final determination on the merits may constitute irreparable harm."
-*Am. Hosp. Ass'n*, 625 F.2d at 1331 (citing *A. O. Smith Corp.*, 530 F.2d at 527).

The preceding rudimentary and incomplete review of caselaw suggests more circuit courts prefer finding monetary costs to be irreparable harm in cases where the costs cannot later be recovered. And while these cases provide only persuasive guidance, the Tenth Circuit and this Court have already previously held that unrecoverable economic costs can constitute irreparable harm for preliminary injunction purposes.

- Tenth Circuit: "Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury. *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir.1994); *see also Ohio Oil Co. v. Conway*, 279 U.S. 813, 814, 49 S.Ct. 256, 73 L.Ed. 972 (1929) (holding that paying an allegedly unconstitutional tax when state law did not provide a remedy for its return constituted irreparable injury in the event that the statute were ultimately adjudged invalid); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir.2003) ('An irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.' (quotation and emphasis omitted)). If forced to comply with the Oklahoma Act, the Chambers' members will face a significant risk of suffering financial harm as described in Part II. Yet, because Oklahoma and its officers are immune from suit for retrospective relief, *Edelman*, 415 U.S. at 667–68, 94 S.Ct. 1347, these financial injuries cannot be remedied."
-*Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010); *see also Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) ("Under Wyoming law, Tri-State may not be able to collect directly from Pacific…. Difficulty in collecting a damage judgment may support a claim of irreparable injury…. If Tri-State cannot collect a money judgment, then failure to enter the preliminary injunction would irreparably harm it.").

- District of Wyoming: "Economic damages in the form of compliance costs that cannot later be recovered for reasons such as sovereign immunity constitute irreparable injury. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 756, 770–71 (10th Cir. 2010) (finding trade associations' members were likely to suffer irreparable harm from compliance costs related to Oklahoma law that might total more than $1,000 per business per year because such costs were unrecoverable due to sovereign immunity)."
  *-Wyoming v. United States Dep't of the Interior*, 136 F. Supp. 3d 1317, 1347–48 (D. Wyo. 2015), *vacated and remanded on other grounds sub nom. Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016).

Accordingly, this Court has little difficulty concluding that "the general rule that '[e]conomic harm is not normally considered irreparable' does not apply where there is no adequate remedy to recover those damages, such as in APA cases." *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018) (quoting *California v. Azar*, 911 F.3d at 581).

As noted earlier, the parties strongly disagree as to how much the compliance costs will amount to. Nonetheless, the parties agree lessees will incur at least some economic costs in complying with the Valuation Rule, and the actual costs likely rest somewhere between the parties' estimates. But even if those costs are closer to ONRR's estimates ($401,000 across the industry) than IPAA's estimates ($100,000+ per company), they're certainly not insignificant. And those compliance costs will not be recoverable later even if Petitioners win on the merits due to the federal government's sovereign immunity from monetary damages. *See* 5 U.S.C. § 702 (allowing a person aggrieved by agency action to file an action "seeking relief other than money damages"); *Lane v. Pena*, 518 U.S. 187, 196 (1996) ("It is plain that Congress is free to waive the Federal Government's sovereign immunity against liability without waiving its immunity from monetary damages awards.

The Administrative Procedure Act (APA) illustrates this nicely."). Consequently, the lessees' monetary costs necessary to comply with the new Valuation Rule, which are not later recoverable even if Petitioners win this litigation on its merits, constitute irreparable injury.

Petitioners also argue irreparable harm exits because lessees face a threat of civil penalties if they mis-report under the Valuation Rule and contend they are likely to mis-report because they don't adequately understand many aspects of the new rule and ONRR has failed to provide sufficient guidance to help. While lessees' fears are not unfounded, the threat of civil penalties for mis-reporting is too speculative to amount to irreparable harm. "[T]o satisfy the irreparable harm factor, the [movant] 'must establish both that harm will occur, and that, when it does, such harm will be irreparable.'" *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1251 (10th Cir. 2017) (quoting *Vega v. Wiley*, 259 F. App'x. 104, 106 (10th Cir. 2007) (unpublished)). Lessees' fears of civil penalties for mis-reporting under the new rule may rest in reality, but such fears are too theoretical and abstract to constitute irreparable harm for injunctive relief. An injunction "will not be granted against something merely feared as liable to occur at some indefinite time." *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931). The Court finds lessees' fears of civil penalties count for very little in the irreparable harm analysis.

At the September 4, 2019 hearing, Respondents also noted Petitioners' delay in seeking injunctive relief counters their claims of irreparable harm. "To be sure, our case law dictates that 'delay in seeking preliminary relief cuts against finding irreparable

injury.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (quoting *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social and Rehab. Servs.,* 31 F.3d 1536, 1543–44 (10th Cir. 1994)). And there is some delay at issue here. The Northern District of California issued its order vacating the Repeal Rule on March 29, 2019. Petitioners, who were parties in that case, chose not to seek an appeal in the Ninth Circuit to challenge that order. Instead, more than two months later, on June 12, 2019, they filed petitions for review in this Court to challenge the now-reinstated Valuation Rule. Petitioners then waited more than another month to pursue their joint motion for preliminary injunction, which they filed on July 19, 2019. As in the *RoDa Drilling* and *Kan. Health Care Ass'n* cases, though, the three months of delay here does not substantively alter the irreparable harm analysis. When faced with the Northern District of California's decision, the several Petitioners needed time to consult each other and determine their next steps. Moreover, and more significantly, Petitioners filed their joint motion for preliminary injunction barely a month after ONRR issued its "Dear Reporter" letter on June 13, 2019, which announced that lessees had only until January 1, 2020, to fully comply with the Valuation Rule. (*See* Doc. 23-3.) The delay was not unreasonable and not a consequence of Petitioners sitting on their rights. Therefore, it weighs little against a finding of irreparable harm.

Altogether, lessees' unrecoverable compliance costs suffice to demonstrate irreparable injury, and the Court turns to the remaining requirements for a preliminary injunction.

**2.**     **Petitioners have shown a likelihood of success on the merits only as to the new valuation methodology for federal and Indian coal.**

"The very purpose of an injunction under Rule 65(a) is to give temporary relief based on a preliminary estimate of the strength of plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc. Civ.* § 2948.3 (3d ed.) (Aug. 2019 update). As the Court still lacks the administrative record in this judicial review action, its current estimate of the case is preliminary and should not be taken as conclusive.

Insofar as relevant here, the APA allows a court to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). When reviewing agency action, "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. 706. Agency action is arbitrary and capricious where

> the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## 2.1  Extra-Record Documents

The first issue to consider is the scope of review. Parties on both sides of this case filed attachments from outside the administrative record, including several declarations, and referenced arguments and filings from the Northern District of California. However, when considering the likelihood of success on the merits under the APA, "judicial review

is generally limited to the administrative record." *N. Arapaho Tribe v. Ashe*, 92 F. Supp. 3d 1160, 1170 (D. Wyo. 2015); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

> Reviews of agency action in the district courts must be processed *as appeals.* In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure.

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) (emphasis in original). To that end, Rule 16 of the Federal Rules of Appellate Procedure describes the contents of the administrative record:

> (a) **Composition of the Record.** The record on review ... of an agency order consists of:
> (1)  the order involved;
> (2)  any finding or report on which it is based; and
> (3)  the pleadings, evidence, and other parts of the proceedings before the agency.

Fed. R. App. P. 16(a). The Tenth Circuit has described the few occasions when it may be appropriate to consider something beyond the administrative record:

> A reviewing court may go outside of the administrative record only for limited purposes. For example: Where the administrative record fails to disclose the factors considered by the agency, a reviewing court may require additional findings or testimony from agency officials to determine if the action was justified, *Overton,* 401 U.S. at 420, 91 S.Ct. at 825; or where necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position, *Thompson v. United States Dept. of Labor,* 885 F.2d 551, 555 (9th Cir.1989); or where necessary to explain technical terms or complex subject matter involved in the action, *Animal Defense Council v. Hodel,* 867 F.2d 1244, 1244 (9th Cir.1989), and *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988).

*Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision*, 934 F.2d 1127, 1137–38 (10th Cir. 1991). None of the parties contend any of these limited reasons for looking beyond the administrative record exist in this case, and, at least at this early stage of litigation, the Court does not find the circumstances currently suggest a need to consider extra-record documents. Therefore, in considering the likelihood of Petitioners' success on the merits, the Court will not consider any documents or court filings that were not before ONRR in July 2016 when it published the Valuation Rule in final form.[5]

### 2.2   As to federal oil and gas, Petitioners have not shown the Valuation Rule is likely to be found to exceed the Department of Interior's statutory authority.

Petitioners challenge the Valuation Rule as exceeding ONRR's Congressionally-delegated authority (Doc. 23 at p. 19), though they provide little detailed argument on this issue. "Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)).

Congress empowered the Secretary of the Interior to lease federal lands containing deposits of coal, oil, and gas (among other resources), 30 U.S.C. § 352, as well as areas of the Outer Continental Shelf containing gas and oil deposits, 43 U.S.C. § 1334. Congress

---

[5] In contrast, the Court did consider all the parties' submissions, including the extra-record documents, when examining the irreparable harm factor because the alleged irreparable harm necessarily arises after the agency action and is likely better understood or measured post-hoc.

also required the Secretary to collect royalties and other "receipts" owed to the United States on those leases. 30 U.S.C. § 360; 30 U.S.C. § 1711; 30 U.S.C. § 1751. Indeed, Congress sought "to clarify, reaffirm, expand and define the authorities and responsibilities of the Secretary of the Interior to implement and maintain a royalty management system for oil and gas leases on Federal lands, Indian lands, and the Outer Continental Shelf." 30 U.S.C. § 1701(b)(2). The Secretary is statutorily authorized to "prescribe such rules and regulations as are necessary" to carry out those duties. 30 U.S.C. § 359; 43 U.S.C. § 1334; 30 U.S.C. § 1751. The Court finds no ambiguity in Congress' mandate and simply applies it accordingly here. *See Ukeiley v. United States Envtl. Prot. Agency*, 896 F.3d 1158, 1163–64 (10th Cir. 2018) ("Under *Chevron*, we first consider if Congress has directly spoken to the precise question at issue and, if so, we apply the statute's plain meaning and the inquiry ends.") (internal quotation marks omitted).

Congress placed a great deal of responsibility in the Secretary of the Interior to administer federal and Indian leases and collect accurate royalties owed on those leases. Proportionate to that responsibility, Congress provided the Secretary a wide latitude of discretion in enacting rules and regulations enabling the Department of Interior to complete the tasks it has been assigned. *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039-40 (D.C. Cir. 2002) (under mineral leasing statutes Congress granted Department of Interior rather sweeping authority to proscribe necessary and proper rules and regulations and to do any and all things necessary to carry out the purposes of the leasing statutes, including determining the methods by which royalties are calculated); *see also Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1033 (D.C. Cir. 2008) ("In the Federal Oil

and Gas Royalty Management Act, the Secretary of the Interior was instructed by Congress to create a comprehensive inspection, collection, accounting, and auditing system to ensure that the government receives the royalties owed."). "Congress enacted the Federal Oil and Gas Royalty Management Act ('FOGRMA') in 1983 to strengthen the ability of the Secretary of the Interior ('Secretary') to collect oil and gas royalties by developing a comprehensive system of royalty management in order properly to collect and account for all royalties." *Shell Oil Co. v. Babbitt*, 125 F.3d 172, 174 (3d Cir. 1997) (citing 30 U.S.C. §§ 1701 *et seq.*). Excluding the new valuation methodology for federal and Indian coal (discussed separately below), Petitioners have not presented any convincing argument or evidence showing the Valuation Rule exceeded the Secretary's statutory authority. Thus, Petitioners have not shown a likelihood of success on this argument as it applies to federal oil and gas valuations.

### 2.3    As to federal oil and gas, Petitioners have not shown the Valuation Rule is likely to be found arbitrary and capricious.

The U.S. Supreme Court has explained the arbitrary and capricious standard as follows:

> Under what we have called this "narrow" standard of review, we insist that an agency "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). We have made clear, however, that "a court is not to substitute its judgment for that of the agency," *ibid.,* and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir. 1988)).

In brief, under the new Valuation Rule, federal oil is first valued according to the lessee's or affiliate's arm's-length sales of the commodity. 81 Fed. Reg. at 43373 (new 30 C.F.R. § 1206.101). If there is no associated arm's-length sale, then the lessee can use certain averages or region-specific marketplace spot prices to value their oil. 81 Fed. Reg. at 43373-74 (new 30 C.F.R. § 106.102). Finally, if ONRR determines the oil value is unreasonable (regardless of whether it is sold under an arm's-length agreement), e.g., the spot price is unreasonably low, ONRR holds the discretion to value the oil based on its consideration of several factors. 81 Fed. Reg. at 43375 (new 30 C.F.R. § 1206.105).

Federal gas valuations follow a similar path. It is valued according to the first arm's-length contract for sale. 81 Fed. Reg. at 43380-82 (new 30 C.F.R. §§ 1206.141 (unprocessed gas), 1206.142 (processed gas)). Where there is no applicable arm's-length sale, unprocessed gas and residue gas (when processed) are valued according to the published bidweek price reported at associated index pricing point(s), while natural gas liquids (NGLs) are valued based on published commercial price bulletins. 81 Fed. Reg. at 43381-82 (new 30 C.F.R. §§ 1206.141(c) (unprocessed gas), 1206.142(d) (residue gas and NGLs after processing). If these methods are unavailable, ONRR again has discretion to

value the gas based on its consideration of several factors. 81 Fed. Reg. at 43383 (new 30 C.F.R. § 1206.144.

At this early stage of the litigation, the available record evidence demonstrates ONRR examined the relevant data and articulated a satisfactory explanation for changing the method used to value oil and gas produced from federal leases when calculating royalties. To begin with, in the "Background" section of the Proposed Rule, ONRR explained the impetus behind the proposed changes was a 2007 report from the Subcommittee on Royalty Management titled *Mineral Revenue Collection from Federal and Indian Lands and the Outer Continental Shelf.* 80 Fed. Reg. at 608. The next section then offered a brief overview of the proposed changes. *Id.* at 609-10. The subsequent 32 pages provided a detailed section-by-section explanation of the proposed changes, ONRR's reasons behind each change, and ONRR's calculations of revenue and costs under the proposed rule. *Id.* at 610-42. The final 33 pages of this publication sets forth the proposed new text of each provision in 30 C.F.R. Parts 1202 and 1206. *Id.* at 642-75.

During an extended public comment period on the Proposed Rule, ONRR "received more than 1,000 pages of written comments from over 300 commenters and over 190,000 petition signatories." 81 Fed. Reg. at 43338. The published Valuation Rule spent 21 pages summarizing the comments received and responding to them, explaining why some comments and suggestions were adopted while others rejected. *Id.* at 43338-59; *see, e.g., id.* at 43342 (noting ONRR modified the definition of "area" based on comments received), *id.* at 43346 (noting ONRR reworded a paragraph in 30 C.F.R. § 1206.141(b) based on confusion expressed by commenters), *id.* at 43348 (noting ONRR added a new paragraph

(d) to 30 C.F.R. § 1206.141 based on comments received), *id.* at 43351 (noting ONRR added a new paragraph (e) to 30 C.F.R. § 1206.142 based on comments received). The published final rule then spent nine pages under the subheading "Procedural Matters" explaining how it calculated the anticipated costs, savings, and benefits for the various parties involved resulting from the rule changes.

In general, starting with the advanced notices of proposed rulemaking published in 2011 through the Proposed Rule in 2015 and final Valuation Rule in 2016, the available evidence suggests ONRR examined the relevant data, solicited and considered public comments, and offered satisfactory explanations supporting its decisions to change how federal oil and gas is valued when calculating royalties. Petitioners offered some focused criticism of ONRR's actions, which the Court will address briefly.

Petitioners argue, "The ill-conceived Rule is the fruit of an administrative process that ignored key legal and economic concerns. Despite Petitioners' and other affected parties' voluminous comments on the Rule as proposed, the final Rule was basically *unchanged*." (Doc. 23 at p. 19 (emphasis in original).) There is no requirement that an agency adopt comments or suggestions during proposed rulemaking. Instead, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). As already recounted and documented, ONRR did so here with regard to oil and gas.

Petitioners also take issue with the Valuation Rule's "default" provision. (Doc. 23 at pp. 20-23.) In brief, the default provision allows ONRR to decide the value of a lessee's oil, gas, or coal for royalty purposes if ONRR determines the lessee's valuation did not

conform to the final Valuation Rule's requirements. 81 Fed. Reg. at 43374-75 (new 30 C.F.R. §§ 1206.104, 1206.105 (oil)); 81 Fed. Reg. at 43382-83 (new 30 C.F.R. §§ 1206.143, 1206.144 (gas)); 81 Fed. Reg. at 43390-91 (new 30 C.F.R. §§ 1206.253, 1206.254 (federal coal)); 81 Fed. Reg. at 43396-97 (new 30 C.F.R. §§ 1206.453, 1206.454 (Indian coal)). These provisions certainly give ONRR a great deal of discretion, a point with which ONRR agrees. *See* 80 Fed. Reg. at 614 ("under proposed § 1206.105, ONRR has the authority and responsibility to establish the reasonable value of production for royalty purposes and possesses considerable discretion in determining that value").

> But in the mineral leasing statutes Congress has granted rather sweeping authority "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the leasing statutes]." 30 U.S.C. § 189 (federal lands); see also 25 U.S.C. §§ 396, 396d (tribal lands); 43 U.S.C. § 1334(a) (outer Continental shelf). These "purposes," of course, include the administration of federal leases, which involves collecting royalties and determining the methods by which they are calculated. See *California Co. v. Udall,* 296 F.2d 384, 387–88 (D.C.Cir.1961); see also *Independent Petroleum Association v. Babbitt,* 92 F.3d 1248, 1262 n. 6 (D.C.Cir.1996) (Rogers, J., dissenting) (recognizing that Congress authorized Interior "to prescribe regulations governing mineral leases").

*Indep. Petroleum Ass'n of Am. v. DeWitt,* 279 F.3d 1036, 1039–40 (D.C. Cir. 2002). Petitioners here have made their displeasure with the default provision known, but they have not shown a likelihood of success on the merits because of it. This is particularly true given that prior to the enactment of the Valuation Rule, the regulations already contained several default provisions under which ONRR could determine a resource's value or challenge the value calculated by the lessee. *See, e.g.,* 30 C.F.R. §§ 1206.103(d) (allowing ONRR to "establish reasonable royalty value based on other relevant matters" where

ONRR determines the NYMEX or ANS spot prices were unreasonable in a particular case as to oil not sold under arm's-length contract); 1206.152(f) (allowing ONRR to establish value of unprocessed gas where "ONRR determines that a lessee has not properly determined value"); 1206.153(f) (same as to processed gas); 1206.257(e) (same as to federal coal); 1206.456(e) (same as to Indian coal).

Petitioners also contend the Valuation Rule erroneously requires arm's-length contracts to be in writing and signed by all parties, or the default provision may be triggered to allow ONRR to calculate the value of the fossil fuel. (Doc. 23 at p. 23.) Petitioners feel this is an outdated requirement inconsistent with current procedures and ignores that oral contracts are legally binding. ONRR considered and addressed this issue in its responses to the comments. *E.g.,* 81 Fed. Reg. at 43342. In short, ONRR agreed that oral contracts are legally binding, but noted that oral contracts, and even their written follow-ups (via email exchanges, letters, etc.), significantly impede or even render impossible ONRR's duty to audit lessees' royalty payments. ONRR also responded that requiring written contracts was "a logical evolution of our previous regulations," which "required arm's-length sales contract revisions and amendments to be in writing and signed by all parties." 81 Fed. Reg. at 43342. While this requirement may be unwieldy and problematic for lessees, ONRR has asserted good reasons underlying it. "The Court is not free to second guess or review the *wisdom* of the agency's decision." *Colorado Envtl. Coal. v. Salazar,* 875 F. Supp. 2d 1233, 1243 (D. Colo. 2012) (emphasis in original) (citing *New Mexico ex rel. Richardson v. Bureau of Land Mgt.,* 565 F.3d 683, 704 (10th Cir. 2009)).

Petitioners next attack the loss of certain transportation allowances on oil and gas. (Doc. 23 at pp. 24-27.) The focus of this attack is ONRR's decision to revoke the May 1999 "Guidance for Determining Transportation Allowances for Production from Leases in Water Depths Greater Than 200 Meters" (Deep Water Policy).[6] This policy provided that most subsea movement of oil or gas from subsea manifolds to the first offshore platform facility qualified as a transportation allowance on which lessees did not owe royalty. Canceling the Deep Water Policy means the movement of oil and gas to a platform facility constitutes "gathering" rather than "transportation" and is therefore no longer allowed as a deduction. In the final Valuation Rule publication, ONRR explained its decision on this matter thusly:

> The former Minerals Management Service [ONRR's predecessor] intended for the Deep Water Policy to incentivize deep water leasing by allowing lessees to deduct broader transportation costs than the regulations allowed. ONRR concluded that the Deep Water Policy has served its purpose and is no longer necessary. The regulations still allow offshore lessees to deduct considerable transportation costs to move oil and gas from the offshore platform to onshore markets. Rescinding this policy clarifies the meaning of gathering, which, in turn, provides a more consistent and reliable application of the regulations.

81 Fed. Reg. at 43,340. Further, in the Section-By-Section Analysis of the Proposed Rule, ONRR explained the Deep Water Policy did not comply with its definition of "gathering" and "lessees have taken transportation allowances under the Deep Water Policy, in some instances, for movement ONRR considers non-deductible 'gathering' under its regulations." 80 Fed. Reg. at 624. Accordingly, ONRR rescinded the Deep Water Policy

---

[6] Available at https://www.onrr.gov/Laws_R_D/pubcomm/PDFDocs/990520.pdf.

because it had effected its purpose of encouraging deep water leasing and to more uniformly apply the "gathering" definition to all resources. ONRR examined the relevant data and articulated a satisfactory explanation for its action. An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television Stations*, 556 U.S. at 515 (emphases in original). That standard appears to be satisfied here. And to the extent Petitioners also challenge the Valuation Rule's caps on transportation and processing allowances (*see* Doc. 23 at 24-26), the same analysis and result hold true.

Petitioners conclude by attacking the valuation methods assigned to federal and Indian coal leases. (Doc. 23 at pp. 27-33.) The Court will consider the issues related to coal valuation separately. Suffice it to say that, as it stands now, the Court is not convinced Petitioners are likely to succeed on their claim that the new oil and gas valuation provisions are arbitrary or capricious.

### 2.4 As to federal and Indian coal, Petitioners have shown the Valuation Rule is likely to be found arbitrary and capricious or beyond statutory authority

The new valuation procedures applying to coal require a slightly different analysis, and the Court shares in some of Petitioners' very serious concerns.

In general, the Valuation Rule demands lessees to value the natural resources based on the first arm's-length sale. "The Department of the Interior has long held the view that the prices agreed to in arm's-length transactions are the best indication of market value."

76 Fed. Reg. 30878, 30879. Sometimes though, particularly where coal cooperatives are involved and vertical integration is extensive, coal is burned at a power plant to generate electricity before there is any true arm's-length sale. In such a situation, "the value of the coal subject to this section, for royalty purposes, is the gross proceeds accruing to you for the power plant's arm's-length sales of the electricity less" applicable deductions. 81 Fed. Reg. at 43390 (new 30 C.F.R. § 1206.252(b) (federal coal)); 81 Fed. Reg. at 43396 (new 30 C.F.R. 1206.452(b) (Indian coal)). Thus, when an earlier arm's-length sale is not available, the Valuation Rule requires federal and Indian coal lessees to value their coal based on the sale of electricity generated from burning that coal.

Several problems are inherent in valuing coal based on the sale of electricity, but the Court will only discuss two of the more glaring problems to serve as examples. First, "an electricity utility's power supply portfolio typically includes a range of options, from nuclear to coal to natural gas to hydro, wind, and solar." Jim Rossi, *The Shaky Political Economy Foundation of a National Renewable Electricity Requirement*, 2011 U. Ill. L. Rev. 361, 369 (2011). The electricity sold to consumers is generated from multiple sources, not just coal. Thus, the sales price of the electricity is comprised of much more than just the cost of coal, and that's ignoring the rabbit hole that is electricity sales regulation by both the federal and state governments. Trying to value coal based on the sale of electricity is akin to valuing wheat based on the sale of a cake; there may be a relationship between the two, but it is weak and several other factors potentially play a much larger role in determining the sales price of the end product. In response to comments, ONRR noted, "Opponents argued that valuing coal using electric sales was a

violation of the MLA, ignored and oversimplified the complexities of electric markets and contracts, and was administratively burdensome." 81 Fed. Reg. at 43355. While ONRR refuted it was in violation of the Mineral Leasing Act, citing 30 U.S.C. § 207, ONRR offered no response to the contention that it ignored and oversimplified the complexities of electric markets. Moreover, at the September 4, 2019 hearing, none of the parties could articulate how this provision could be applied to extract the value of the coal from the sale of electricity, a highly-regulated commodity.

Second, coal delivered to a power plant may sit in storage and not be burned to generate electricity until well after the lessee is required to report the value of that coal to ONRR for royalty-calculation purposes. *See Herman v. Associated Elec. Co-op., Inc.*, 172 F.3d 1078, 1088 (8th Cir. 1999) ("The refuse and coal was screened, sized, crushed, and stored until it was fed into boilers to produce electricity and steam."). This renders it impossible to value the coal based on the sales price of electricity because there's no relationship between the two at the time the report to ONRR is due. This further creates the issue of whether ONRR is in fact requiring "payment of a royalty … of not less than 12 ½ per centum of *the value of coal*," 30 U.S.C. § 207(a) (emphasis added), or, contrary to ONRR's statutory authority, requiring payment of royalty based upon the value of electricity.

Thus, at this preliminary stage of the proceedings, the Court agrees with Petitioners that the provision in the Valuation Rule requiring lessees to value coal based on the gross proceeds of electricity sales (when there is no prior arm's-length sale) is likely to be found contrary to law or arbitrary and capricious on the merits, at least based on this initial

assessment. Basing the value of coal on the sales prices of electricity and failing to discuss the serious complications and complexities suggests ONRR either exceeded its statutory authority, failed to consider an important aspect of the problem, contradicts the evidence before the agency, or is so implausible that it cannot be explained by a difference in view or the product of agency expertise. Accordingly, the Court will consider the final two preliminary injunction factors in relation to the new coal-valuation methodology.

3. **Threat of Irreparable Harm versus Harm of Preliminary Injunction to the Opposing Party (Balance of Equities)**

The balance of equities weighs in favor of preliminarily enjoining the Valuation Rule's new methodology for valuing federal and Indian coal. Staying the Valuation Rule as it applies to coal royalties would not impose a significant burden on either the lessees or ONRR. And if the Court is wrong and ONRR prevails on the merits, then the lessees are capable of re-reporting past reports and complying with the new rule, including paying any interest owed for underpayment of royalties during the pendency of the litigation. 30 U.S.C. § 1721(a), (h).

In contrast, if the coal lessees prevail on the merits without a preliminary injunction, then the burden placed on coal lessees to conform to the Valuation Rule during this litigation and then to revert to the old system is immense, consisting of both the unrecoverable compliance costs discussed earlier as well as lost interest on any royalty overpayments. *See* Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94, § 32301 (2015) (amending 30 U.S.C. § 1721 to eliminate ONRR's obligation to pay interest on royalty overpayments).

In light of Petitioners' likelihood of success on the merits concerning the new coal valuation methodology, there's a much greater risk of irreparable harm to coal lessees if a preliminary injunction is denied than to ONRR if a preliminary injunction is granted. The balance of harms weighs in Petitioners' favor.

## 4.    Adverse Effect on the Public Interest

The public has an interest in the accurate and timely collection of royalties owed for the development of fossil fuels on federal and Indian lands. That interest would not be adversely affected if a preliminary injunction was issued in this case. Much of the same reasoning from the balance-of-equities factor applies here. If the new rule's coal-valuation methodology is upheld on its merits, ONRR and the public will be made whole because coal lessees will be required to submit any underpayment along with interest. And in the interim, royalties under the pre-2016 methodology will continue to be owed and collected. Therefore, this factor also supports Petitioners' request for preliminary injunction, at least as to the Valuation Rule's effects on coal royalties.[7]

## 5.    Scope of Preliminary Injunction

The question now concerns the scope of the preliminary injunction. Petitioners have not shown that all provisions of the Valuation Rule pertaining to coal are likely to be found arbitrary and capricious. For example, the final rule contemplates basing the value of coal on the first arm's-length contract where available. *See* 81 Fed. Reg. at 43390 (new 30

---

[7] For largely similar reasons, the final two factors also weigh in favor of a preliminary injunction as to the new methodologies for valuing oil and gas for royalty calculations. However, a preliminary injunction cannot lie where Petitioners have not shown a likelihood of success on the merits. *See Diñe Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) ("each of these elements is a prerequisite for obtaining a preliminary injunction").

C.F.R. § 1206.252(a) (federal coal)); 81 Fed. Reg. at 43396 (new 30 C.F.R. § 1206.452(a) (Indian coal)). This valuation methodology is unlikely to be found arbitrary and capricious on the merits because an arm's-length sale has been historically accepted as an accurate measurement of an item's value. The primary problem with the new valuation methodology for coal is requiring it to be valued based on the sales price of a different commodity (electricity) where an arm's-length sale of the coal does not otherwise exist.

The Court is therefore tempted to preliminarily enjoin only the subsections that contemplate using electricity sales to value coal. However, this would appear to cause more problems than it solves because the entire new methodology has been re-written based on new definitions, including what constitutes an arm's-length transaction. 81 Fed. Reg. at 43369 (new 30 C.F.R. § 1202.20). Applying new definitions to the old valuation methodology invites confusion, complications, errors, and further litigation. Consequently, the Court finds the only concrete way to ensure the status quo during the pendency of the litigation is to enjoin the Valuation Rule's application as to all facets of coal valuation. The pre-2016 valuation methodologies for coal shall continue to control during this litigation.

## CONCLUSION AND ORDER

Petitioners have established the four elements for a preliminary injunction preventing the final Valuation Rule from applying to coal valuations during the pendency of this action. Therefore, a preliminary injunction will issue, but only as to federal and Indian coal royalties. Petitioners have not shown a likelihood of success on the merits as to their challenge to the Valuation Rule's new methodologies for valuing oil and gas. The

findings and conclusions set forth herein "do not constitute a determination on the merits, but are preliminary findings in the context of the limited evidence presented at the hearing for a preliminary injunction." *CBM Geosolutions, Inc. v. Gas Sensing Tech. Corp.*, 2009 WY 113, ¶ 13, 215 P.3d 1054, 1060 (Wyo. 2009).

**IT IS THEREFORE ORDERED** that Petitioners' Joint Motion for Preliminary Injunction (Doc. 22) is hereby **GRANTED IN PART AND DENIED IN PART**. The 2016 *Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform Rule*, 81 Fed. Reg. 43338, is enjoined from applying or taking effect as to federal and Indian coal valuations during the pendency of this action.[8] Instead, the pre-2016 valuation methodologies applicable to coal shall continue to govern during this litigation. However, the 2016 Valuation Rule is <u>not</u> enjoined as to the new valuation methodologies for federal oil and gas.

**IT IS FURTHER ORDERED** that Petitioners need not post a bond or security.[9]

**DATED:** October ___8Th___, 2019.

Scott W. Skavdahl
United States District Judge

---

[8] This preliminary injunction shall apply nationwide. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409–10 (D.C. Cir. 1998) ("when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed"); *Earth Island Inst. v. Ruthenbeck,* 490 F.3d 687, 699 (9th Cir. 2007), *rev'd on other grounds,* 555 U.S. 488 (2009) (nationwide scope of injunction compelled by APA where agency action found to be unlawful).

[9] District courts have wide discretion in determining whether to require security under F.R.C.P. 65(c). *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1215 (10th Cir. 2009). Having determined there is no likelihood of harm to Respondents, the Court finds an injunction bond is unnecessary in this case. *See Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir. 1987).