Walter F. Eggers, III, WSB No. 6-3150
HOLLAND & HART LLP
2515 Warren Ave., Suite 450
Cheyenne, WY 82003-1347
Phone: (307) 778-4200
weggers@hollandhart.com

John F. Shepherd, *pro hac vice*
Tina Van Bockern, *pro hac vice*
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Phone: (303) 295-8000
jshepherd@hollandhart.com
trvanbockern@hollandhart.com
*Attorneys for Petitioner Cloud Peak Energy Inc.*

R. Kirk Muller, WSB No. 5-2420
Gail L. Wurtzler, *pro hac vice*
Kathleen C. Schroder, *pro hac vice*
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Phone: (303) 892-9400
*Attorneys for Petitioner Tri-State Generation and Transmission Ass'n Inc.*

Keith S. Burron, WSB No. 5-2884
The Burron Firm, P.C.
1695 Morningstar Road
Cheyenne, WY 82009
Phone: (307) 631-7372
keith@burronlaw.com

Peter J. Schaumberg, *pro hac vice*
James M. Auslander, *pro hac vice*
BEVERIDGE & DIAMOND, P.C.
1350 I St., N.W., Suite 700
Washington, DC 20005
Phone: (202) 789-6009
pschaumberg@bdlaw.com
jauslander@bdlaw.com
*Attorneys for Petitioners American Petroleum Institute, National Mining Association, and Wyoming Mining Association*

Rex E. Johnson, WSB No. 5-1845
Brian D. Artery, WSB No. 7-4819
SHERARD, SHERARD, ARTERY & JOHNSON
602 10th Street
Wheatland, WY 82201
Phone: (307) 322-5555
rex@ssjwyolaw.com
bartery@ssjwyolaw.com
*Attorneys for Petitioners Basin Electric Power Cooperative and Western Fuels Wyoming, Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| AMERICAN PETROLEUM INSTITUTE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | Case No. 19-cv-120-S |
| | ) | [and Related Case Nos. 19-cv-121-S |
| | ) | and 19-cv-126-S] |
| | ) | |
| Respondents. | ) | |

---

## PETITIONERS' JOINT OPENING BRIEF

---

# **TABLE OF CONTENTS**

INTRODUCTION ..............................................................................1

INTERESTS OF THE PETITIONERS .................................................5

LEGAL BACKGROUND ....................................................................9

   A.   Royalty Valuation Must Be Established at the Lease, Not at a Market Downstream from the Lease After Value Is Enhanced. ..............................9

   B.   Lessees' Arm's-Length Contract Prices for Oil, Gas, and Coal Generally Are the Best Indicator of Royalty Value..................................16

   C.   A Netback Valuation Method Should Only Be a Last Resort. ..................19

   D.   Lessees Have the Principal Responsibility to Perform Royalty Valuation. ..........................................21

PROCEDURAL HISTORY.................................................................24

STANDARD OF REVIEW .................................................................32

ARGUMENT .....................................................................................35

I.  The 2016 Rule's Oil and Gas Provisions Should Be Vacated..........................35

   A.   ONRR Arbitrarily Reversed Itself to Convert Offshore Subsea Bulk Transportation of Oil and Gas into Non-Deductible "Gathering."............35

   B.   The Rule Arbitrarily Denies Allowances for Lessees' Reasonable, Actual, and Necessary Transportation and Processing Costs. ..................45

   C.   The Rule Exacts Arbitrary Premiums to Use the Index Option to Value Gas.........................................50

   D.   The Rule Disregards Valid Sales, Transportation, and Processing Contracts..........................................54

II. The 2016 Rule's Coal Provisions Should Be Vacated. ......................................59

   A.   The Rule Unlawfully Values Coal Based on Sales Prices for Electricity...60

       1.   The 2016 Rule Unlawfully Departs from the Mineral Leasing Act and Well-Established Valuation Principles When It Values Coal by Using Sales Prices for Electricity. ....................................60

       2.   A Netback from Electricity Sales is Functionally Impossible to Perform..........................................63

i

      3.      ONRR's Determination that Coal Should be Valued Using the Price of Electricity Lacks Factual Support. ...................................65

      4.      The Requirement to Value Coal by Using Prices of Electricity Violates Due Process........................................................................67

  B.    The Rule's Mandate that Coal Lessees Chase Gross Proceeds to Distant Sales Points for Valuation Is Arbitrary and Unworkable. ........................69

  C.    The 2016 Rule Arbitrarily Treats Members of Coal Cooperatives as Affiliates.................................................................................................77

  D.    The Provision for Valuing Non-Arm's-Length Sales by Coal Lessees Is Impermissibly Vague and Violates the MLA. ...........................................81

  E.    The Allowances Afforded to Coal Lessees Are Arbitrary and Unlawful...84

      1.      The Coal Transportation Allowances Are Impermissibly Vague. ....................................................................................85

      2.      The 2016 Rule Arbitrarily Adopts Generation and Transmission Allowances Developed for Geothermal Resources. ....................................................................................86

III. The Rule's Default Provisions Are Unlawful and Undermine the Rule's Stated Purposes. ....................................................................................................88

CONCLUSION ......................................................................................................96

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                     **Page(s)**

*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*,
    226 F.3d 1138 (10th Cir. 2000) ...........................................................................61

*Arco Oil and Gas Co.*,
    109 IBLA 34 (1989) ...........................................................................................13

*Becerra v. U.S. Dep't of the Interior*,
    276 F. Supp. 3d 953 (N.D. Cal. 2017) ........................................................ 27, 28

*BHP Biliton Petroleum (Americas) Inc.*,
    ONRR-11-0015-OCS, 2012 WL 8451081 (Oct. 26, 2012) ...............................33

*Black Butte Coal Co. v. United States*,
    38 F. Supp. 2d 963 (D. Wyo. 1999) ...................................................................13

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) ...........................................................................................40

*California Co. v. Udall*,
    296 F.2d 384 (D.C. Cir. 1961)............................................................................43

*Cloud Peak Energy, Inc., v. U.S. Dep't of the Interior*,
    415 S. Supp. 3d 1034 (D. Wyo. 2019) ...................................................... *passim*

*Connally v. Gen. Const. Co.*,
    269 U.S. 385 (1926) ...........................................................................................69

*Cont'l Oil Co. v. U.S.*,
    184 F.2d 802 (9th Cir. 1950) ..............................................................................13

*Ctr. for Food Safety v. Vilsack*,
    718 F.3d 829 (9th Cir. 2013) ..............................................................................31

*Devon Energy Prod. Co. v. Gould*,
    421 F. Supp. 3d 1213 (D. Wyo. 2019) ...............................................................33

*Diné Citizens Against Ruining Our Env't v. Jewell*,
   2015 WL 4997207 (D.N.M. Aug. 14, 2015) ....................................................... 34

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ........................................................................ 34, 62, 66

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .................................................................................. *passim*

*Freeman United Coal Min. Co. v. Fed. Mine Safety & Health Review Comm'n*,
   108 F.3d 358 (D.C. Cir. 1997) .............................................................. 81, 91

*Gen. Elec. Co. v. USEPA*,
   53 F.3d 1324 (D.C. Cir. 1995) ..................................................................... 91

*Humana of Aurora, Inc. v. Heckler*,
   753 F.2d 1579 (10th Cir. 1985) .................................................................. 78

*Indep. Petroleum Ass'n of Am. v. Armstrong*,
   91 F. Supp. 2d 117 (D.D.C. 2000) ....................................................... 13, 75

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996) ..................................................................... 72

*Indep. Petroleum Ass'n of Am. v. DeWitt*,
   279 F.3d 1036 (D.C. Cir. 2002) .................................................................. 13

*Kerr-McGee Corp.*,
   147 IBLA 277 (1999) ............................................................................ 42, 43

*Landgraf v. Usi Film Prods.*,
   511 U.S. 244 (1994) ..................................................................................... 40

*Mobil Exploration & Producing U.S., Inc. v. U.S. Dep't of the Interior*,
   180 F.3d 1192 (10th Cir. 1999) ................................................................. 32

*Montana Power Co. v. Kravik*,
   586 P.2d 298 (Mont. 1978) ......................................................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................... *passim*

*Mountain Side Mobile Estates P'ship v. Sec'y of Housing & Urban Dev.*,
    56 F.3d 1243 (10th Cir. 1995) ...........................................................33

*Murphy Exploration and Prod. Co.*,
    147 IBLA 386 (1998) ........................................................................43

*Olenhouse v. Commodity Credit Corp*,
    42 F.3d 1560 (10th Cir. 1994) ...........................................................32

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................ 33, 34, 38

*Petro-Lewis Corp.*,
    108 IBLA 1989 WL 255495 (1989)....................................................60

*Piney Woods Country Life School v. Shell Oil Co.*,
    726 F.2d 225 (5th Cir. 1984) .............................................................20

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004) .........................................................................40

*Shell Oil Co.*,
    52 IBLA 15 (1981) ...........................................................................13

*Shell Oil Co.*,
    70 I.D. 393 (1963) ...........................................................................13

*State of California v. U.S. Dep't of the Interior*,
    381 F. Supp. 3d 1153 (N.D. Cal. Apr. 12, 2019) ...............................29

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    874 F.2d 1346 (10th Cir. 1989) ...........................................................8

*U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*,
    825 F.3d 674 (D.C. Cir. 2016)............................................................91

*United States v. Gen. Petroleum Corp. of Cal.*,
    73 F. Supp. 225 (S.D. Cal. 1946) ........................................................12

*United States v. AMC Entm't Inc.*,
    549 F.3d 760 (9th Cir. 2008) ...........................................................91

*United States v. Magnesium Corp. of Am.*,
    616 F.3d 1129 (10th Cir. 2010) ........................................................91

*United Techs. Corp. v. U.S. Dep't of Def.*,
    601 F.3d 557 (D.C. Cir. 2010)..........................................................33

## Statutes

5 U.S.C. § 704 ............................................................................32
5 U.S.C. § 705 ............................................................................28
5 U.S.C. § 706(2)(A) .....................................................................32
7 U.S.C. § 901 .............................................................................8
25 U.S.C. § 396, 396(a) .................................................................10
30 U.S.C. § 189 ..........................................................................11
30 U.S.C. § 207(a).............................................................. 10, 60, 83, 89
30 U.S.C. § 226(b)(1)(A) ................................................................10
30 U.S.C. § 1004(a) ......................................................................87
30 U.S.C. § 1701 .................................................................... 10, 11
30 U.S.C. §§ 1711(a), 1711(c)(1) ........................................................11
30 U.S.C. § 1712(a) ......................................................................11
30 U.S.C. § 1719 .........................................................................23
30 U.S.C. § 1720a .......................................................................11
30 U.S.C. § 1721(a) ................................................................. 23, 24
30 U.S.C. § 1724(c)(2) ...................................................................24
43 U.S.C. § 1334(a) ......................................................................11
43 U.S.C. § 1337(a)(1)(A) ...............................................................10

Pub. L. No. 109-58, 119 Stat. 594 (2005)................................................87

## Rules and Regulations

30 C.F.R. § 250.106(e)...................................................................39
30 C.F.R. § 250.1301(c) .................................................................39

30 C.F.R. § 560.202 ................................................................37

30 C.F.R. § 1206.20 .......................................................... *passim*

30 C.F.R. § 1206.20(2)(v)......................................................58

30 C.F.R. § 1206.56 ................................................................48

30 C.F.R. § 1206.102 ..............................................................72

30 C.F.R. § 1206.102(b)(1) ....................................................16

30 C.F.R. § 1206.102(c)(2) (2015) .................................. 21, 96

30 C.F.R. § 1206.102(c)(2)(ii)(A) (2015)................. 19, 22, 95

30 C.F.R. § 1206.102(c)(2)(ii)(B) (2015) ................ 19, 22, 95

30 C.F.R. § 1206.103 ..............................................................95

30 C.F.R. § 1206.104(a)(1) ....................................................93

30 C.F.R. § 1206.104(c)................................................ 57, 92, 96

30 C.F.R. § 1206.104(c)(1) .....................................................92

30 C.F.R. § 1206.104(c)(2) ............................................. 56, 95

30 C.F.R. § 1206.104(g) ................................................. 54, 55

30 C.F.R. § 1206.104(g)(2)......................................................55

30 C.F.R. § 1206.105 ..............................................................89

30 C.F.R. § 1206.109(a)...........................................................90

30 C.F.R. § 1206.109(c)(2) .....................................................46

30 C.F.R. § 1206.110(a)................................................. 14, 48

30 C.F.R. § 1206.110(a)(2) .....................................................14

30 C.F.R. § 1206.110(a)(2)(ii) ................................................45

30 C.F.R. § 1206.110(d) ................................................ 45, 48

30 C.F.R. § 1206.110(d)(1) .....................................................45

30 C.F.R. § 1206.110(d)(2) .....................................................45

30 C.F.R. § 1206.110(f) ...........................................................57

30 C.F.R. § 1206.110(f)(2) ......................................................56

30 C.F.R. § 1206.110(f)(3) ......................................................92

30 C.F.R. § 1206.111(b) ................................................. 75, 86

30 C.F.R. § 1206.111(d) ...........................................................54

30 C.F.R. § 1206.141(c)............................................................50

30 C.F.R. § 1206.141(c)(1)(i) ..................................................51

30 C.F.R. § 1206.141(c)(1)(iv) ....................................... 52, 53

30 C.F.R. § 1206.141(c)(2)........................................................53

30 C.F.R. § 1206.142(d) ................................................. 50, 72

30 C.F.R. § 1206.142(d)(1)(i), (ii) ..........................................51

30 C.F.R. § 1206.142(d)(1)(iv) ....................................... 52, 53

30 C.F.R. § 1206.142(d)(3)........................................................53

30 C.F.R. § 1206.143(a)(1) ......................................................93

30 C.F.R. § 1206.143(c)............................................................65

30 C.F.R. § 1206.143(c)(1) ....................................................................92

30 C.F.R. § 1206.143(c)(1)(ii) ...............................................................51

30 C.F.R. § 1206.143(c)(2) ....................................................................56

30 C.F.R. § 1206.143(c)(3) ....................................................................92

30 C.F.R. § 1206.143(g) ........................................................................54

30 C.F.R. § 1206.143(g)(2) ....................................................................55

30 C.F.R. § 1206.144 ........................................................................ 89, 90

30 C.F.R. § 1206.149(a) .........................................................................90

30 C.F.R. § 1206.152(a)(2) ................................................................ 37, 45

30 C.F.R. § 1206.152(a)(2)(ii) ...............................................................45

30 C.F.R. § 1206.152(c) (2015) ..............................................................17

30 C.F.R. § 1206.152(c) (2) (2015) .........................................................17

30 C.F.R. § 1206.152(e)(1) .....................................................................45

30 C.F.R. § 1206.152(e)(1) (2015) ..........................................................22

30 C.F.R. § 1206.152(e)(2) .....................................................................46

30 C.F.R. § 1206.152(f) (2015) ...............................................................93

30 C.F.R. § 1206.152(g) .........................................................................93

30 C.F.R. § 1206.152(g)(2) ....................................................................56

30 C.F.R. § 1206.152(g)(3) ....................................................................92

30 C.F.R. § 1206.153(b) .........................................................................86

30 C.F.R. § 1206.153(d) .........................................................................54

30 C.F.R. § 1206.154(f) & (g) ................................................................75

30 C.F.R. § 1206.156(c)(3) .....................................................................46

30 C.F.R. § 1206.158(c)(3) (2015) ..........................................................46

30 C.F.R. § 1206.158(d)(2) (2015) ..........................................................45

30 C.F.R. § 1206.159(a) ..................................................................... 14, 48

30 C.F.R. § 1206.159(c)(2) .....................................................................45

30 C.F.R. § 1206.159(c)(3), (c)(4) ..........................................................46

30 C.F.R. § 1206.159(e) .........................................................................57

30 C.F.R. § 1206.159(e)(2) .....................................................................57

30 C.F.R. § 1206.159(e)(3) .....................................................................92

30 C.F.R. § 1206.160(c) .........................................................................54

30 C.F.R. § 1206.172(d)(1)(iii) ...............................................................53

30 C.F.R. § 1206.178(f) & (g) ................................................................86

30 C.F.R. § 1206.251 (2015) ......................................... 15, 61, 66, 73, 78

30 C.F.R. § 1206.252 ......................................................................... 45, 51

30 C.F.R. § 1206.252(a) ................................................. 70, 71, 72, 77, 85

30 C.F.R. § 1206.252(b) .........................................................................82

30 C.F.R. § 1206.252(b), (c) ............................................................. 60, 69

30 C.F.R. § 1206.252(b)(1) .............................................................. 68, 77, 87

30 C.F.R. § 1206.252(b)(2) ................................................................ 77, 81, 82, 84

30 C.F.R. § 1206.252(c) ....................................................................................85

30 C.F.R. § 1206.252(c)(1) ...............................................................................77

30 C.F.R. § 1206.252(c)(2) ...............................................................................77

30 C.F.R. § 1206.253(a)(1) ...............................................................................93

30 C.F.R. § 1206.253(c) ..............................................................................77, 84

30 C.F.R. § 1206.253(c)(1) .........................................................................83, 92

30 C.F.R. § 1206.253(c)(2) ...............................................................................83

30 C.F.R. § 1206.253(c)(3) .........................................................................71, 92

30 C.F.R. § 1206.253(g) ....................................................................................58

30 C.F.R. § 1206.254 ......................................... 71, 77, 82, 83, 89, 90

30 C.F.R. § 1206.257 .........................................................................................84

30 C.F.R. § 1206.257(b) ....................................................................................16

30 C.F.R. § 1206.257(c) (2015) ...................................................................73, 79

30 C.F.R. § 1206.257(c)(2) (2015) ................................. 17, 61, 62, 66, 70

30 C.F.R. § 1206.257(e) (2015) .........................................................................93

30 C.F.R. § 1206.258(a) ..............................................................................77, 81

30 C.F.R. § 1206.258(b) ....................................................................................77

30 C.F.R. § 1206.259(a) ....................................................................................90

30 C.F.R. §§ 1206.260-1206.262 ......................................................................74

30 C.F.R. § 1206.260(g)(2) ...............................................................................58

30 C.F.R. §§ 1206.261(a) ..................................................................................85

30 C.F.R. § 1206.261(c) ....................................................................................58

30 C.F.R. § 1206.267 .............................................................................14, 58, 92

30 C.F.R. § 1206.267(d)(2) ...............................................................................58

30 C.F.R. § 1206.268(c) ....................................................................................58

30 C.F.R. § 1206.353 .........................................................................................87

30 C.F.R. § 1206.354 .........................................................................................87

30 C.F.R. § 1206.452(a) ........................................................................70, 71, 72

30 C.F.R. § 1206.452(b), (c) ........................................................................60, 69

30 C.F.R. § 1206.452(c)(2) ...............................................................................58

30 C.F.R. § 1206.453(c)(3) .........................................................................71, 92

30 C.F.R. § 1206.454 .........................................................................................71

30 C.F.R. § 1206.453(g) ....................................................................................58

30 C.F.R. § 1206.460(g)(2) ...............................................................................58

30 C.F.R. § 1206.460(g)(3) ...............................................................................92

30 C.F.R. § 1206.461(c) ....................................................................................58

30 C.F.R. § 1206.462 .........................................................................................14

30 C.F.R. § 1206.467 .............................................................................14, 92

30 C.F.R. § 1206.468(c) ....................................................................................58

30 C.F.R. § 1206.477(d)(2) ..................................................................58
30 C.F.R. § 1210.201(b) .....................................................................24
30 C.F.R. § 1218.50(a) ........................................................................24
30 C.F.R. § 1218.202 ....................................................................24, 84
30 C.F.R. part 1206 .............................................................................11
30 C.F.R. part 1241 .............................................................................23


52 Fed. Reg. 4,732 (Feb. 13, 1987) ...............................................22, 23
53 Fed. Reg. 1,230 (Jan. 15, 1988) ...............................................13, 16
53 Fed. Reg. 1,184 (Jan. 15, 1988) ............................................... *passim*
53 Fed. Reg. 26,942 (July 15, 1988) ..................................................62
54 Fed. Reg. 354  (Jan. 5, 1989) .................................................. 87, 88
54 Fed. Reg. 1,492 (Jan. 13, 1989) ............................ 16, 17, 19, 20, 62, 66, 94, 95
56 Fed. Reg. 57,256 (Nov. 8, 1991) .............................................. 87, 88
63 Fed. Reg. 38,355 (July 16, 1998) ...................................................41
64 Fed. Reg. 43,506 (Aug. 10, 1999) ..................................................25
64 Fed. Reg. 73,820 (Dec. 30, 1999) ..................................................18
65 Fed. Reg. 14,022 (Mar. 15, 2000) ...................................... 18, 25, 41
73 Fed. Reg. 58,467 (Oct. 7, 2008) .....................................................36
80 Fed. Reg. 608 (Jan. 6, 2015) [AR_80000] ............................... *passim*
80 Fed. Reg. 24,794  (May 1, 2015) ......................................... 15, 25, 48
81 Fed. Reg. 43,338 (July 1, 2016) [AR_73963] ........................... *passim*
82 Fed. Reg. 11,823 (Feb. 27, 2017) ...................................................28
82 Fed. Reg. 36,934 (Aug. 7, 2017) ............................................... 27, 28
85 Fed. Reg. 62,016 (Oct. 1, 2020) .............................................. 29, 31


Fed. R. Civ. P. 41(a)(1)(A)(i) .............................................................28

## Additional Authorities

Jennifer W. Fletcher et al.*, Constructing Power: The Near Term Outlook for Construction of Power Generation Projects in the 21st Century,* 5 No. 2 Am. C. of Construction Laws, J. 4 (2011) ..............................63


Jim Rossi, *The Shaky Political Economy Foundation of a National Renewable Electricity Requirement*, 2011 U. Ill. L. Reg. 361 (2011) .................64


*ONRR Dear Reporter Letter* (June 30, 2020). .........................................69

# INTRODUCTION

In 2016, the Office of Natural Resources Revenue ("ONRR") issued a final regulation purporting to "offer greater simplicity, certainty, clarity, and consistency in product valuation for mineral lessees and mineral revenue recipients," "decrease [the] cost of compliance" for both industry and ONRR, and "provide early certainty to industry and to ONRR that companies have paid every dollar due." Administrative Record ("AR")_73964 ("Rule" or "2016 Rule").[1]  But in reality, the Rule does just the opposite.  Last year, the Court preliminarily enjoined the Rule's provisions for royalty valuation of federal and Indian coal production. *Cloud Peak Energy. Inc., et al. v. U.S. Dep't of the Interior*, 415 F. Supp. 3d 1034, 1053 (D. Wyo. 2019).  The Court also found the Rule's provisions for federal oil and gas royalty valuation satisfied the preliminary injunction elements other than a showing of a likelihood of success on the merits "at this early stage of litigation." *Id.* at 1047.  The Court reserved ultimate judgment on the merits pending receipt of the full administrative record and completion of merits briefing.

Now squarely presented with the merits of the 2016 Rule, the Court should vacate it.  The Rule violates core tenets of royalty valuation stemming from the governing statutes and longstanding agency implementation.  These established principles include the statutory requirement that the value on which royalty is

---

[1] For ease of reference, we use the prefix "AR" instead of "2016VR_AR_ONRR."

owed must be determined at the lease or mine; the sanctity of arm's-length contract sales prices to establish royalty value; the inherent unreliability of netback methods; and lessees' need for certainty in valuing their production.  Other agency reversals within the Rule are sudden, unexplained, and arbitrary.

Nor does the administrative record help ONRR.  Though ONRR consumed nearly a year to prepare and lodge it, the administrative record is devoid of evidence or analysis supporting the Rule.  It instead principally consists of public comments, non-substantive communications, and duplicate files.

The Rule's oil and gas royalty valuation provisions jettison decades of agency practice and instead insert blanket denials of royalty valuation methodologies and allowances, impose arbitrary and baseless valuation requirements, and institute standardless ONRR discretion to determine value. Without support, the Rule decrees that all bulk oil and gas transportation in the unique offshore environment now constitutes non-deductible "gathering," even retroactively for lessees that had invested billions of dollars in deepwater offshore development in reliance on established transportation allowances for such movement.  The Rule also impermissibly extracts additional royalty from lessees via hard caps on allowances regardless of a lessee's reasonable, actual costs to deliver oil and gas to market and to process gas.  Further, to avail themselves of the Rule's index option for royalty valuation of gas, lessees must pay an arbitrary

2

inflated premium, divorced from the value of the resource and the destinations to which gas actually flows. The Rule's "default provisions" and numerous associated triggers enable ONRR to second-guess lessee valuations in myriad circumstances where ONRR may disagree with a lessee's valuation, even where lessees have substantially complied with the valuation regulations. They also allow ONRR to interject its black-box valuation utilizing factors inaccessible or prohibited for lessees' use, rather than rationally directing lessees to correct any errors under the applicable regulatory valuation standards. The Rule also inexplicably deems any contract or amendment that is not physically signed by all parties as invalid.

Regarding federal and Indian coal valuation, the Rule's provisions are arbitrary and capricious and *ultra vires* as the Court has previously indicated.[2] Nothing in the Rule or the administrative record warrants a different conclusion now. ONRR offers no factual or legal justification for valuing coal based on sales of electricity, an entirely different commodity. And, nothing in the record evidences that ONRR knows how, as a practical matter, to determine the value of coal based on sales of electricity. Moreover, for other dispositions of coal, the Rule uniquely forces federal and Indian coal lessees into a universal work-back

---

[2] Unless otherwise indicated, all points raised herein concerning the federal coal valuation regulations apply equally to the corresponding valuation regulations for Indian coal, the operative provisions of which substantially mirror each other.

valuation methodology starting with the lessee's or its affiliate's first arm's-length sale for the coal no matter where in the world that sale may occur—without any option to elect an objectively-determinable and simpler alternative valuation method.  The Rule also singles out coal cooperatives for arbitrary special valuation standards.  The Rule's coal provisions on "default" valuation by ONRR, fully signed written contracts, and other topics fail for similar reasons as the Rule's analogous provisions for oil and gas.  Consistent with the Court's preliminary injunction, the Rule's coal-related provisions are inextricably intertwined, and should be fully vacated.

The Rule inflates royalty demands beyond what is reasonably, and legally, due from lessees based on the value of their production at or near their leases. With no reasoned basis, the Final Rule upends a longstanding valuation system and replaces it with widespread uncertainty and unconstrained agency "discretion." This outcome places lessees in an untenable position for reporting and paying their royalties.  That is why even the agency repeatedly has sought to undo the Rule ever since its issuance, and for good reason.  To be sure, ONRR's own view remains that most of the Rule should not stand.  The only parties in this case that want to preserve the Rule in its entirely are the Intervenors, which report and pay no royalty and advocate for additional burdens on industry.  By contrast, the legality of the pre-2016 regulatory system under the governing statutes has never been

questioned.  The Court thus should vacate the Rule and reinstate those well-understood preexisting regulations.

## <u>INTERESTS OF THE PETITIONERS</u>

The American Petroleum Institute ("API") is a national trade association that represents over 600 members involved in all aspects of the oil and natural gas industry, including the exploration and production of both onshore and offshore resources.  API's members include large integrated companies, as well as exploration and production, refining, marketing, pipeline, and marine businesses, and service and supply firms.  They provide most of the nation's energy.  The U.S. oil and natural gas industry supports 9.8 million U.S. jobs and more than 8 percent of the U.S. economy. The industry has paid more than $150 billion in royalty revenues to the federal treasury.  Several of API's members operate leases on federal and Indian lands with royalty obligations in Wyoming, other states, and on the Outer Continental Shelf ("OCS").  API, on behalf of its members, actively participated in the rulemaking process for the Rule.  API also has been an active participant in other ONRR regulatory actions and related litigation regarding valuation of oil and gas production for royalty purposes.  *See* API Pet. for Review of Final Agency Action, No. 19-cv-121-SWS (consolidated with Nos. 19-cv-120-

SWS and 19-cv-126-SWS), ECF No. 1 (June 13, 2019); Decl. of Erik Milito, ECF No. 23-4 at 3 (July 19, 2019).[3]

The National Mining Association ("NMA") is a national trade association representing America's mining industry, including every major coal company operating in the United States. NMA's members are producers of most of America's coal, metals, and industrial and agricultural minerals; manufacturers of mining and mineral processing machinery and supplies; transporters; financial and engineering firms; and other businesses related to mining. A significant number of NMA's members operate coal leases on federal and Indian lands, many of which are in Wyoming, with royalty obligations within ONRR's purview. *See* Cloud Peak Energy, et al. Pet. for Review of Final Agency Action, No. 19-cv-120-SWS, ECF No. 1 at 3-4 (June 12, 2019); Decl. of Katie Sweeney, ECF No. 23-5 (July 19, 2019).  Like API, NMA has actively participated in regulatory developments and litigation regarding the Rule and other ONRR actions on royalty valuation.

The Wyoming Mining Association ("WMA") is a regional trade organization representing the interests of coal producers and other mining companies operating in the State of Wyoming.  These areas include the Powder River Basin, which is the single largest source of coal nationally.  WMA promotes

_____

[3] Since filing his declaration, Mr. Milito has left API to become President of the National Ocean Industries Association.  His declaration remains accurate on behalf of API.

the interests of its members, including in the present and future economic viability of the coal industry and in the consistent, rational, and prudent regulation of that industry by ONRR and other agencies. *See* Cloud Peak Energy, et al. Pet. for Review of Final Agency Action, No. 19-cv-120-SWS, ECF No. 1 at 4; Decl. of Travis Deti, ECF No. 23-6 (July 19, 2019). WMA has commented on and litigated the Rule and other ONRR actions alongside NMA and API.

Cloud Peak Energy Inc. ("Cloud Peak") has historically been one of the largest and safest producers of low sulfur, high quality subbituminous coal in the United States. *See* Cloud Peak Energy, et al. Pet. for Review of Final Agency Action, No. 19-cv-120-SWS, ECF No. 1 at 3; Decl. of Matthew Adams, ECF No. 23-7 (July 19, 2019). On May 10, 2019, Cloud Peak, along with certain of its affiliates, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware. *See In re Cloud Peak Energy Inc., et al., Debtors*, No. 19-11047-CSS, ECF No. 1 (Del. Bankr. May 10, 2019). On October 24, 2019, the Navajo Transitional Energy Company, LLC ("NTEC") acquired all rights, title, and interests of Cloud Peak, including Cloud Peak's three Powder River Basin coal mines (two in Wyoming and one in Montana), which have been mining and shipping coal since the mid-1970s and have received awards for their commitment to safety and environmental compliance and initiatives. *See In re Cloud Peak Energy Inc.*, No. 19-11047-CSS, ECF No. 759 (Del. Bankr. Oct. 24, 2019). Before

7

October 24, 2019, Cloud Peak also provided logistics services to some of its domestic and international customers, which required Cloud Peak to incur substantial risk and costs wholly distinct from its coal mining business. Today, NTEC's mines continue to sell coal to both domestic and international customers.

Tri-State Generation and Transmission Association, Inc. ("Tri-State"), Basin Electric Power Cooperative ("Basin") and Western Fuels-Wyoming, Inc. ("WFW") fall within ONRR's definition of "coal cooperatives" in the 2016 Rule. These Petitioners were all formed as a result of the Rural Electrification Act, 7 U.S.C. §§ 901, *et seq.*, enacted in 1936 to facilitate provision of affordable electricity to rural America. *See, e.g., Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1348-51 (10th Cir. 1989) (court recounted Act's history and legislative purpose). Tri-State is a not-for-profit wholesale electric cooperative whose power supply portfolio includes a diverse mix of renewable and nonrenewable fuel sources including coal from federal leases. AR_73486.[4] It is cooperatively owned by more than forty not-for-profit rural electric distribution cooperatives and public power districts serving rural consumers spread over approximately 200,000 square miles in Colorado, Nebraska, New Mexico, and Wyoming. *Id.* Basin is a member-owned generation and transmission cooperative that provides wholesale electricity to its 138

---

[4] For ease of reference, we use the prefix "AR" instead of "2016VR_AR_ONRR."

distribution cooperative members in Colorado, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, South Dakota, and Wyoming.  AR_1478. These distribution cooperatives in turn provide electricity to their members (approximately three million customers).  *Id.*  WFW is a Wyoming single member cooperative that owns and operates the Dry Fork Mine which produces coal from federal and state leases in Wyoming.  *See* Tri-State, et al. Pet. for the Review of Final Agency Action, No. 19-cv-126-SWS (consolidated with Nos. 19-cv-120-SWS and 19-cv-121-SWS), ECF No. 1 at ¶ 12 (June 14, 2019).  Western Fuels Association ("WFA") is the single member of WFW, and Basin and Tri-State are each members of WFA and are lessees of record under federal coal leases in the Dry Fork Logical Mining Unit.  *Id.* at ¶¶ 11, 12.

## LEGAL BACKGROUND

The 2016 Rule upends bedrock legal principles of royalty valuation.  It is important upfront to understand the nature and longstanding basis of these core concepts to appreciate the Rule's unjustified departure from them.

### A.    Royalty Valuation Must Be Established at the Lease, Not at a Market Downstream from the Lease After Value Is Enhanced.

The federal government's authority to require payment of a royalty on the value of oil, gas, and coal production from federally-owned lands derives from the Mineral Leasing Act ("MLA") and Outer Continental Shelf Lands Act ("OCSLA").  For federal oil and gas leases onshore, the MLA provides only that

9

"[a] lease shall be conditioned upon the payment of a royalty at a rate of not less than 12.5 percent in amount or *value of the production removed or sold from the lease*." 30 U.S.C. § 226(b)(1)(A) (emphasis added).  For production from coal leases on federal lands, the MLA provides that the "lease shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of the *value of coal* as defined by regulation . . . ." 30 U.S.C. § 207(a) (emphasis added).  Similarly, for oil and gas leases on the OCS, OCSLA requires royalty based on a percentage of the "amount or *value of the production* saved, removed, or sold . . . ." 43 U.S.C. §§ 1337(a)(1)(A), (C), and (F) (emphasis added).  The principal Indian mineral leasing statutes, 25 U.S.C. §§ 396 and 396a, do not include any specific language relating to valuation, but for decades ONRR's federal and Indian coal valuation regulations have been nearly identical.

The Court's preliminary injunction opinion also cites the Federal Oil and Gas Royalty Management Act ("FOGRMA"), which ONRR's Rule invokes as well.  30 U.S.C. § 1701 *et seq.*; *Cloud Peak*, 415 F. Supp. 3d at 1046; AR_73995.  However, FOGRMA is neither a leasing nor a valuation statute.  Rather, as the Court points out, Congress passed FOGRMA to "strengthen the ability of the [Secretary] to collect oil and gas royalties by developing a comprehensive system of royalty management in order properly to collect and account for all royalties." *Cloud Peak*, 415 F. Supp. 2d at 1046.  In other words, FOGRMA is an accounting,

auditing, and enforcement statute for whatever royalties already are due under ONRR's adopted valuation regulations. *See, e.g.*, 30 U.S.C. § 1712(a) ("In order to increase receipts and achieve effective collections of royalty and other payments, a lessee who is required to make any royalty or other payment *under a lease or under the mineral leasing laws*, shall make such payments *in the time and manner* as may be specified by the Secretary or the applicable delegated State.") (emphasis added); *see also* 30 U.S.C. §§ 1701, 1711(a), 1711(c)(1), 1712(a).  To further support this point, other than its penalty provisions, FOGRMA does not even apply to federal or Indian coal leases.  30 U.S.C. § 1720a.

Neither the MLA nor OCSLA defines "value," or mandates any particular valuation method.  Congress provided rulemaking authority to the Secretary of the Interior for that purpose.  30 U.S.C. § 189 (MLA); 43 U.S.C. § 1334(a) (OCSLA).  ONRR's royalty valuation regulations at 30 C.F.R. part 1206 exercise that authority.  However, in the 100 years since Congress enacted the MLA, and the nearly 70 years since OCSLA's enactment, the agency and the courts have put a gloss on the meaning of that term, routinely interpreting it as meaning the value of production *at the lease or mine*.  Adherence to this core principle necessarily requires the agency to allow deductions against the higher prices received at downstream markets, to reflect the full enhanced value added by transportation and

processing lease production (beyond the costs of placing oil, gas, or coal in marketable condition).

Judicial and Department of the Interior ("DOI") administrative case law recognizing the principle that valuation must be "at the lease" pre-dated the first agency regulations in 1988 and 1989 expressly providing for allowances.[5]  For example, in *United States v. General Petroleum Corporation of California,* the court found that because the MLA did not define "value," it "will be presumed, therefore, that Congress intended the natural import of such word of common usage.  'Value', in common usage, means 'reasonable market value'; that price which a product will bring in an open market, between a willing seller and a willing buyer."  73 F. Supp. 225, 235 (S.D. Cal. 1946).  The value was determined to be where oil production occurred.  *Id.*  For gas processing allowances, the same court found:

> Natural-gas royalties are payable on the gas as it is produced at the well. It is the value of that gas which must be determined. Ordinarily the gas as produced contains a certain amount of "casing-head" gasoline. If the gas is processed in an extraction plant, two products

_____

[5] ONRR's predecessor, the Minerals Management Service ("MMS") promulgated the 1988 and 1989 regulations.  Over the last 40 years, responsibility for administering the federal royalty program has passed through three DOI agencies: the U.S. Geological Survey ("USGS") (1946-1981); MMS (1981-2011); and ONRR (2011-present).  *See also* Cloud Peak, 415 F. Supp. 3d at 1,038 (recognizing ONRR currently administers the royalty program for DOI).  We refer to these agencies collectively as "ONRR" or "the agency" unless otherwise noted herein.

> result, the natural gasoline and dry residual gas. Since
> part of the value of the gasoline and dry gas so
> manufactured is attributable to the extraction process,
> allowance must be made for the manufacturing costs in
> order to arrive at the value of the gas as originally
> produced.

*Id*. at 254.  *See also id* at 258 (gas royalty is properly determined "at the leases, that is, before it left the field"), *aff'd sub. nom., Cont'l Oil Co. v. U.S.*, 184 F.2d 802, 820 (9th Cir. 1950) ("royalties were to be calculated at values at the wells, not at the . . . destination"); *Indep. Petroleum Ass'n of Am. v. Armstrong*, 91 F. Supp. 2d 117, 119 (D.D.C. 2000) ("the essential bargain embodied in federal and Indian leases entitled the lessor to a royalty based upon the value of production at the lease"), *aff'd in part, rev'd in part on other grounds sub. nom.*, *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036 (D.C. Cir. 2002); *Black Butte Coal Co. v. United States*, 38 F. Supp. 2d 963, 971 (D. Wyo. 1999) (same principles for federal coal lease production); *Arco Oil and Gas Co.*, 109 IBLA 34 (1989); *Shell Oil Co.*, 52 IBLA 15 (1981); *Shell Oil Co.*, 70 I.D. 393, 396 (1963).

Likewise, the agency has continuously recognized the importance of valuation at the lease and the corresponding need to provide adequate deductions. *See* 53 Fed. Reg. 1,230, 1,257 (Jan. 15, 1988) (stating, with respect to 1988 revisions to gas valuation regulations: "The MMS believes generally that royalty should be free of cost.  However, values may need to be adjusted for transportation and/or processing to determine value at the lease.").  For instance, aside from the

2016 Rule's new artificial limitations on transportation and processing cost

deductions, the Rule preserves ONRR's regulatory text stating that a lessee may

deduct the "reasonable, actual" transportation and processing costs that enhanced

the value of oil, gas or coal after they were removed from the lease, against a

higher sales price at a market remote from the lease.  *See* 30 C.F.R. §§ 1206.110(a)

(oil transportation); 1206.152(a) (gas transportation); 1206.159(a) (gas processing);

1206.262 (federal coal transportation); 1206.267 (federal coal washing); 1206.462

(Indian coal transportation); 1206.467 (Indian coal washing).  Amendments to

ONRR's Indian oil transportation allowance regulations, issued just one year

before the currently challenged Rule, again enunciated the principle of valuation

"at the lease":

> In essence, transportation allowance accounts for the
> costs that a lessee must incur to move its production to a
> market and, therefore, captures the value at the lease. The
> lessor shares in this expense because the lessor reaps the
> benefit of selling its lease production at a market rather
> than at the wellhead. If the lessor were to take its
> royalties in kind (i.e. in barrels of oil), the lessor would
> then incur all of the cost of transporting the oil
> production to a market to sell the oil. To comply with this
> provision, for decades ONRR's regulations have allowed
> a lessee to deduct its transportation costs to calculate the
> value of their Indian oil production when it sells that oil
> at a location remote from the lease. See 53 FR 1184 (Jan.
> 15, 1988) (promulgating rule incorporating transportation
> allowances to determine the value of Federal and Indian
> oil production, for royalty purposes). ONRR has
> consistently allowed transportation costs because
> transporting oil to market off of the lease increases the

14

> value of the oil. Courts have upheld the use of
> transportation allowances as a means to calculate the
> value of oil production for royalty purposes.

80 Fed. Reg. 24,794, 24,799 (May 1, 2015) (citations omitted).  The regulatory

definition of the term "net-back" (before its deletion by the 2016 Rule) also

reflected valuation "at the lease or mine."  *E.g.*, former 30 C.F.R. § 1206.251

(2015) (federal coal).[6]

   In promulgating its 2016 Rule, ONRR reiterated this principle in preamble

text.  *See* AR_73967; AR_80002 (proposed Rule) ("the Department reaffirms that

the value, for royalty purposes, of crude oil and natural gas produced from Federal

leases . . . is determined at or near the lease").  It also left unchanged the above-

referenced ONRR regulatory language allowing deductions for "reasonable, actual

costs."  Yet, the Rule's regulatory amendments eschew valuation at the lease,

including by eliminating or capping various oil, gas, and coal allowances

regardless of operating conditions.  Inflexibly barring a lessee from taking a full

allowance for its actual costs necessarily yields a greater value than at the lease,

and thus requires paying more royalty than lessees actually owe under the MLA

and OCSLA and their lease terms.  Thus, affording full regulatory transportation

and processing allowances is not a matter of ONRR discretion, but rather is well-

---

[6] For clarity, citations herein to the regulations superseded by the 2016 Rule are
preceded by "former," and cite the immediately preceding 2015 version of the
Code of Federal Regulations.

established as legally required to determine fair valuation of oil, gas, and coal for royalty purposes.

**B.    Lessees' Arm's-Length Contract Prices for Oil, Gas, and Coal Generally Are the Best Indicator of Royalty Value.**

Another key tenet of federal royalty valuation is the sanctity of arm's-length contracts.  For decades, ONRR has accepted lessees' valuation based on arm's-length agreements for sales of oil, gas, or coal, and deductions involving arm's-length contracts for associated arm's-length transportation, processing, or coal washing services.  The agency has repeatedly disclaimed second-guessing of sales, transportation, or other agreements reached in good faith by unaffiliated parties. The agency's 1988 rulemakings for federal oil and gas valuation are illustrative, under which if a lessee disposed of its production pursuant to an arm's-length contract, that contract price typically determined value.  *See* former 30 C.F.R. § 1206.152(b)(1) (2015) (gas); 30 C.F.R. § 1206.102(b)(1) (2015) (oil); and 30 C.F.R. § 1206.257(b) (2015) (coal).  Those rules' corresponding preambles reinforced the agency's rationale.  *E.g.*, 53 Fed. Reg. 1,184, 1,186 (Jan. 15, 1988) (oil) ("[ONRR] believes that gross proceeds under arm's-length contracts are representative of market value."); 53 Fed. Reg. 1,230, 1,259 (Jan. 15, 1988) (gas) ("The MMS has determined that payments made under arm's-length contracts are the best available indicator of reasonable, actual costs incurred by the lessee."); 54 Fed. Reg. 1,492, 1,500 (Jan. 13, 1989) (coal) ("Typically a firm will endeavor to

16

maximize the value of a business by obtaining as great a price for its product as the marketplace will permit. . . . The use of arm's-length contract values maximizes the return to the public or the Indians to the extent that the lessee is also striving to sell coal at the highest profit it can attain.").

For production not disposed of pursuant to an arm's-length contract, the agency in 1988 and 1989 adopted a hierarchical set of "benchmarks" for determining value, applied in descending order. *See* former 30 C.F.R. §§ 1206.152(c) (2015) (gas), 206.102(c) (2015) (oil), and § 1206.257(c)(2) (2015) (coal). Yet, even these benchmarks for non-arm's-length sales relied in the first instance on comparisons to arm's-length contracts in the field or area to establish value. *See, e.g.*, 54 Fed. Reg. at 1,493 ("Even the alternative valuation methods, however, are determined by reference to prices received by individuals buying or selling like-quality products in the same general area and having opposing economic interests."). The first benchmark was based largely on comparing the lessee's non-arm's-length contract price for that particular transaction to the lessee's or other comparable arm's-length contract prices for purchases and sales in the same area. Additional benchmarks allowed reliance on other market-reflective prices such as other arm's-length sales prices, index prices, posted prices, and other publicly available indicia of prices in the area where the production occurred. The least favored benchmark was a netback value, starting with a value at a location

17

distant from the lease where the production occurred and deducting transportation and other allowable costs to determine a net value at the lease location.

Similarly, the agency's preamble language for its 2000 oil valuation rulemaking allayed industry fears that the agency would rewrite contracts to extract more royalty for itself.  *See, e.g.*, 64 Fed. Reg. 73,820, 73,829 (Dec. 30, 1999) ("It is longstanding MMS policy to rely on arm's length prices as the best measure of value, and we have no intention of changing this."); 65 Fed. Reg. 14,022, 14,051 (March 15, 2000) ("MMS continues to reiterate that it will not 'second guess' a company's decision on how it disposes of production.  We have emphasized this at several points, both in the text of the rule and in the preambles to this rule and previous proposals . . . .  MMS has rarely, if ever, 'second guessed' the value received in an arm's-length sale of oil . . . ."); *id.* at 14,046 ("lessees have nothing to fear if they are acting in good faith").  To erase any doubt, the agency in its 2000 amendments to its federal oil valuation regulations specifically added regulatory text to this effect:

> (A) ONRR will not use this provision to simply substitute its judgment of the market value of the oil for the proceeds received by the seller under an arm's-length sales contract.

> (B) The fact that the price received by the seller under an arm's length contract is less than other measures of market price, such as index prices, is insufficient to establish breach of the duty to market unless ONRR finds

> additional evidence that the seller acted unreasonably or
> in bad faith in the sale of oil from the lease.

Former 30 C.F.R. §§ 1206.102(c)(2)(ii)(A) and (B) (2015).

ONRR recognized the vitality of arm's-length contracts in adopting its 2016 Rule—but only nominally.  The proposed 2016 Rule preamble stated that "[t]his Department reaffirms . . . gross proceeds from arm's-length contracts are the best indication of market value."  AR_80002; *see also* AR_80009 ("The Department has long believed the values established in arm's-length transactions are the best indication of market value, and the 1988 rules reflect that belief.").  Similarly, the final Rule declared, for example, "[t]he best indication of value is the gross proceeds received under an arm's-length contract between independent persons who are not affiliates and who have opposing economic interests regarding that contract.  The best indicator of value under a non-arm's-length sale is the gross proceeds accruing to the lessee or its affiliate under the first arm's-length contract, less applicable allowances."  AR_73965.  But this proved to be merely lip service, as the Rule's operative provisions eliminate prior assurances (such as former 30 C.F.R. §§ 1206.102(c)(2)(ii)(A) and (B) above) and instead substitute unbounded ONRR discretion to displace values even under arm's-length contracts.

## C.    A Netback Valuation Method Should Only Be a Last Resort.

At the opposite end of the spectrum from relying on comparable sales under arm's-length agreements in the field or area are valuations based on a netback

methodology for non-arm's-length dispositions.  In essence, a netback valuation

method for oil, gas, or coal initially sold or transferred non-arm's-length entails

searching for the first subsequent market-based valuation and then tracing all

applicable deductions from that point back to the lease or mine.

Time and again, ONRR has regarded netbacks as valuation methods only of

last resort, because they are innately burdensome, complex, and uncertain.  *See,*

*e.g.*, 54 Fed. Reg. at 1,506 ("The MMS [Minerals Management Service] will use a

net-back valuation method only when other methods of determining value, such as

those specified in the rules, are inapplicable."); 53 Fed. Reg. at 1,249 ("MMS

agrees that the net-back method will not be used frequently.  The netback analysis

*should only be used where less complex procedures are not feasible*.") (emphasis

added); 53 Fed. Reg. at 1,186 ("To routinely perform labor-intensive net-back

calculations is impractical."); *id.* at 1,201 (use of netback analysis "on a routine

basis to verify oil value is impractical and unnecessary"); *id*. at 1,203 ("the other

benchmarks which have higher priority will result in a reasonable value for royalty

purposes and obviate the need to undertake a labor-intensive net-back method").

Some courts have also taken a dim view of netback calculations.  *See, e.g., Piney*

*Woods Country Life School v. Shell Oil Co*., 726 F.2d 225, 239 (5th Cir. 1984)

(netback-type method "is the least desirable method of determining market price"

for gas) (quoting *Montana Power Co. v. Kravik*, 586 P.2d 298, 303-04 (Mont.

1978)).  Correspondingly, ONRR had never required a netback-type method as the primary measure of value without also offering a simpler alternative, usually index-price based, for lessees to value their production for royalty purposes in lieu of performing the complex netback.  But that, too, changed as a result of the 2016 Rule.

### D.     Lessees Have the Principal Responsibility to Perform Royalty Valuation.

For nearly 30 years prior to the Rule, the regulations made consistent and substantial strides toward increasing predictability for lessees in royalty valuation, including by assigning lessees the primary responsibility to determine royalty value, subject to agency audit.  Indeed, the preceding regulations aimed to "allow[] the lessee some certainty in determining its own value without dependence upon [ONRR] to establish the value."  53 Fed. Reg. at 1,248; *see also id.* at 1,250 ("MMS is satisfied that ultimately the lessee will be able to determine the proper royalty value for its gas.").

The agency's 1988 oil and gas regulations and 1989 coal regulations codified lessee's primary role in valuation, and afforded lessees an opportunity to fix alleged errors.  *E.g.*, former 30 C.F.R. § 1206.102(c)(2) (2015).  For non-arm's-length transactions that required the lessee to apply the series of benchmarks to determine royalty value, the agency had to affirmatively "determine[] that the lessee has improperly applied the regulations" in its submitted monthly royalty

reports before the agency could substitute a different value. 52 Fed. Reg. 4,732, 4,736 (Feb. 13, 1987) (proposed rule preamble); former 30 C.F.R. § 1206.152(e)(1) (2015).[7]  For arm's-length transactions where value generally was based on the lessee's gross proceeds under its sales contract, the agency had to show that the lessee "acted unreasonably or in bad faith" before displacing the lessee's valuation. Former 30 C.F.R. § 1206.102(c)(2)(ii)(A), (B) (2015).  In response, lessees have set up sophisticated accounting, reporting, and payment systems to generate reporting and payments for each calendar month. Individual oil and gas operators may submit thousands of lines of royalty data each month to ONRR; the agency typically receives hundreds of thousands of lines monthly.

A primary purpose for the regulatory reform in 1988 and 1989 was to create as much certainty as possible for lessees in the royalty valuation process. *See* 52 Fed. Reg. at 4,735.  Lessees were frustrated that they would pay royalties on what they thought was the proper value, and then years later the agency would audit their payments, demand additional royalties based on its re-determinations of royalty value, and also assess substantial amounts of underpayment interest at the

---

[7] That former regulation provided:  "Where the value is determined pursuant to paragraph (c) of this section [the 'benchmarks' for non-arm's-length valuation], the lessee shall retain all data relevant to the determination of royalty value. Such data shall be subject to review and audit, and MMS will direct a lessee to use a different value if it determines that the reported value is inconsistent with the requirements of these regulations."

high statutory rate under 30 U.S.C. § 1721(a).  The agency responded by adopting a valuation system that would afford more certainty to lessees in the first instance in establishing value.  *See* 52 Fed. Reg. at 4,735;  53 Fed. Reg. at 1,248 (Jan. 15, 1988) (same).

Thus, consistent with established practice, ONRR should be able to challenge lessees' valuation only if lessees' original reporting violated the applicable regulatory valuation standards—not merely when ONRR prefers a higher value for royalty purposes.  As the agency stated in its 1988 rulemaking, "[i]t must be assumed that lessees will apply the rules properly considering the likelihood of audit and the possibility of significant interest and perhaps penalties for intentional underpayment of royalties."  53 Fed. Reg. at 1,250.  Moreover, when reporting errors occur, the remedy should be for the lessee to correctly re-apply the methodologies established in ONRR's regulations, rather than ONRR interposing its own arbitrary determination of value divorced from its own set regulatory standards.  ONRR has no authority to manufacture a wholly different (and presumably higher) valuation for royalty purposes as a form of "penalty" for lessee reporting errors.  To the contrary, ONRR's separate penalty authority derives from FOGRMA, 30 U.S.C. § 1719, and implementing regulations at 30 C.F.R. part 1241.

## PROCEDURAL HISTORY

As the Court pointed out, the "now-not-repealed" Rule was reinstated following a California federal district court decision that vacated ONRR's superseding 2017 final rule on oil, gas, and coal royalty valuation, as an unjustified "reversal." *Cloud Peak*, 415 F. Supp. 3d at 1039. But that label more aptly befits the Rule itself. Indeed, as discussed in the preceding section, the 2016 Rule was hardly written on a blank slate.

Generally, federal oil and gas lessees must value production and report and pay royalties by the end of the calendar month following the production month.[8] 30 U.S.C. § 1724(c)(2); 30 C.F.R. § 1218.50(a). ONRR also generally requires filing of reports for coal lease production by the end of the month following the production month. 30 C.F.R. § 1210.201(b). Untimely or insufficient royalty payments are subject to underpayment interest or potentially other consequences of noncompliance. *See* 30 U.S.C. § 1721(a); 30 C.F.R. § 1218.202(a)-(e).

As discussed above, in 1988 and 1989 the agency adopted its first set of comprehensive regulations governing oil and gas valuation and coal valuation, respectively. The thrust of these changes was to provide more certain methodologies based on values determined under arm's-length transactions, ensure full transportation and processing allowances to calculate royalty value at the lease,

---

[8] Lessees typically use Form ONRR-2014.  https://www.onrr.gov/reportpay/PDFDocs/2014.pdf.

and remove the agency from routine and unbounded initial valuation determinations.  That regulatory scheme has remained stable and functioned well, and industry has reasonably come to rely on it.  The federal oil valuation regulations were amended in 2000 to adopt an index-based valuation methodology in lieu of benchmarks for non-arm's-length dispositions, and as an option to chasing gross proceeds under arm's-length sales to the downstream sale points, because the NYMEX price and Alaska North Slope price had become reliable index-based methods to value crude oil production.  65 Fed. Reg. 14,021, 14,022, 14,068 (Mar. 15, 2000).  The Indian gas valuation regulations were amended in 1999, 64 Fed. Reg. 43,506, 43,515 (Aug. 10, 1999), and the Indian oil valuation regulations were amended in 2015, 80 Fed. Reg. 24,794, 27,904, 24,805 (May 1, 2015), to reflect more reliance on index values and certain royalty valuation terms unique to Indian oil and gas leases.  The 2016 Rule does not involve royalty valuation for Indian oil and gas production.

The 2016 Rule overhauled the regulations and turned back the clock on royalty valuation. The Rule was fueled by unsubstantiated, generalized concerns. In particular, as the Court's prior opinion recognized, the Rule relied on a single advisory subcommittee report issued a decade earlier.  *See Cloud Peak*, 415 F. Supp. 3d at 1047 (citing proposed Rule at 80 Fed. Reg. at 608); AR_3.  But that report's so-called "findings" did not prescribe the problematic provisions ONRR

adopted in the 2016 Rule.

Petitioners and other affected parties provided voluminous comments on the proposed Rule, including detailed legal arguments and economic analyses.  *E.g.*, AR_1450, AR_1478, AR_73397, AR_73486, AR_73935.  Yet, despite the broad problems and recommended solutions identified in public comments, ONRR made almost no substantive changes between the proposed and final 2016 Rule. Misleadingly, the Rule's preamble stated that "[w]e [ONRR] carefully considered all of the public comments that we received during the rulemaking process and, in some instances, revised the language of the final rule based on these comments." AR_73964.  But the Rule, preamble, and administrative record evidence no such thing.  Indeed, the Court identified nearly the sum total of the alterations from the proposed Rule, none of which is major or affects the Rule's key provisions countermanding core royalty valuation principles and precipitating this litigation. *Cloud Peak*, 415 F. Supp. 3d at 1047-48.  And a closer review of ONRR's preamble text discussing received comments reveals that ONRR provided little to no reasoning for retaining the Rule almost entirely in its proposed form.

Shortly after finalizing the Rule, ONRR began to publicly recognize its significant defects, in line with Petitioners' prior warnings.  Though ONRR conducted "trainings," they largely mirrored the Rule or reflected confusion even within the agency, rather than providing meaningful implementation guidance in

response to widespread industry questions. *See, e.g.*, AR_74481-74658 (December 2016 ONRR oil and gas training slides); AR_82461-82467 (September 13, 2016 ONRR Dear Reporter letter summarizing Rule's oil and gas provisions, and promising "training sessions"); *Becerra v. U.S. Dep't of the Interior*, 276 F. Supp. 3d 953, 956 (N.D. Cal. 2017) ("trainings revealed some confusion about the Rule . . . ONRR responded that it could not provide guidance before the January 1, 2017 effective date and could not guarantee guidance by the end of February"); 82 Fed. Reg. 36,934, 36,935 (Aug. 7, 2017) ("The feedback we received through the training sessions and guidance requests revealed certain unforeseen defects in, or unintended consequences of, portions of the 2017 Valuation Rule.  Lessees raised multiple questions that ONRR had not previously considered and was not prepared or able to answer, particularly with respect to the coal valuation provisions.").

Petitioners first filed suit in this Court nearly four years ago amid their and their members' pervasive concerns with the Rule's unfounded revamping of longstanding federal royalty valuation principles.[9]  The Court stayed the then-pending cases while ONRR began the process of reevaluating its 2016 Rule in light of its shortcomings and the filed litigation.  Before the first royalty reports under

---

[9] *Cloud Peak Energy Inc., et al. v. U.S. Dep't of the Interior*, No. 16-315 (D. Wyo. filed Dec. 29, 2016); *API v. U.S. Dep't of the Interior*, No. 16-316 (D. Wyo. filed Dec. 29, 2016); *Tri-State Generation and Transmission Ass'n, Inc., et al. v. U.S. Dep't of the Interior*, No. 16-319 (D. Wyo. filed Dec. 29, 2016) (collectively, *"Cloud Peak I.")*.

the Rule were due, ONRR under 5 U.S.C. § 705 "postponed the effectiveness of the [Rule] pending judicial review." 82 Fed. Reg. 11,823, 11,824 (Feb. 27, 2017). ONRR did so to "preserve the regulatory status quo" because it "f[ound] that justice so requires." *Id.* at 11,823. Despite the ongoing litigation in this Court, some of the present Intervenors (environmental groups and the States of California and New Mexico) then ventured to a different forum, the U.S. District Court for the Northern District of California, to vacate ONRR's postponement. That court found that ONRR had misinterpreted the first sentence of 5 U.S.C. § 705 in lieu of engaging in a new rulemaking. *Becerra*, 276 F. Supp. 3d at 965-66. Yet, the court denied Plaintiffs' request to reinstate the 2016 Rule because such a repeal rulemaking was impending. *Id.* at 967.

ONRR then completed the full notice-and-comment rulemaking process to repeal the Rule. 82 Fed. Reg. 36,934 (Aug. 7, 2017) ("Repeal Rule"). In the interim, this Court stayed the prior litigation at ONRR's request. *Cloud Peak I*, ECF No. 30 (Mar. 24, 2017). After ONRR's final adoption of the Repeal Rule that reinstated the pre-2016 regulations, Petitioners voluntarily dismissed their prior Petitions without prejudice. *See* Fed. R. Civ. P. 41(a)(1)(A)(i).

Yet, while those Petitions were still pending in this Court, the present Intervenors again sued in the Northern District of California to vacate the Repeal Rule. The California court agreed and ruled against ONRR on summary judgment,

finding the Repeal Rule procedurally deficient under the Administrative Procedure Act ("APA") because it required more explanation and public process. *State of California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1179 (N.D. Cal. 2019). Notably, the court's opinion did not address the reinstated Rule's merits, or the consequences of its abrupt implementation. Nor did it even mention specific key provisions in the Rule central to the current litigation, such as ONRR's reversal of oil and gas subsea transportation allowances and inflated index methodology. It also dismissed claims against the Repeal Rule based on violations of FOGRMA, the MLA, and the Federal Land Policy and Management Act. *Id.* at 1178.

Following vacatur of the Repeal Rule, ONRR announced in a June 13, 2019 "Dear Reporter" letter that the Rule now applies to "all oil, gas, and coal production from January 1, 2017, forward," and full compliance must occur by January 1, 2020. *See* https://www.onrr.gov/DearRep.htm. ONRR thus required lessees to come into compliance retrospectively for the last two and a half years and prospectively by January 1, 2020.[10]

Petitioners contemporaneously refiled suit in this Court. Shortly thereafter,

---

[10] On October 1, 2020, ONRR reissued the 2016 Rule in the same form and with retroactive effect. *See* 85 Fed. Reg. 62,016 (Oct. 1, 2020). ONRR took this ministerial step to ensure the Code of Federal Regulations reflected the reinstatement of the Rule following the California district court order vacating the 2017 Repeal Rule. *Id.*

Petitioners moved for a preliminary injunction of the Rule.  On October 8, 2019, this Court granted the motion with respect to the Rule's coal provisions, but denied it with respect to the Rule's oil and gas provisions, pending receipt of a full administrative record and briefing on the merits.

Over the course of a year, ONRR obtained multiple stays of its deadline (originally September 12, 2019) to produce the administrative record prior to merits briefing.  *See Cloud Peak*, No. 19-120, ECF Nos. 66, 70, 75.[11]  The parties agreed in October 2019 that ONRR "should lodge the complete administrative record."  ECF No. 69 at ¶ 7.  The government finally lodged its administrative record on July 6, 2020, and an attorney-client privilege log on July 17, 2020.  ECF Nos. 80, 82.  The government excluded anything it claimed to be "predecisional deliberative documents," categorically asserting that all such documents are not part of the administrative record and do not need to be included in a privilege log.  ECF No. 80.  The resulting administrative record, despite the extensive time to compile and its voluminous total file size (due in part to duplicate documents), consists mostly of public comments received on ONRR's Advance Notices of Proposed Rulemakings and proposed version of the Rule, as well as other already-public agency materials, with minimal agency analysis or support for the Rule's

---

[11] Unless otherwise noted, all ECF citations to this case are to the lead case docket, No. 19-120.

key provisions beyond anything stated in the Rule itself.  Indeed, there appear to be years purportedly during the rulemaking (e.g., 2013, 2014) with almost no administrative record documents.

On October 1, 2020, ONRR published a proposed rule on federal oil and gas and federal and Indian coal royalty valuation and civil penalties.  85 Fed. Reg. 62,054 (Oct. 1, 2020).  The proposed rule acknowledges the merits of Petitioners' arguments in this litigation, and would amend several of the challenged provisions on a going forward basis.  Yet, unlike prior ONRR actions, the proposed rule does not obviate the Petitions here.  That is because any final rule would be prospective-only, whereas ONRR has interpreted the 2016 Rule as effective for production beginning January 1, 2017.  *See* ONRR Dear Reporter Letter (June 30, 2020), https://www.onrr.gov/DearRep.htm.  Moreover, though reflecting ONRR's position, "proposed regulations have no legal effect."  *Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 843 (9th Cir. 2013).  Also, if the recently proposed rule is not finalized in the next few weeks, it is uncertain whether the new Administration will proceed to issue any final rule.  Accordingly, the Court should proceed to decide the merits of the current Petitions, and in doing so vacate the Rule, or at a minimum its coal provisions and its most problematic severable oil and gas provisions.

## STANDARD OF REVIEW

"The Administrative Procedure Act provides a right to judicial review of 'final agency action for which there is no other adequate remedy in a court.'" *Mobil Exploration. & Producing U.S., Inc. v. U.S. Dep't of the Interior*, 180 F.3d 1192, 1196 (10th Cir. 1999) (quoting 5 U.S.C. § 704).  Under the APA, courts "shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).  "These standards require the reviewing court to engage in a 'substantial inquiry.'"  *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).  "The agency must provide a reasoned basis for its action and the action must be supported by the facts in the record." *State of Wyoming v. U.S. Dep't of the Interior*, No. 16-285, ECF No. 274, slip op. at 16 (D. Wyo. Oct. 8, 2020) (citing *Olenhouse*, and vacating DOI 2016 rule on venting and flaring of gas from federal and Indian leases).  "Agency action is arbitrary if not supported by 'substantial evidence' in the administrative record." *Id.*

The Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

ONRR "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (internal quotation omitted). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Devon Energy Prod. Co. v. Gould*, 421 F. Supp. 3d 1213, 1222 (D. Wyo. 2019) (order vacating ONRR Director decision) (quoting *Mountain Side Mobile Estates P'ship v. Sec'y of Housing & Urban Dev.*, 56 F.3d 1243, 1250 (10th Cir. 1995)). ONRR itself has acknowledged its "burden of providing adequate record support and a reasoned and factual explanation" for its decisions sufficient to understand their basis. *E.g., BHP Billiton Petroleum (Americas) Inc.*, ONRR-11-0015-OCS, 2012 WL 8451081 at *3-4 (Oct. 26, 2012).

As the Court has observed, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Cloud Peak*, 415 F. Supp. 3d at 1048 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)). To be clear, ONRR is not legally obligated to adopt all comments received on proposed rulemakings. But dedicating preamble space, regardless of length, to restating public comments and discarding them without reasoned basis does not fulfill that agency duty—particularly where the agency is upsetting longstanding understandings. *See United Techs. Corp. v. U.S. Dep't of Def.*, 601

F.3d 557, 562 (D.C. Cir. 2010) ("[W]e do not defer to the agency's conclusory or unsupported suppositions.") (citation omitted).   Moreover, "[t]he agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings . . . ." *Diné Citizens Against Ruining Our Env't v. Jewell*, 2015 WL 4997207 at *27 (D.N.M. Aug. 14, 2015) (citation omitted).

The agency's burden is pronounced where, as here, the agency reverses a longstanding position that engendered reasonable reliance by the regulated community.  As the U.S. Supreme Court reaffirmed:

> [T]he APA contains a variety of constraints on agency decisionmaking—the arbitrary and capricious standard being among the most notable. As we held in *Fox Television Stations*, and underscore again today, the APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters.

*Perez*, 575 U.S. at 106 (citations and quotations omitted).  Thus, ONRR cannot just disavow and cast aside prior findings and understandings.  Rather, the agency must exercise the same care to ensure its purported regulatory improvements rest on substantial evidence, are administratively workable, and respect industry reliance interests.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (in cases of policy reversals, "a reasoned explanation is needed for disregarding facts and

circumstances that underlay or were engendered by the prior policy")); *State of Wyoming*, *supra*, slip. op. at 52-53 ("'Unexplained inconsistency' can be 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act.'") (citation omitted).

## **ARGUMENT**

## I.    **THE 2016 RULE'S OIL AND GAS PROVISIONS SHOULD BE VACATED.**

Many of the 2016 Rule's oil and gas provisions run afoul of fundamental valuation principles explained above.  The Rule and administrative record also make little effort to square ONRR's new approach with its well-established existing policies or to justify the Rule's sea changes.  The Rule cannot paper over its failure to furnish substantive analysis and evidence or to meaningfully rebut Petitioners' and others' detailed comments before summarily rejecting them. Taken together, the core deficiencies throughout the 2016 Rule warrant vacatur in its entirety.  If the Court does not concur with full vacatur, key offending oil and gas provisions are severable and should be individually vacated.

### A.    **ONRR Arbitrarily Reversed Itself to Convert Offshore Subsea Bulk Transportation of Oil and Gas into Non-Deductible "Gathering."**

The Rule's most blatant reversal involved ONRR's wholesale conversion of subsea movement of OCS oil and gas from a deductible transportation cost to non-deductible "gathering."  Leasing and development of the deepwater OCS were

35

encouraged by Congress and accelerated in the late 1990s.[12]  Because of the

substantial costs associated with deepwater development, and to minimize the

number of platforms needed for development, not every lease had its own platform

facility for development purposes.  Rather, to move their bulk production,

producers would connect a manifold located on the seafloor via a pipeline to a host

platform on another lease that often was as far as 50 miles away.  In 1999, ONRR

clarified that in determining the royalty value of production from these deepwater

leases, such movement constituted deductible transportation of oil or gas and not

non-deductible gathering.  AR_1-2 (May 20, 1999 "Deep Water Policy").  OCS

producers relied on this ONRR interpretation when making decisions on whether

to acquire deepwater OCS leases and how much to bid for those leases, since the

expectation of a lower net royalty on production over the life of the lease would

---

[12] "On November 28, 1995, President Clinton signed Public Law 104-58, which
included the Deep Water Royalty Relief Act (Act). The Act was designed to
encourage development of new supplies of energy. It included incentives to
promote investment in a particularly high-cost, high-risk area, the deep waters of
the Gulf of Mexico. These deep Gulf of Mexico waters were viewed as having
potential for large oil and gas discoveries, but technological advances and multi-
billion dollar investments would be needed to realize that potential. Since the
enactment of the incentive, the deep waters of the Gulf of Mexico have become
one of the most important sources of domestic oil and gas production."  73 Fed.
Reg. 58,467, 58,468 (Oct. 7, 2008).

encourage higher upfront bonus bids in favor of the government lessor during the competitive leasing process.  *See* 30 C.F.R. § 560.202.

Contrary to ONRR's long-held interpretation, the 2016 Rule reversed course and redefined "gathering" to render the costs of "any" such movement from a wellhead on a lease to an off-lease platform anywhere on the OCS as categorically ineligible for a transportation allowance in determining royalty due.  30 C.F.R. § 1206.20.  ONRR also inserted parallel provisions in the federal oil and gas regulations on transportation allowances.  *Id.* §§ 1206.110(a)(2)(ii) (oil), 1206.152(a)(2)(ii) (gas).  ONRR did so regardless of deepwater OCS conditions unique from onshore production, such as much longer distances traveled, complex geography, far greater economic costs, and scarcity of surrounding infrastructure. As a result, OCS lessees no longer can even *request* a transportation allowance for necessary costs to move oil and gas those long distances.  This is true for both future *and existing* OCS leases, as companies have no flexibility to conform their existing facilities to the new rule.  This change alone constitutes approximately 25 percent ($17.4 million to $23.6 million) of ONRR's own estimate of the Rule's *total* annual royalty impact to industry.  AR_73986.

This outcome amounts to a naked money grab unsupported by authority or evidence, and these provisions should be vacated.  The final Rule's sole defense for its change was that "[t]he former Minerals Management Service intended for

the Deep Water Policy to incentivize deep water leasing by allowing lessees to deduct broader transportation costs than the regulations allowed.  ONRR concluded that the Deep Water Policy has served its purpose and is no longer necessary."  AR_73966.  But that is nothing more than ONRR's *ipse dixit*.  The Rule nowhere explains or provides evidence for ONRR's change in position, particularly in the face of considerable industry reliance interests.  *See Perez*, 575 U.S. at 106.  Indeed, the Rule fails to justify ONRR's newfound proposition that moving offshore oil or gas over many miles from the wellhead is inexorably "gathering," or assess why transportation deductions suddenly are no longer needed by OCS lessees who have reasonably relied on them in undertaking exorbitant OCS investments and have not yet recouped their investment.  Rather, ONRR effectively just stated that it wants to collect additional royalty from OCS lessees.  Following a more probing merits review, the Court thus should reconsider its preliminary finding that this constituted a "satisfactory explanation" by ONRR. *Cloud Peak*, 415 F. Supp. 3d at 1050.

As explained above, it is well-established that the proper value for royalty purposes is determined at the lease, including on the OCS, and transportation allowances from the leases to intermediate or onshore markets are critical to accurately determining such value and the royalty owed.  Transportation allowances have long been defined to exclude what historically were considered

gathering costs (generally in the onshore context) to move production from individual well sites on a lease to a central gathering facility.  *See* 30 C.F.R. § 1206.20.  But that does not mean that under the APA ONRR simply can declare something that was "transportation" for many years to now be "gathering" or ignore relevant facts on the OCS.  That is, denial of OCS transportation allowances by instead merely labeling those costs as "gathering" is not valid just because ONRR claims those denials will be "consistent" or "reliable."  *See* AR_73966.

To be sure, the deepwater OCS comprises unique fields different from typical onshore and OCS shallow water development.  Inherent physical and cost barriers preclude lessees from constructing platforms or central production facilities on every OCS lease.  Given the relative paucity of surface facilities, movement of production from the wellhead may necessitate long travel distances to the first platform or central production facility, including joint platforms or tie-back facilities.  This practice supports DOI's stated interest in minimizing the number of OCS platforms and facilities for the efficient exploration, development, and production of offshore oil and gas resources.  *See* 30 C.F.R. §§ 250.1301(c), 250.106(e).  In turn, to justify their decisions over the last two decades to undertake the multi-billion dollar costs of deepwater OCS leasing and development, lessees reasonably relied on the ability to obtain deepwater OCS transportation allowances to recover the associated costs of this distant movement.

*See, e.g.*, Decl. of Erik Milito, at ¶ 14, ECF No. 23-4.  It takes OCS lessees many years to recover the costs of building deepwater production systems.

It is illogical and indefensible for ONRR to acknowledge the transportation allowance as an "incentive" to induce leasing and development activity, and then to retroactively pull it back after lessees reasonably relied on it and were in the midst of a multi-year recoupment of their investment.  "Retroactivity is not favored in the law." *Landgraf v. Usi Film Prods*., 511 U.S. 244, 264 (1994) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)); *see also Republic of Austria v. Altmann*, 541 U.S. 677, 693 (2004) ("these antiretroactivity concerns are most pressing in cases involving new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance") (internal quotations omitted); *id*. at 696 ("The aim of the presumption is to avoid unnecessary post hoc changes to legal rules on which parties relied in shaping their primary conduct.").  The Rule contravenes this principle.

The Rule also obfuscates the significant history and prior agency analysis supporting the Deep Water Policy.  Tellingly, that Policy was never challenged while in effect, and the California court's opinion on the 2017 Repeal Rule made no mention of it or of OCS transportation allowances.

In July 1998, during its rulemaking process resulting in the 2000 valuation rules for oil, the agency specifically "requested comments on the definition of

'gathering' as related to deepwater leases involving subsea production without a platform but with long-distance movement of bulk production."  65 Fed. Reg. 14,022, 14,046 (Mar. 15, 2000) (final rule); *see also* 63 Fed. Reg. 38,355, 38356-57 (July 16, 1998) (further supplementary proposed rule).  The submitted comments, including those from Petitioner API, explained at length why such costs are more appropriately deemed allowable transportation costs.  The comments explained that the historical concept of gathering from onshore or shallow water development, wherein field processes take place on or near the lease, failed to translate to the deepwater OCS where it is infeasible and undesirable to construct platform facilities on every lease.  In these areas, a subsea manifold or other collection point can effectively serve the function of the first surface facility. Subsea pipelines also entail greater costs and risks borne solely by the lessee, including those for fabrication, installation, operation, and maintenance.  To deny transportation allowances for subsea pipelines necessary to bring production across greater distances to shared platforms, and toward markets, would arbitrarily discriminate based on the technology utilized.

In response, the agency ultimately determined it was unnecessary to redefine gathering to include subsea transportation.  Rather, the agency in 1999 issued the Deep Water Policy resolving the issue by confirming that movement of oil or gas long distances in the deepwater OCS may qualify as transportation.  *See*

AR_80016-17.  A year later, the agency's final rule for oil acknowledged this guidance and did not revise the regulatory definition of gathering to include such movement.  Over the last two decades, companies have proceeded to significantly expand their activities into deeper water, expending many billions of dollars on lease bonus bids, exploration, and development, while relying on the ability to claim and justify transportation allowances where warranted for subsea movement of produced oil and gas.

The Rule "rescinds and supersedes the Deep Water Policy," but its cited authority and reasoning do not support that step.  AR_73989.  The preamble to the Rule addresses none of the issues discussed above.  In its proposed Rule, ONRR claims that "almost all of the movement the Deep Water Policy allows as a transportation allowance is, in actuality, non-deductible 'gathering,'" relying on *Kerr-McGee Corp.*, 147 IBLA 277 (1999).  That statement is wrong and *Kerr-McGee* does not support ONRR's assertion.  *Kerr-McGee* was decided before MMS issued the 1999 guidance, and thus MMS was aware of it in crafting its now-longstanding policy.  Moreover, the IBLA there merely denied retroactive transportation allowances for production from "adjacent leases."  *Id*. at 283 ("We agree that, even though production is moved across lease boundaries, because it is treated and sold on adjacent leases the costs of moving it there are properly regarded as gathering, not transportation. . . . We conclude that MMS correctly

determined that Kerr-McGee was not entitled to reimbursements for the costs of gathering and accumulating the gas under the circumstances of this case.") (emphasis added).  This principle of close proximity or adjacency is expressly reflected in the Deep Water Policy's exclusion for leases with at least one point of contact with the producing lease.  AR_1.  Indeed, in *Kerr-McGee*, the agency itself took the position that transportation involved moving production "remote from the lease or field."  *Id.* at 282.  In a subsequent case citing *Kerr-McGee*, the IBLA further clarified that "we in general have no objection" to the proposition that "'gathering' refers only to well head and in-field movement of production." *Murphy Exploration and Prod. Co.*, 147 IBLA 386, 396 (1998) (disallowing transportation cost deductions only because the Section 6 leases pre-dating OCSLA stated "no gathering or other charges are made chargeable to the lessor" in calculating royalty) (emphasis added).

The proposed Rule preamble also avers that "[i]t is well established that the movement of oil and gas that ONRR determines is 'gathering' is not allowable as a transportation allowance."  If ONRR means to imply that anything ONRR summarily declares as gathering irrefutably renders it not transportation, that proposition is circular and untenable.  ONRR cites *California Co. v. Udall*, 296 F.2d 384 (D.C. Cir. 1961), but that case has nothing to do with gathering, transportation, or OCS leases.  Indeed, that court made clear that the Secretary was

not claiming royalty for long-range movement of oil and gas, unlike the Rule now does. *Id.* at 387 ("Let us here insert a cautionary parenthesis. *No transportation costs are involved in this case.* The Secretary is *not* here claiming that costs incurred in moving gas from the field in the neighborhood of the wells to a *distant* selling point are includable in the royalty base. This gas was conditioned by the seller and delivered to the purchaser in the field within a *short distance* of the wells.") (emphasis added).

For these reasons, ONRR has no practical or legal justification to in effect retroactively reverse long-held understandings and create a blanket rule disallowing subsea transportation costs, even for existing facilities. ONRR has provided no new evidence for this change, or explained why the existing record warrants a different rule, and thus has failed to satisfy the standards set forth by the Supreme Court. *See, e.g., Encino Motorcars*, 136 S. Ct. at 2126. To be clear, the key problem is not ONRR's reversal of its 1999 guidance, but its creation of a categorical prohibition in its regulations. While not all subsea movement must be transportation, categorically determining that *no* subsea movement to the first platform can *ever* qualify for a transportation allowance, no matter the distances or other facts involved, is arbitrary and capricious given the substance and history of this issue and the unique circumstances on the OCS. At a minimum, to ensure that value is established at the lease, lessees must have the flexibility to defend such

transportation deductions in a given case.  Accordingly, the Court should reject the Rule's changes to the definition of "gathering" in 30 C.F.R. § 1206.20, and the corresponding changes to §§ 1206.152(a)(2)(ii) and 1206.110(a)(2)(ii).

### B.     The Rule Arbitrarily Denies Allowances for Lessees' Reasonable, Actual, and Necessary Transportation and Processing Costs.

In addition to bulk subsea transportation, the Rule improperly places other artificial and inflexible limitations on oil and gas transportation and processing allowances for production from federal leases onshore and on the OCS.  30 C.F.R. §§ 1206.110(d)(1) (oil transportation allowance), 1206.152(e)(1) (gas transportation allowance), 1206.159(c)(2) (gas processing allowance). Specifically, no matter a lessee's reasonable and actual costs incurred, the Rule precludes the lessee from even *seeking* a transportation allowance that exceeds 50 percent of the value of the oil or gas, or from seeking a gas processing allowance that exceeds 66.67 percent of the value of each gas plant product.[13]  *Id.*  The Rule also precludes any opportunity to obtain an extraordinary processing allowance against the value of processed residue gas.  *See* former 30 C.F.R. § 1206.158(d)(2) (2015).  The Rule goes so far as to perfunctorily terminate ONRR's pre-Rule approvals of justified allowances in excess of these limits.  30 C.F.R. §§

---

[13] "Gas plant product" is defined as "separate marketable elements, compounds, or mixtures, whether in liquid, gaseous, or solid form, resulting from processing gas, excluding residue gas."  30 C.F.R. § 1206.20.

1206.110(d)(2), 1206.152(e)(2), 1206.159(c)(3) & (c)(4).  These newly inflexible caps are arbitrary and unreasonable because it is ineluctable that the Rule cannot yield value "at the lease" when it arbitrarily prohibits lessees from deducting the *full* reasonable and actual transportation costs from sales prices in distant markets, or the *full* reasonable and actual processing costs from the enhanced value of post-processing gas plant products.  These provisions thus should be vacated as well.

Historically, to determine royalty value "at the lease" when sales of oil and gas occur downstream from the lease, or gas is processed to separate the gas stream into natural gas liquids and residue gas, ONRR has allowed deductions for certain costs and associated risks beyond placing the production in marketable condition. While the 1988 regulations included initial 50 percent transportation and 66.67 percent processing caps on these allowances as a proportion of the sales price of the oil, gas, or natural gas liquids, the regulations enabled lessees to exceed those caps by demonstrating to ONRR that their greater incurred costs were "reasonable, actual, and necessary."  Former 30 C.F.R. §§ 1206.109(c)(2) (oil transportation allowance), 1206.156(c)(3) (gas transportation allowance), 1206.158(c)(3) (gas processing allowance) (2015).

This flexibility reflected ONRR's recognition that some oil and gas lessees necessarily incur costs that exceed costs in more traditional and fully developed areas of operation, and thus fully justify higher allowances.  In general, more

remote fields may incur higher transportation costs, while low-quality reservoirs may incur higher processing costs.  The opportunity for lessees to seek higher allowances acknowledged the unique gas composition, complex plant designs, and high unit costs associated with atypical gas producing fields.  Real world market scenarios, as recently evidenced during the COVID-19 pandemic, also exist where oil and gas pricing fluctuates (sometimes to very low levels) yet the lessee's costs to transport or process production do not.  This scenario includes where a preexisting agreement prescribes transportation or processing costs in terms of rates that do not fluctuate based on market prices for gas.  The Rule's inflexible caps are a particular issue for crude oil or natural gas that may be exported overseas where transportation costs are always more significant as a proportion of the delivered sales price.  As a hypothetical example, in a situation where a lessee receives $0.50 (a low price) for sale of its gas, but has a transportation contract that requires the lessee to pay $0.40 to transport that gas to the sales point, the Rule would inflexibly cap the lessee's claimed transportation allowance at $0.25.  Thus, that lessee would only be able to claim 62.5 percent ($0.25/$0.40) of its reasonable, actual costs as it transportation allowance, artificially raising the federal royalty value above the value at the lease by the 37.5 percent differential.

The Rule offers no rationale for these caps except ONRR's administrative convenience.  As noted above, the Rule retains the pre-2016 regulatory principle

that oil and gas lessees may deduct their "reasonable, actual" transportation and processing costs.  30 C.F.R. §§ 1206.110(a) (oil transportation); 1206.152(a) (gas transportation); 1206.159(a) (gas processing).  The Rule does not deny that certain operations may incur costs in excess of the stated caps.  Nor does the Rule's preamble contravene that royalty value is determined at the lease; in fact, it reiterates this bedrock legal standard.  *E.g.*, AR_80002 ("the Department reaffirms that the value, for royalty purposes, of crude oil and natural gas produced from Federal leases . . . is determined at or near the lease . . .").  But the Rule's newly-minted provisions denying lessees even the opportunity to demonstrate all of their actually incurred transportation or processing costs plainly violates that principle.  Indeed, the Rule's resulting provisions allowing deductions of "reasonable, actual" costs yet then setting uniform caps on those costs are internally contradictory.  *Compare, e.g.*, 30 C.F.R. §§ 1206.110(a) *with* 1206.110(d).

Further illustrating the Rule's arbitrariness, ONRR just one year earlier *declined* to impose the same 50 percent transportation cap for valuation of oil production from Indian leases.  80 Fed. Reg. 24,794, 24,801 (May 1, 2015) (retaining "a lessee's ability to request approval to exceed the 50-percent limitation on transportation allowances."); 30 C.F.R. § 1206.56.  In response to industry comments adverse to such a hard cap, the agency there recognized that its existing authority to review future lessee transportation allowance requests "satisf[ies] its

trust responsibility to the Indian lessor." 80 Fed. Reg. at 24,801.  The Rule

provides no rational basis to yield a different standard for transportation and

processing allowances applicable to oil and gas production from federal leases,

particularly since the Secretary's highest duty is its trust responsibility to Indian

lessors.

Furthermore, the Rule again undercuts lessees' reasonable reliance interests

by terminating all pre-Rule ONRR approvals of higher allowances, even where

lessees already have fully justified them.  This result is impermissibly retroactive.

The lessees in these fields already made investment decisions based upon the

economics of these operations, including the ability to obtain full allowances for

necessary transportation and processing costs.  ONRR has provided no rationale or

evidence that it is unable to review, decide, or renew a requested transportation and

processing allowance greater than 50 percent or 66.67 percent, respectively, where

warranted.

ONRR failed to rebut similar concerns raised in public comments when it

finalized these Rule provisions without change.  The Court's preliminary

injunction opinion dedicated just one sentence to these Rule provisions, following

its discussion of the Rule's provision on subsea movement of oil and gas, and

stated that "to the extent Petitioners also challenge the Valuation Rule's caps on

transportation and processing allowances . . . the same analysis and result hold

true." *Cloud Peak*, 415 F. Supp. 3d at 1050.  Petitioners respectfully request that the Court reexamine these provisions on the merits, and invalidate them.

### C.   The Rule Exacts Arbitrary Premiums to Use the Index Option to Value Gas.

The Rule's newly-adopted index pricing scheme for gas production from federal leases improperly demands an arbitrarily inflated premium to utilize the index option, and extracts additional monies from producers by ignoring how gas actually flows and is sold.  *See* 30 C.F.R. §§ 1206.141(c) (unprocessed gas), 1206.142(d) (residue gas and gas plant products).  ONRR acknowledges that this methodology results in a value "consistently higher" than a value based on gross proceeds.  AR_73973.  To defend this premium, ONRR invokes the perceived greater "simplicity" for the lessee to use an index-based value compared to chasing gross proceeds to the downstream sales point for an affiliate and performing complex calculations for applicable transportation and processing allowances, including unbundling determinations.  *See id.*  But the opportunity for administrative convenience in the process for calculating royalty value does not increase the inherent value of the gas, and is not a valid ground to increase royalty payments.  In other words, ONRR statutorily is entitled only to royalty on the value of the production, not value plus a convenience fee.

The Rule pads royalty value in two key ways: (1) selection of unattainable gas index pricing points, and (2) arbitrary adjustments to index prices to reflect

location differentials between the lease and the market point where the index is established.  In effect, the Rule adopts a "highest price available anywhere standard" for index-based valuation.  But nothing in the Rule justifies this result or adequately responds to comments raising these issues for ONRR's identical proposed provisions.

First, the Rule extracts an arbitrary value premium by prescribing index prices that a lessee realistically cannot consistently achieve in the marketplace. Where a lessee "can only transport" gas to one published index pricing point (e.g., market center), the Rule mandates use of the "highest reported monthly bidweek price for that index pricing point for the production month."  30 C.F.R. §§ 1206.141(c)(1)(i), 1206.142(d)(1)(i).  The Rule provides no rationale for inexorably choosing the "highest" monthly price rather than an average or median price for the month.  Separately, the Rule specifies that where a lessee "can transport gas" to "more than one" published index pricing point, the lessee must utilize "the highest reported monthly bidweek price for the index pricing points to which your gas could be transported for the production month, whether or not there are constraints, for that production month."  30 C.F.R. § 1206.141(c)(1)(ii), 1206.142(d)(1)(ii).  Similarly as above, the Rule fails to justify its use of the "highest" price among indexes, or the "highest" monthly price for that index.  The Rule also does not explain what "can transport" means, or how it comports with

51

physical pipeline hookups or contracts.  Most significantly, ONRR proffers no basis to ignore actual constraints on gas movement for a given production month. Thus, if a lessee actually sells all of its gas at index price point A, and there exists a pipeline to index pricing point B that has a higher index price, yet there is no physical hookup or otherwise no available capacity on that pipeline for the lessee to actually sell its gas there, under the Rule the lessee still must pay royalty on the higher point B index price.  This is arbitrary—consistent with basic valuation principles, ONRR must base valuation on how a lessee's gas actually flowed or reasonably could flow, not on unattainable hypotheticals that simply would yield more royalty for ONRR.  This is particularly true since pipeline systems are complex and a lessee may not even know how many index points exist to which its gas theoretically could flow.

Second, the Rule's adjustments to index prices to reflect location differentials are arbitrary and unsubstantiated.  For federal gas lessees that pay royalty on an index-based value in lieu of tracing gross proceeds, the Rule includes a fixed location differential provision intended to account for the difference in value for gas at the lease versus the market center where the index price is established.  30 C.F.R. §§ 1206.141(c)(1)(iv), 1206.142(d)(1)(iv).  On one hand, the very inclusion of location differentials for index-based values reflects the fundamental precept that valuation must occur at the lease.  Indeed, ONRR

"recognize[d] that index pricing points are normally located off of the lease and, frequently, are at lengthy distances from the lease."  AR_73972.  On the other hand, however, the Rule's operative provisions once again fail to give fidelity to valuation at the lease, because their prescribed adjustments are fixed, outdated, and lack record support.  Under the Rule, to arrive at royalty value for their produced gas, onshore lessees must reduce the applicable index price by 10 percent, and OCS lessees must employ a 5 percent reduction, but in no event may the reduction be less than 10 cents per MMBtu or more than 30 cents per MMBtu.  30 C.F.R. § 1206.141(c)(1)(iv).  Moreover, lessees "may not take any other deductions" under the Rule's index methodology.  30 C.F.R. §§ 1206.141(c)(2), 1206.142(d)(3).  Petitioner API commented on the lack of justification for this fixed adjustment factor, which is too low.  API explained that the provision simply parroted the location adjustment range of 10-cents/MMBtu to 30 cents/MMBtu for Indian gas index valuation in ONRR regulations adopted 17 years earlier, and which never had application to OCS lease production.  *See* 30 C.F.R. § 1206.172(d)(1)(iii).  In finalizing the Rule without change, ONRR gave a one-sentence generic response that, based on "transportation rate data" ONRR analyzed, these fixed adjustments are "a reasonable reduction to the index price." AR_73973.  ONRR did not include this data or its analysis in the administrative record.  Nor did ONRR address changes in gas marketing costs or practices in the

17 years since it first adopted the same differential for Indian leases, or explain

why the Rule's prescribed factor remained reasonable for leases today not on

Indian lands, and particularly on the OCS.

The Court's preliminary injunction ruling did not opine on these gas index

provisions in the Rule.  On the merits, the Court should find them arbitrary and

capricious.

### D.   The Rule Disregards Valid Sales, Transportation, and Processing Contracts.

Despite recognizing the fundamental reliability of lessee's arm's-length

sales and services contracts for federal royalty valuation, *e.g.*, AR_73967, the Rule

simultaneously enables ONRR to freely cast them aside.  Two arm's-length

scenarios are of particular concern: (1) agreements lacking all parties' written

signatures; and (2) agreements with sales prices that ONRR deems "unreasonably

low" or transportation or processing costs that ONRR deems "unreasonably high"

and therefore purportedly overstate allowable deductions.

The Rule unconditionally refuses to recognize "all contracts, contract

revisions, or amendments" unless they are written and signed by "all parties to the

contract."  30 C.F.R. §§ 1206.104(g) (oil sales), 1206.111(d) (oil transportation),

1206.143(g) (gas sales), 1206.153(d) (gas transportation), 1206.160(c) (gas

processing).  Even more problematic, the Rule's consequence for no fully signed

written contract is that ONRR may unilaterally step in and reestablish whatever

royalty value it prefers.  *E.g.,* 30 C.F.R. §§ 1206.104(g)(2), 1206.143(g)(2).

This inflexible mandate and draconian result directly contradict ONRR's

broader regulatory definition of "contract"—tellingly unaltered by the Rule—

which recognizes the validity of any "oral" agreement "that is enforceable by law

and that, with due consideration, creates an obligation."  30 C.F.R. § 1206.20.  It

also is unsupported in the record.  As API and others commented to ONRR,

modern real world business practices do not entail fully signed contracts.  Many

current agreements among oil and gas producers and other parties active in the

market exist only electronically or via email exchanges, renew automatically, or

include terms that obviate written signatures.  For example, oil and gas can be sold

on a spot basis with confirmation of terms exchanged by emails.  Purchasers of oil

and gas produced from federally-managed lands also may be unwilling to

restructure the form of their agreements with lessees.  Beyond ONRR's baldly-

stated conclusions, which the Court should not accept as explanations, the Rule

cites no evidence of "difficult" or understated valuation where, e.g., one or neither

arm's-length party has physically signed an agreement.  *See* AR_73968.  That is

unsurprising because, after all, federal royalty only accounts for between 12.5

percent and 18.75 percent of total value, and thus federal lessees are economically

incentivized to derive the most total value from their oil and gas production since

their benefit is about five to seven times what the government receives.  Moreover, the Rule requires lessees' affiliates to restructure their contracts as well, despite that affiliates are not ONRR-regulated parties like lessees.

To be clear, vacating the requirement for full contractual signatures would not diminish a lessee's obligation to justify its federal oil or gas valuation to ONRR when so ordered or on audit.  The mere absence of a fully signed written contract is not a valid reason for ONRR to negate an arm's-length agreement, and then step in to reestablish the royalty value as whatever it prefers in place of the legally-valid, contract-based value.

Even where a lessee has a written arm's-length contract that is fully signed, the Rule empowers ONRR to ignore it and again substitute its own value whenever ONRR believes the oil or gas sales price thereunder is what ONRR characterizes as "unreasonably low."  30 C.F.R. §§ 1206.104(c)(2), 1206.143(c)(2).  Specifically, "ONRR may consider a sales price unreasonably low if it is 10 percent less than the lowest reasonable measures of market price, including, but not limited to, index prices and prices reported to ONRR for like-quality" oil, gas, or gas plant products. *Id.*  The Rule contains parallel provisions licensing ONRR to disregard oil and gas transportation or processing agreements where the allowance is "unreasonably high," in turn defined as "10 percent higher than the highest reasonable measures" of transportation or processing costs.  30 C.F.R. §§ 1206.110(f)(2), 1206.152(g)(2),

1206.159(e)(2).  Again, the consequence in any of these circumstances is the triggering of the "default provision" whereby "ONRR may decide your value," "ONRR may determine your transportation allowance," or "ONRR may determine your processing allowance."  30 C.F.R. §§ 1206.104(c), 1206.143(c), 1206.110(f), 1206.152(g), 1206.159(e).  For example, under the Rule, if ONRR determines that a lessee's oil or gas arm's-length sales price is 10.1 percent below what ONRR deems the "lowest reasonable value," the result is not that the lessee must add one-tenth of a percent to its royalty payment, or even that it must increase its royalty payment to the "lowest reasonable value."  Instead, ONRR can unilaterally establish any value for royalty purposes based on whatever factors ONRR deems relevant.

The Court did not address these provisions in its preliminary injunction opinion, but should now find them to be arbitrary and capricious.  They amount to no standard at all and permit ONRR to second-guess valid arm's-length agreements in nearly limitless situations.  The "10 percent" threshold is entirely circular because it defines what is "unreasonable" based on what is "reasonable."  This supposed metric also is (1) unilaterally and retroactively determined by ONRR, yet based on no regulatorily specified standards, and (2) reliant on information possessed only by ONRR and that it will not share because the agency does not reveal like quality prices or costs reported to ONRR due to confidentiality

concerns. Nor does the Rule explain the genesis of its 10 percent standard; it appears out of thin air. The problem with ONRR's arbitrary standard is that certain arm's-length sales, transportation, and processing contracts, depending upon the lack of fully developed transportation and processing infrastructure in the areas of operations, could legitimately vary by more than 10 percent from any such "reasonable measures." Or for production months with low commodity price markets, a producer may be forced to sell at a low price to secure its continuing sales. And once again, the end result of a lessee's allegedly not meeting the threshold is not to move the lessee's value up to that floor, but rather to disregard the floor altogether. While ONRR need not blindly accept every arm's-length contract, the unchecked discretion afforded by these Rule provisions broadly undercuts arm's-length agreements and the certainty that is critical to lessees' royalty valuation.[14]

---

[14] For the same reasons, the Rule's corresponding provisions requiring full written signatures on contracts and imposing "10 percent" standards for coal sales, transportation costs, or washing costs are also invalid. *See* 30 C.F.R. §§ 1206.253(g) & 1206.453(g) (federal and Indian coal sales); 1206.261(c) & 1206.461(c) (federal and Indian coal transportation); 1206.268(c) & 1206.468(c) (federal and Indian coal washing); 1206.252(c)(2) & 1206.452(c)(2) (10 percent provision for coal sales); 1206.260(g)(2), 1206.267(d)(2), 1206.460(g)(2), 1206.477(d)(2) (10 percent provision for coal allowances).

## II.     THE 2016 RULE'S COAL PROVISIONS SHOULD BE VACATED.

The 2016 Rule's federal and Indian coal valuation provisions are fundamentally misguided, unsupported, and unworkable.  Uniquely for coal, the Rule among other things fails to value the relevant lease commodity (*coal*) at or near the mine; mandates the *least* reliable valuation method (netback) for coal non-arm's-length transactions; categorically and arbitrarily treats cooperatives and their members as *affiliates*; adopts arbitrary allowances; and, in doing so, imposes additional novel and arbitrary requirements on cooperatives formed under the Rural Electrification Act to generate and distribute affordable power to rural areas.

The Court's preliminary injunction opinion correctly concluded that the Rule's requirement to value certain coal based on arm's-length sales of electricity derived therefrom is unlawful.  The Court also properly found that those provisions are not severable from the remainder of the 2016 Rule's provisions for coal valuation.  In any event, on full consideration of the merits, they are invalid as well.  In short, the Rule inflicts disparate and *ultra vires* new requirements on federal and Indian coal lessees and coal cooperatives.  The Rule has never taken effect for any reporting month for coal, thus ensuring certainty and consistency. The Court should reach the same conclusion after merits briefing as it did when it issued the preliminary injunction, and vacate the Rule's coal valuation provisions.

**A.      The Rule Unlawfully Values Coal Based on Sales Prices for Electricity.**

The Rule requires coal lessees, including those it defines as coal cooperatives, to value coal using sales prices for electricity, under the purported rationale that ONRR "seek[s] a clear, consistent, and repeatable standard for valuing coal at its true market value."  AR_73980.  This requirement accomplishes none of these objectives.  The requirement not only is impossible to implement but also violates the MLA, lacks any factual support, and is unconstitutionally vague.

> 1.      *The 2016 Rule Unlawfully Departs from the Mineral Leasing Act and Well-Established Valuation Principles When It Values Coal by Using Sales Prices for Electricity.*

The 2016 Rule's required use of a netback from *electricity* sales to value *coal* if the coal is sold to an affiliated power plant is contrary to law.  30 C.F.R. §§ 1206.252(b) & (c), 1206.452(b) & (c).  The MLA directs that royalty shall be based on the percentage expressed in the lease of the "value of coal," the lease product.  30 U.S.C. § 207(a); *see, e.g., Petro-Lewis Corp.*, 108 IBLA 20, 39-41, 1989 WL 255495, at *10-11 (1989) (royalty must be assessed on the value of the oil, the lease product, not electricity).  Applying the statutory lease royalty rate for coal to an entirely different energy commodity generated from the coal, and that is subject to a distinctly and highly regulated pricing structure, is inconsistent with the statute.

In addition, the 2016 Rule departs from well-established principles for valuation of federal and other minerals, as described above.  Actual sales data for the lease product have long been recognized as the preferred and most reliable measure of that product's market value.  *See, e.g., Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1167 (10th Cir. 2000).  The 1989 coal royalty valuation rules in effect from January 1, 1989 until the 2016 Rule took effect (the "1989 Rule") followed this principle for non-arms-length sales by looking to coal sales data benchmarks—first to gross proceeds from comparable arms-length sales of coal, then to prices reported to a public utilities commission, then to prices reported to the Energy Information Administration of the U.S. Department of Energy, and then to other relevant information including but not limited to publicly available spot market prices for coal.  Former 30 C.F.R. § 1206.257(c)(2)(i)-(iv) (2015).[15]

In contrast, the 2016 Rule rejects actual coal sales data in favor of exclusive use of a netback method from electricity sales and thereby departs from the

---

[15] Only if there are no actual sales data under one of these four benchmarks will coal value be determined using a netback method beginning "at the first point at which reasonable values for the coal may be determined by a sale pursuant to an arm's-length contract or by comparison to other sales of coal."  Former 30 C.F.R. §§ 1206.251, 1206.257(c)(2)(v) (2015).

agency's longstanding position that even such a method of last resort[16] must start from the lease product.  The 1989 Rule's netback valuation method started with the lease product, coal, not a product created by use of the coal such as electricity.  *See* 30 C.F.R. § 1206.257(c)(2)(v) (2015); Preamble to Revision of Coal Product Valuation Regulations and Related Topics, 53 Fed. Reg. 26942-01, 26956 (July 15, 1988) ("[T]his section would apply to situations where the value of the coal is enhanced beyond the point of marketable condition prior to use, sale, or other disposition by the lessee . . . This approach, to be seen as a last resort, determines royalty value after the marketable coal has been enhanced and is subsequently used, sold, or otherwise transferred."); *id.* (applied to "beneficiated coal").

Nothing in the administrative record acknowledges, let alone provides a basis for, the 2016 Rule's dramatic departure from the well-established principle that one must look to sales of coal, the lease product, to establish its value.  Failure to acknowledge and explain this substantial change in the agency's position is arbitrary and capricious.  *See, e.g., Encino Motorcars*, 136 S. Ct. at 2126 (citing *Fox*, 556 U.S. at 515).  For this reason, and the fact that ONRR's valuation is inconsistent with the MLA, the 2016 Rule's requirement that coal cooperatives value coal using sales of electricity should be set aside.

---

[16] "The MMS will use a net-back valuation method only when other methods of determining value, such as those specified in the rules, are inapplicable."  54 Fed. Reg. at 1,506 (preamble).

2. *A Netback from Electricity Sales is Functionally Impossible to Perform.*

A netback from electricity sales to value coal is functionally impossible to perform because electricity is an entirely different commodity than coal. A number of comments submitted during rulemaking point this out. *See, e.g.*, AR_73461, AR_73462; AR_73616, AR_73624; AR_73486, AR_73489–AR_73490; *accord* AR_73943, AR_73944 (comments from Wyoming Governor's Office describing the netback method as "complex" and "difficult for companies and the ONRR to implement"). ONRR also essentially admits this because the Rule provides no formula, criteria, or guidance to perform such a calculation. The preamble to the Rule and the administrative record are similarly silent on this critical matter. And, as this Court noted in its preliminary injunction ruling, "none of the parties could articulate how this provision could be applied to extract the value of the coal from the sale of electricity, a highly-regulated commodity." *Cloud Peak*, 415 F. Supp. 3d at 1051. That includes ONRR.

Further, the 2016 Rule incorrectly assumes a similarity in markets. *See* AR_80376, AR_80369. The generation, transmission, distribution, and sale of electricity are incredibly complex arrangements. Electricity is generated from myriad sources, including coal, natural gas, hydropower, nuclear, solar, and wind. Jennifer W. Fletcher et al., *Constructing Power: The Near Term Outlook for Construction of Power Generation Projects in the 21st Century*, 5 No. 2 Am. C. of

Construction Laws. J. 4 (2011); Jim Rossi, *The Shaky Political Economy Foundation of a National Renewable Electricity Requirement*, 2011 U. Ill. L. Reg. 361, 369 (2011).  Once generated, electricity is pooled in regional or interstate grids and cannot be traced to a specific source.  *E.g.*, AR_73461, AR_73462 ("gross realizations based on energy sales from a specific source would be impossible to determine").  "Thus, the sales price of the electricity is comprised of much more than just the cost of coal, and that's ignoring the rabbit hole that is electricity sales regulation by both the federal and state governments."  *Cloud Peak*, 415 F. Supp. 3d at 1051.

Furthermore, electric cooperatives have complex rate structures for their members and their members' customers.  *See* AR_73486, AR_73490.  Each member has classes of customers and its own rate design.  *See id.*  Retail rates of electricity may differ depending on the classes of utility customers (i.e., residential, commercial, industrial, irrigation and other agriculture).  *See id.*  Each of those rates also may vary from day-to-day based on incentives utilities offer to their customers to manage peak load demand and other considerations.  Because gross proceeds for each electric utility will vary substantially, the 2016 Rule likely would result in significantly different values for the same coal.  AR_73489–AR_73490; AR_73461, AR_73462.

For these reasons, this Court correctly observed that "[t]rying to value coal based on the sale of electricity is akin to valuing wheat based on the sale of a cake; there may be a relationship between the two, but it is weak and several other factors potentially play a much larger role in determining the sales price of the end product." *Cloud Peak*, 415 F. Supp. 3d at 1051. A netback from the electricity rate a coal cooperative charges its members or a member charges its customers would never reflect the actual value of coal produced from a particular federal lease because of the complexities and arbitrary assumptions inherent in attempting such a calculation.

> 3.   *ONRR's Determination that Coal Should be Valued Using the Price of Electricity Lacks Factual Support.*

ONRR's conclusion that the value of electricity reasonably represents the value of coal lacks factual support. The administrative record confirms that ONRR neither "examine[d] the relevant data" in support of, nor "articulate[d] a satisfactory explanation" for, its conclusion that the value of electricity reflects the value of coal. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The administrative record lacks *any* evidence correlating the value of coal with the price of electricity. Although ONRR generally recites that "arm's-length sales are the best indicator of value," AR_73981, it offers no specific facts or analysis to support the conclusion that arm's-length sales of electricity are the best indicator of the value of coal. *See generally* AR_73981; AR_771, AR_792, AR_803. For this reason alone, the 2016

Rule's requirement that coal sold by cooperatives should be valued using the price of electricity is arbitrary and capricious.

Further, when promulgating the Rule, ONRR did not acknowledge, or explain its reasons for, its newfound preference for a netback method over actual coal sales transactions and data as the best mechanism to determine the value of coal. When an agency changes policy positions, the agency "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox*, 556 U.S. at 515). In the 2016 Valuation Rule, ONRR rejects use of comparable arms-length or other coal sales data utilized by the 1989 Rule in favor of a netback from electricity. Setting aside the substantive issues with any effort to netback from electricity, under the 1989 Rule, a netback method was the last alternative only if none of the four non-arm's-length benchmarks using sales data could be applied. *See* former 30 C.F.R. § 1206.257(c)(2)(v) (2015); 54 Fed. Reg. at 1,506. ONRR did not acknowledge its prior disfavor of a netback method or provide reasons for its newfound position that prefers a netback method from an entirely different commodity. Without ONRR acknowledging and providing a reason for its changed position, the 2016 Valuation Rule is arbitrary for this reason alone. *See Encino Motorcars*, 136 S. Ct. at 2126.

Finally, ONRR's position that arm's-length sales of electricity are the best indicator of value is belied by its own economic analysis of the Rule.  In this analysis, ONRR could not conclude that using a netback method to value electricity would cause an increase in federal royalty but, rather, recognized that the change actually may cause a *decrease* in federal royalty.  *See* AR_73992 ("we estimated that the combined average annual royalty impacts for these coal dispositions will range from a royalty decrease of $1.06 million (benefit) to a royalty increase of $1.06 million (cost)").  Because ONRR's administrative record does not support the 2016 Rule's netback requirement and, in fact, undercuts it, the netback requirement is arbitrary and must be permanently set aside.

4.   *The Requirement to Value Coal by Using Prices of Electricity Violates Due Process.*

The 2016 Rule's requirement to value coal using the price of electricity is so vague that it violates due process.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  *Fox*, 567 U.S. at 253.  "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  *Id.*  "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and

guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *Id.*

The 2016 Rule's requirement to value coal using a price of electricity is unconstitutionally vague.  The 2016 Rule does not inform lessees "what is required of them."  Given the complexities associated with the generation, transmission, distribution, and sale of electricity, as detailed above, the exercise of netting back the price of electricity to value coal is extraordinarily complex—if it can be done at all.  The 2016 Rule, the preamble to the 2016 Rule, and the administrative record are all silent on this critical point.  They contain *no* discussion at all of how lessees should perform the proposed netback, *see* AR_73980–AR_73981, despite public comment that ONRR's proposed valuation method would be "difficult if not impossible to apply in any logical, consistent and accountable fashion," *see* AR_73461, AR_73467.

Moreover, the 2016 Rule contains no safeguards to ensure that ONRR does not "act in an arbitrary or discriminatory way."  The administrative record indicates that ONRR enacted the 2016 Rule without any sense of how lessees should perform a netback calculation or how ONRR should enforce this requirement.  ONRR admitted it "has limited experience determining lease product royalty values using the methodology under proposed § 1206.252(b)(1)." AR_73992; AR_803–AR_804.  Furthermore, although ONRR prepared an October

5, 2016 "Dear Reporter" letter to coal lessees advising them of the Rule, *see https://www.onrr.gov/DearRep.htm*, that letter provides no guidance as to how to perform a netback calculation from electricity sales.  Coal cooperatives and other coal lessees therefore have no way to discern how to comply with the netback requirement and have no safeguards to ensure that ONRR will find it acceptable. "The dividing line between what is lawful and unlawful cannot be left to conjecture."  *Connally v. Gen. Const. Co.*, 269 U.S. 385, 393 (1926).  Therefore, the 2016 Rule's requirement to value coal using the price of electricity violates due process.

For all these reasons, the Court should set aside the requirement at 30 C.F.R. § 1206.252(b) and (c) and § 1206.452(b) and (c) to netback the value of coal from the price of electricity.

### B.    The Rule's Mandate that Coal Lessees Chase Gross Proceeds to Distant Sales Points for Valuation Is Arbitrary and Unworkable.

It is common for coal lessees not to sell their coal directly to third-party purchasers, but rather to first transfer production to an affiliate for marketing and disposition of the coal.  The agency has been well-aware of this common coal marketing practice for decades.  To value coal production in these circumstances, the 1989 Rule adopted a benchmark valuation methodology that generally relied on comparable arm's-length sales values in the same area as the mine to value the coal.  *See* former 30 C.F.R. § 1206.257(c)(2) (2015).

The 2016 Rule entirely eschews the 1989 Rule's benchmark-based system for valuing federal and Indian coal initially transferred non-arm's-length to an affiliate, then sold by the lessee's affiliate or the affiliate's own affiliate arm's-length.  *See* 30 C.F.R. §§ 1206.252(a), 1206.452(a).  Instead, the Rule consigns coal lessees to a one-size-fits-all valuation methodology for such sale, no matter where in the world that first arm's-length sale may occur:

> The value of coal under this section for royalty purposes is the gross proceeds accruing to you or your affiliate under the first arm's-length contract, less an applicable transportation allowance determined under §§ 1206.260 through 1206.262 and washing allowance under §§ 1206.267 through 1206.269. . . .

30 C.F.R. § 1206.252(a); *see also* 30 C.F.R. § 1206.452(a) (same except for cross-references to Indian coal allowance provisions).  In doing so, the Rule problematically adopts as the singular valuation method the very type of netback methodology that yields the greatest burdens and least accuracy, as the agency has recognized for decades.  In performing the netback methodology, the Rule also leaves lessees in the dark as to which transportation costs involved in moving coal to far distant sales points ONRR will accept to arrive at royalty value at the lease or mine.  And then if years after the lessee reports its royalties based on its complex work-back calculation ONRR disagrees with it "for any reason," ONRR may substitute its own value—even by using the same (former benchmark) factors, such as "like-quality coal from the same mine" or local index prices, which the

70

Rule abolishes for lessees' own valuation.  *See* 30 C.F.R. §§ 1206.253(c)(3),

1206.254, 1206.453(c)(3), 1206.454.

The result of this regulatory restructuring is to deprive coal lessees of an

adequate method to value coal at the mine as statutorily required.  For any or all of

these reasons, the Court should invalidate the Rule and thereby reinstate the

benchmarks that have functioned well, including over the nearly 18 months while

the Rule's coal provisions have been enjoined by this Court.

The Court's preliminary injunction opinion included two sentences on 30

C.F.R. §§ 1206.252(a) and 1206.452(a).  It paraphrased these provisions as "basing

the value of coal on the first arm's length contract where available."  *Cloud Peak*,

415 F. Supp. 3d at 1052.  It then concluded that "[t]his valuation methodology is

unlikely to be found arbitrary and capricious on the merits because an arm's-length

sale has been historically accepted as an accurate measurement of an item's value."

*Id.*  The Court correctly recognizes the general reliability of arm's-length contracts

as a valuation method, as explained above.  However, these provisions' mere

invocation of an arm's-length sale—not by the lessee at the lease or mine, but by

an affiliate anywhere in the world—alone cannot save them.  Rather, the proposed

provisions (mal)function to violate other core tenets of royalty valuation, by

forcing lessees to undertake hugely complicated netback calculations, and to do so

uniformly, without clarity on allowances to achieve value at the lease, and at

71

substantial cost and effort by both lessees and ONRR.  They also arbitrarily reverse

the agency's long-held position, and even contradict other aspects of the Rule.

Only for coal lessees, the Rule provides no alternative, readily determinable

valuation methodology for lessees unwilling or unable to undertake a complex

work-back calculation.  *Compare* 30 C.F.R. §§ 1206.252(a) and 1206.452(a) *with*

30 C.F.R. §§ 1206.102 (oil), 1206.142(d) (gas).[17]  This disparate treatment of coal

lessee valuation is unjustified and violates the APA.  *See Indep. Petroleum Ass'n of*

*Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) ("[a]n agency must treat

similar cases in a similar manner unless it can provide a legitimate reason for

failing to do so.").  The inherent complexity and imprecision in chasing distant

gross proceeds and performing complex transportation and processing calculations

are precisely why the agency has consistently viewed doing so as a valuation

procedure of last resort, including as the final benchmark in the 1989 Rule.  For

that reason, ONRR never before required a netback-type method without also

providing a simpler valuation option.  But under the Rule that is no longer true

uniquely for coal.

Moreover, ONRR fails to explain its imposition of a significantly more

burdensome and imprecise valuation methodology on coal lessees.  Nowhere does

---

[17] *See also* AR_73972 ("The [gas] index-based option provides a lessee with a
valuation option that is simple, certain, and avoids the requirements to unbundle
fees and 'trace' production.").

the administrative record support how wholesale transition to a universal work-

back method is preferable to, or would inexorably yield a higher royalty than, the

well-established valuation standards adopted in 1989 for federal and Indian coal.

To be sure, those regulatory benchmarks for non-arm's-length sales are based on

other arm's-length transactions in the area, looking initially to comparable sales of

locally produced coal in the same timeframe to value coal first disposed of non-

arm's-length.  *See* former 30 C.F.R. § 1206.257(c) (2015).  ONRR nowhere

supports why a distant arm's-length contract among different parties yields a more

representative value of coal than similar sales at or in proximity to the mine.  The

Rule's changes and substantially increased burdens are even more inexplicable

given ONRR's own prediction of very little to no resulting royalty benefit.  *See*

AR_73992.

The Rule's requirement to value coal by chasing it to the ultimate first

arm's-length sales point anywhere in the world, and then calculating deductions

back to the lease, is even more onerous than the 1989 Rule's last resort netback

option.  In referencing a netback valuation method, the 1989 Rule had looked to

"the *first point at which reasonable values for the coal may be determined* by a

sale pursuant to an arm's-length contract or by comparison to other sales of coal . .

. ." Former 30 C.F.R. § 1206.251 (2015) (emphasis added) (definition of "net-back

method").  That point could be determined by arm's-length sales of other coal at an

intermediate market, not necessarily an arm's-length sale of the specific coal being valued for royalty purposes.[18] Now coal lessees have no option and must ascertain the latter.

Exacerbating its flawed approach, the Rule mandates a netback method from the first arm's-length sales point but provides no detail on which deductions lessees may take for the myriad costs involved in transporting coal, particularly for international sales. *See* 30 C.F.R. §§ 1206.260-1206.262.  A lessee's affiliate may incur a variety of transportation costs beyond those necessary to place the coal in marketable condition.  These may include not only rail costs and terminal fees, but also terminalling and storage costs, other port fees, and ocean transportation. These costs may be incurred even thousands of miles away or in another country, and, similar in some respects to the difficulties inherent in attempting to follow electricity prices to value coal, the coal may be extremely difficult to trace through multiple transactions to the first arm's-length sales point due to storage and commingling with other coals as part of the transportation process.  Moreover, subtracting transportation costs from a price in a distant location does not account for the considerable risk incurred by the coal lessee's affiliate in transporting the

---

[18] By way of illustration, if Powder River Basin coal mined in Wyoming were sold in Asia, but was transported through a West Coast port, and if there is an established market price at the West Coast port based on arm's-length sales, the 1989 Rule "net-back" method would start at the West Coast port, not with the sale in Asia.

coal to those locations.  *See Indep. Petroleum Ass'n of Am.*, 91 F. Supp. 2d at 120

("from an economic standpoint, the higher sales prices obtained in a downstream

market are, in part, a reflection of the costs *and risks* involved") (emphasis added).

The paucity of any guidance in the 2016 Rule as to allowable transportation costs

is made glaringly evident by the detailed transportation allowance rules applicable

under ONRR's federal gas valuation regulations, 30 C.F.R. § 1206.154(f) & (g),

and oil valuation regulations, 30 C.F.R. § 1206.111(b).  Even more unreasonably,

as noted above, if ONRR disagrees "for any reason" with the costs the lessee

claims in this significant but standardless realm of transportation allowances, it

may unilaterally re-value the lessee's coal production.  Again, the Rule provides no

legitimate reason for disparate treatment here.

  ONRR's explanation for replacing the traditional "comparable sales"

process with a method based solely on an affiliate's downstream resale price is that

the "benchmarks were difficult to use in practice" and "[t]here have been disputes

over comparable sales."  AR_73980.  This is an irrational basis for blanket

imposition of mandatory netbacks.  There often is ample evidence of arm's-length

sales prices of coal from the same or nearby mines that readily establish a value at

or near the lease for coal transferred to an affiliate and ultimately sold far

downstream.  For example, Petitioner Cloud Peak (now NTEC) sells the vast

majority of its Powder River Basin coal to third parties at the mine, and only a

relatively small portion was transferred to its affiliate for resale in foreign markets. Decl. of Matthew Adams, at ¶ 10, ECF No. 23-7.  Also, there are two index prices for Powder River Basin coal, one for 8,800 Btu/lb. coal and the other for 8,400 Btu/lb. coal.  *Id.* ¶ 16.  Similarly, Argus/McCloskey's Coal Index Price Service publishes daily and weekly index prices for various coal market centers, including the Powder River Basin.  *Id.*

Any of these local indicia of coal value is demonstrably more reasonable for determining value at the lease than the required netback process.  ONRR uniquely has access to all of the sales prices for federal and Indian coal in the major producing regions and the ability to compare those sales prices to the available index prices or other valuation indicia to gauge their reliability.  Yet, ONRR's administrative record includes no meaningful consideration of these available index prices or other local or regional alternatives.

Overall, the Rule's unequivocal requirement to chase proceeds downstream to the first sales point when a lessee first transfers coal to an affiliate is a dramatic and unexplained reversal from decades of the agency treating such a valuation method as unreliable and the method of last resort.  Having compelled a flawed method, the Rule doubles down and handicaps its implementation by failing to address the necessarily relevant transportation costs.  These unjustified regulatory changes should be reversed.

### C.     The 2016 Rule Arbitrarily Treats Members of Coal Cooperatives as Affiliates.

The 2016 Rule coins a new term, "coal cooperative," meaning "an entity organized to provide coal or coal-related services to the entity's members (who may or may not also be owners of the entity), partners, and others."  30 C.F.R. § 1206.20.  That term then drives ONRR's novel and unprecedented approach to coal valuation.  Members of a "coal cooperative" are categorically assumed to be "affiliates," and all transactions among the members are deemed to be non-arm's-length.  30 C.F.R. §§ 1206.20, 1206.252(c)(1); AR_73965.  Under the 2016 Rule, this means that transfer of coal from one cooperative member to another member is never treated as an arm's-length's sale under § 1206.252(a).  This also means that electricity prices either will be or can always be used to value their coal. See, e.g., 30 C.F.R. §§ 1206.252(c)(2) and 1206.252(b)(1) (netback from electricity sales); 1206.252(c)(2), 1206.252(b)(2), 1206.1258(a) & (b) (lessee request for a royalty determination); 1206.253(c) (default provision); 1206.254(b) (electricity prices to be considered when lessee requests a valuation determination and under default provision).

The 2016 Rule's treatment of members of a coal cooperative as affiliates is unsupported, arbitrary, and capricious.  As observed above, in rulemakings, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the

choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted).  The administrative record must factually support an agency's decisions, particularly when the agency is changing long-standing policy.  *Humana of Aurora, Inc. v. Heckler*, 753 F.2d 1579, 1583 (10th Cir. 1985).  Here, the record is largely silent on the important issue of whether to treat coal cooperatives as affiliates; only 58 documents in the administrative record mention "coal cooperative."  Those documents consist of multiple copies of Federal Register notices containing the proposed and final rules, multiple copies of comments from the public that largely object to the new term, multiple copies of ONRR summaries of public comments, and a lone internal agency email (AR_75133) suggesting a sentence be added to the definition in an advance notice of proposed rulemaking.  The administrative record fails to include any facts supporting the decision to treat members of "coal cooperatives" as "affiliates."

First, the Rule arbitrarily ignores the long-established case-by-case, factual analysis under both the Rule and prior regulations to establish that two entities are "affiliate[d]."  30 C.F.R. § 1206.20; former 30 C.F.R. § 1206.251 (2015).  That analysis starts with evidence regarding defined percentages of ownership that are presumed to be control (more than 50%) or lack thereof (less than 10%), and then, for ownership percentages between 50% and 10%, looks to "[o]ther evidence of power to exercise control over or common control with another person."  *Id.*  But

the 2016 Rule conducted no such analysis for "coal cooperatives" as a group or individually.  Instead, ONRR simply assumed that every entity it defined as a coal cooperative is "affiliated" and that all of that entity's coal sales contracts are non-arm's-length, without regard to any evidentiary facts concerning ownership and control of any specific coal cooperative.  *See* AR_73965.  Here, the facts regarding the relationships, e.g., between cooperatives and their member systems, demonstrate the lack of basis for and the arbitrary nature of ONRR's coal cooperative definition and its assumption of "control."  *See, e.g.,* AR_73461, AR_73465.

Second, the 2016 Rule assumes that "sales [of coal] within coal cooperatives may not reflect the true market value of the coal" because cooperatives "are primarily designed for mutual economic advantage."  AR_73980.  Yet ONRR offers no factual analysis in support of its assumption that sales of coal within cooperatives do not reflect the market value of coal.  Under the prior regulations, non-arm's-lengths sales were valued using a series of benchmarks tied to arms-length sales data including the price of coal reported to the U.S. Energy Information Administration, rather than gross proceeds from a non-arm's-length sale.  AR_73486, AR_73487; former 30 C.F.R. § 1206.257(c) (2015).  Moreover, given that lessees have reported the value of coal sold under arm's-length and non-arm's-length sales to ONRR and its predecessor agencies for decades, ONRR

could have compared the values of coal reported by coal cooperatives to the values of other sales to confirm that ONRR was receiving fair market value.  ONRR, however, undertook no such analysis.  Rather, the 2016 Rule reflects, at most, a suspicion that ONRR was not receiving fair market for coal sold by cooperatives.  *See* AR_73980 ("We share the concerns that some commenters expressed that sales within coal cooperatives may not reflect the true market value of the coal."); AR_792 ("ONRR believes all sales between cooperative members are non-arm's-length because they do not have opposing economic interests").  ONRR's decision to treat members of a "coal cooperative" as "affiliates" based on a speculation is arbitrary and capricious.

Finally, to the extent ONRR is concerned about actors without opposing economic interests, the 2016 Rule does not cure ONRR's perceived flaw.  Whereas ONRR incorrectly assumes that sales of coal within cooperatives may not reflect the true market value of coal because cooperatives do not have opposing economic interests, that same rationale would apply to electricity sales within cooperatives, which then would also not be deemed arm's-length.  For these reasons, the Court should set aside the 2016 Rule's treatment of coal cooperatives as "affiliates" as arbitrary and capricious.

**D.    The Provision for Valuing Non-Arm's-Length Sales by Coal Lessees Is Impermissibly Vague and Violates the MLA.**

When a coal lessee or its affiliate does not sell coal at arm's-length and the netback from electricity does not apply, the 2016 Rule does not specify any valuation method.  Rather, it provides that ONRR will determine value under § 1206.254, using the procedures in § 1206.258, of the 2016 Rule.  *See* 30 C.F.R. §§ 1206.252(b)(2), 1206.258(a).  This valuation provision is impermissibly vague and violates the MLA's requirement that ONRR define the value of coal by regulation.

The "void for vagueness doctrine" serves to ensure that "regulated parties should know what is required of them so they may act accordingly" and that "those enforcing the law do not act in an arbitrary or discriminatory way."  *Fox*, 567 U.S. at 253.  "[R]egulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require."  *Freeman United Coal Min. Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997).  Here, the 2016 Rule's treatment of non-arm's-length sales by coal lessees is impermissibly vague.  The 2016 Rule affords ONRR unbridled discretion to determine value.  Further, a coal lessee faces substantial and unnecessary uncertainty as to whether its royalty valuations will be deemed to

81

comply with the 2016 Rule even if they are made in good faith in an effort to fully comply with the law.

The 2016 Rule imposes no substantive constraints on ONRR's ability to determine value. The 2016 Rule directs that ONRR "will determine the value of the coal under § 1206.254." 30 C.F.R. § 1206.252(b)(2). The 2016 Rule directs the coal lessee to propose a method to determine value but does not require ONRR to adopt the lessee's proposed method. *See id.* § 1206.252(b)(2)(i). Moreover, the 2016 Rule does not identify the circumstances in which ONRR may reject the lessee's proposed method. *See id.*

The 2016 Rule instead allows ONRR to determine value pursuant to § 1206.254 "by considering *any* information that [ONRR] deem[s] relevant." The flaws with § 1206.254 and nearly identical provisions for oil and gas valuation, known as the "default provisions," are discussed in detail in Argument Section III below. *See* 30 C.F.R. §§ 1206.252(b), 1206.254(a) (emphasis added). Unique to coal, however, § 1206.254 expressly identifies the price of electricity as an example of "relevant" information that ONRR may consider. *Id.* § 1206.254(b). Further, although the 2016 Rule lists some examples of relevant information, it does not limit ONRR's consideration to these examples. *See id.* Rather, it specifies that ONRR may consider "*[a]ny other* information that ONRR deems relevant regarding the particular lease operation or salability of the coal." *Id.* §

1206.254(e) (emphasis added).  As a result, the 2016 Rule fails to give coal lessees "fair warning" of how ONRR will value coal not sold at arm's-length.

The § 1206.252(b) requirement that ONRR define the value of coal not sold by cooperatives at arm's-length, with no prescribed standards for such a determination, also facially fails the MLA's requirement that the value of coal be "defined by regulation."  30 U.S.C. § 207(a).  For coal cooperatives, the 2016 Rule provides no "definition" of value.

Further, ONRR offers no reasonable rationale for applying the default provision in § 1206.254 to circumstances in which coal cooperatives or their affiliates do not sell at arm's-length.  *See* AR_73992.  ONRR does not explain why coal sold in a non-arms-length transaction warrants similar treatment as alleged "misconduct" by contracting parties or breach of the lessee's duty to market.  *See* AR_73980; 30 C.F.R. § 1206.253(c)(1) and (2).  Rather, ONRR merely states that it may apply the default provisions to non-arm's length sales by coal cooperatives or their affiliates "given the low percentage of non-arm's-length dispositions of Federal coal."  AR_73992.  In other words, ONRR acknowledges that complying with the MLA's requirement to define the value of coal does not warrant ONRR's time or effort.

Yet, for those lessees engaging in the "low percentage of non-arm's-length dispositions of Federal coal," they face significant uncertainty as to whether their

royalty valuations will be deemed to comply with the 2016 Rule.  ONRR's determination whether to accept a coal lessee's valuation proposal is apparently never final until ONRR chooses to make it final.  30 C.F.R. §§ 1206.252(b)(2), 1206.257.  Until such time, the lessee continues to be at risk for additional royalty claims and late payment charges.  30 C.F.R. § 1218.202.  In addition, at any time, ONRR may itself choose *sua sponte* to determine the value of coal.  30 C.F.R. § 1206.253(c).  Again, the lessee risks a demand for additional royalties and late payment charges years after the production occurred.  30 C.F.R. §§ 1218.202.  And again, this is contrary to the MLA dictate that ONRR's regulations must "define" the coal's value.  In light of the substantial uncertainty facing lessees, and the risk of improper and inconsistent valuation by ONRR, the provisions of the 2016 Rule allowing ONRR to determine the value of coal not sold at arm's-length by coal lessees are impermissibly vague and violate the MLA.  Accordingly, the provision of the Rule addressing valuation of coal not sold at arm's-length should be set aside.

> ### E.     The Allowances Afforded to Coal Lessees Are Arbitrary and Unlawful.

The coal allowances identified by the 2016 Rule must be set aside.  The Rule adopts impermissibly vague transportation allowances and arbitrary generation and transmission allowances otherwise associated with valuation of geothermal resources.  As noted in the oil and gas argument section above, the same provisions

setting a 10 percent "unreasonably high" standard for coal transportation or washing deductions are arbitrary and unsupported as well.

        1.    *The Coal Transportation Allowances Are Impermissibly Vague.*

    The transportation allowances that may be deducted as part of the netback method for coal cooperatives are impermissibly vague and overly cumbersome to calculate. The 2016 Rule requires coal cooperatives to value coal based on the gross proceeds under the first arm's-length contract, "less an applicable transportation allowance." 30 C.F.R. § 1206.252(a), (c). The Rule then explains that, under an arm's-length transportation contract, the transportation allowance may include "reasonable, actual costs incurred" for the transportation of coal. *Id.* § 1206.261(a).

    The Rule does not, however, sufficiently specify which costs will be deductible. Costs associated with the transportation of coal are not limited to straightforward charges such as rail and rail terminal fees. Rather, the shipment of coal via rail, truck, or barge incurs a variety of fees and charges. For example, shipment by rail carries a base rail transportation rate, fuel charges, related accessorial charges, and rail equipment costs. Shipment by any means will, at a minimum, carry costs such as charges to mitigate dust and oxidation at the coal mine and management fees. *See* AR_73486, AR_73488.

Whereas ONRR has explicitly identified allowable and disallowed transportation deductions from royalty value of federal oil and gas, *see, e.g.*, 30 C.F.R. §§ 1206.111(b), 1206.153(b), 1206.178(f) & (g), the 2016 Rule does not identify which of the many possible coal transportation charges ONRR will allow lessees to deduct. *See* AR_73488. The 2016 Rule neither informs coal lessees and cooperatives which transportation costs they may deduct nor ensures that ONRR does not act arbitrarily when accepting or rejecting claimed transportation allowances. Given the variety of possible transportation costs, the Rule's failure to specify the costs that lessees may deduct renders it unlawfully vague. *See Fox*, 567 U.S. at 254.

2.   *The 2016 Rule Arbitrarily Adopts Generation and Transmission Allowances Developed for Geothermal Resources.*

Even if the 2016 Rule's use of electricity sales to value coal were not improper (which it is), the Rule's use of geothermal generation and transmission allowances as surrogates for costs of electricity generation and transmission is arbitrary and capricious. The 2016 Rule adopts for coal cooperatives, and lessees in no-sale situations, the generation and transmission allowance provisions for geothermal resources, with no analysis as to their comparability. *See* AR_73976 (stating the rule "does allow lessees to deduct costs associated with converting the coal to electricity to arrive at the value of the coal at the lease—not the value of the

electricity"); 30 C.F.R. § 1206.252(b)(1) (referencing generation and transmission allowances for geothermal resources at 30 C.F.R. §§ 1206.353 and 1206.354).

To begin with, Congress *expressly* authorized valuation of the geothermal resource based on the value of the electricity generated.  Pub. L. 109-58, 119 Stat. 594 (2005); 30 U.S.C. § 1004(a).  As discussed above, Congress did no such thing for coal in the MLA.  In addition, Congress recognized that geothermal resources are unique and not comparable to other federal resources leased for energy production by, among other things, substantially reducing the royalty rate to be applied to geothermal resources as compared to the rate applied to coal or oil and gas.  *Id.*

Geothermal resources are fundamentally different from coal in scope and in nature because they are not portable.  "Unlike other energy resources—such as oil, gas, and coal—geothermal resources must be used immediately after production and in close proximity to the production well because of the rapid dissipation of heat in the surface environment."  Revision of Geothermal Resources Valuation Regulations and Related Topics, 56 Fed. Reg. 57,256, 57,257 (Nov. 8, 1991) (emphasis added); *accord* Revision of Geothermal Resources Valuation Regulations and Related Topics, 54 Fed. Reg. 354 (Jan. 5, 1989).  As a result, geothermal resources "do not have a truly open market" because their markets "are

restricted to the fields in which they are produced and to the type of usage for which they are suited."[19]  56 Fed. Reg. at 57,257.

By contrast, coal is portable and has a global market.  Further, sales of coal by cooperatives are complex, as ONRR as recognized.  *See* AR_73981 (recognizing "complexity of affiliated interests across coal mining, logistics, and sales").

In light of these differences, ONRR offers no explanation or justification for grafting the generation and transmission allowances available for geothermal resources onto the valuation of coal sold by coal lessees and cooperatives.  *See* AR_73981.  These allowances are arbitrary and must be set aside.

## III.   THE RULE'S DEFAULT PROVISIONS ARE UNLAWFUL AND UNDERMINE THE RULE'S STATED PURPOSES.

The Rule's so-called "default provision" for each of oil, gas, and coal valuation, and the many other Rule provisions cross-referencing and triggering the default provision in numerous circumstances, magnify the other problematic aspects of the Rule and undermine longstanding, fundamental principles of royalty

---

[19] For these reasons, MMS has rejected the use of conventional valuation methods to value geothermal resources.  For example, MMS considered but declined to value geothermal resources using sales in other areas because the characteristics of geothermal resources vary widely from field to field.  Revision of Geothermal Resources Valuation Regulations and Related Topics, 54 Fed. Reg. at 356.  MMS also considered but declined to use prices established in contracts of lessees in the same field because of variation in valuation of geothermal resources within the same field and varying power plant efficiencies.  *Id.*

valuation.  The Rule does so by vesting ONRR with limitless "discretion" to second-guess lessees' valuation and arbitrarily substitute any (ostensibly higher) valuation it prefers.  What is more, when ONRR substitutes its determination in place of lessees' reported value, lessees will be unable to meaningfully challenge ONRR's default valuation due to inaccessibility to underlying information that ONRR will rely upon in making its determination.  The Rule provides no reasoned explanation in the record for this vast expansion of unilateral ONRR valuation authority in place of the principle of valuation certainty for federal and Indian mineral lessees inherent in its pre-2016 rules.  In fact, the default provisions create precisely the opposite of the "greater simplicity, certainty, clarity, and consistency in product valuation" that the Rule purports to adopt.  AR_73964.  Thus, the Rule violates the APA.  The lack of valuation specificity also violates the MLA requirement that value of coal must be "defined by regulation."  30 U.S.C. § 207(a).

The Rule's default provisions when invoked place valuation in a black box. They license ONRR to "decide[] that we will value your [oil, gas, or coal] for royalty purposes."  30 C.F.R. §§ 1206.105, 1206.144, 1206.254.  Further, ONRR may "consider[] *any* information that [ONRR] deem[s] relevant."  *Id.* (emphasis added).  Enumerated examples of information ONRR may utilize include the same benchmark valuation criteria for non-arm's-length transactions that the Rule

simultaneously forecloses for lessees' own valuation. 30 C.F.R. §§ 1206.144(a)-(c), 1206.254(a). This double standard for lessees' and ONRR's use of the same valuation methods is indefensible.[20] Also, as explained above, the Rule lists the "price of electricity," an unlawful and impossible basis for coal valuation. *Id.* § 1206.254(b). Further, the Rule's listed examples of relevant information are not exhaustive and do not limit ONRR. 30 C.F.R. §§ 1206.105(f), 1206.144(e), 1206.254(e). This information includes production sales data reported to ONRR by other federal lessees that is inherently proprietary and confidential business information. *See* 30 C.F.R. §§ 1206.109(a), 1206.149(a), 1206.259(a),

By affording ONRR unbridled discretion to determine value and no safeguards against arbitrariness, the default provisions create substantial risks of inconsistent valuation, again directly contrary to the Rule's stated purpose. This result fails to give lessees, particularly coal lessees who the Rule makes particularly susceptible to agency determinations of value, requisite "fair warning" of how ONRR will value their production and thus poses due process and void for

---

[20] *Compare* AR_80002 ("ONRR proposes to eliminate current benchmarks" for gas) *with* AR_80007 (proposed Rule "allows ONRR to consider any criteria we deem relevant, as well as criteria similar to the current gas valuation benchmarks").

vagueness problems.  *See Freeman*, 108 F.3d at 362.  As regulated entities, lessees "are entitled to know the rules by which the game will be played."[21]

Royalty valuation regulations have a heightened need for transparency because, other than the Government Accountability Office, no external mechanisms exist to ensure that ONRR is consistently valuing production among federal or Indian lessees.  Because ONRR generally regards contract and pricing information provided by any federal or Indian lessee as exempt from public disclosure under the Freedom of Information Act, a lessee receiving an ONRR default valuation determination based on such information will be unable to evaluate or compare ONRR valuation.  Therefore, the lessee will have no meaningful opportunity to seek further review of the ONRR black-box decision by either the Interior Board of Land Appeals or a federal court.  Because the public cannot retroactively confirm that ONRR is consistently valuing production under the default provisions, the valuation regulations must instead incorporate objective

---

[21] *United States v. AMC Entm't Inc.*, 549 F.3d 760, 768 (9th Cir. 2008) (internal citation omitted); *see also Gen. Elec. Co. v. U.S. Envtl. Protection Agency*, 53 F.3d 1324, 1333-34 (D.C. Cir. 1995).  Rules must be "sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require."  *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 736 (D.C. Cir. 2016) (citation omitted); *accord United States v. Magnesium Corp. of Am.*, 616 F.3d 1129, 1144 (10th Cir. 2010) ("Due process, after all, requires at the least that 'laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'") (citation omitted).

and transparent standards by which ONRR will value such production.  Each

default provision is also impermissibly vague because it fails to explain who within

ONRR could invoke it.

No less problematic than the default provisions themselves is the Rule's vast

range of circumstances triggering them, ostensibly including even simple reporting

errors or arm's-length contract-based transactions.  Most notably, the agency may

invoke default valuation if "for any reason" ONRR cannot determine that a lessee

properly paid royalty or applied an allowance for oil, gas, or coal.[22]  That is,

ONRR is not even required to positively identify a reporting or payment error

made by a lessee before invoking its default provision—ONRR could merely

suspect something is amiss or desire a higher valuation that returns more royalty.

Similarly, as a default provision trigger, the Rule newly defines "misconduct" as

"any failure to perform a duty to the United States . . . or unlawful or improper

behavior, regardless of the mental state."  30 C.F.R. §§ 1206.20, 1206.104(c)(1),

1206.143(c)(1), 1206.253(c)(1).  ONRR thus may invoke the default provision in

response to a lessee inadvertently inputting an incorrect product code, sales type,

---

[22] *See, e.g.*, § 1206.104(c) (oil); § 1206.110(f)(3) (oil transportation allowance); § 1206.143(c)(3) (gas); § 1206.152(g)(3) (gas transportation allowance); § 1206.159(e)(3) (gas processing allowance); § 1206.253(c)(3) (federal coal); § 1206.260(g)(3) (federal coal transportation allowance); § 1206.267(d)(3) (federal coal washing allowance); § 1206.453(c)(3) (Indian coal); § 1206.460(g)(3) (Indian coal transportation allowance); and § 1206.467(d)(3) (Indian coal washing allowance).

or other non-value-based field on its Form ONRR-2014 royalty report. Other examples where ONRR could "decide your value" include, but are not limited to whenever ONRR "determines" that a lessee:

- reported a value "inconsistent with the requirements of this subpart," *see* 30 C.F.R. §§ 1206.104(a)(1), 1206.143(a)(1), 1206.253(a)(1);

- sold production at an "unreasonably low" price under an arm's-length contract, circularly defined as "10 percent less than the lowest reasonable measures of market price" as ONRR unilaterally determines*, see supra* Section I.D; or

- lacks a contract with all parties' written signatures, *see id*.

The Rule and the administrative record do not vindicate ONRR's sudden decision to seize to itself royalty valuation in any of these circumstances, let alone in all of them.

The Rule's default provisions and initiating provisions remove existing regulatory safeguards against ONRR rejecting a lessee's valuation and arbitrarily demanding more royalty. In its preliminary injunction opinion, the Court disagreed that these Rule provisions effected any change from the preexisting 1988 and 1989 rules. *Cloud Peak*, 415 F. Supp. 3d at 1048. However, the regulations cited by the Court support Petitioners' position. For example, former 30 C.F.R. 1206.152(f) for gas states that "[i]f ONRR determines that a lessee has not

properly determined value, the lessee shall pay the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by ONRR."  This language reflects ONRR's pre-2016 approach, as explained earlier, to place primary valuation responsibility on the lessee, prescribe more detail in the regulations on how the lessee should perform valuation, and then if the lessee errs in applying those rules, require the lessee to pay what it owes under the rules and associated late-payment interest.  Moreover, mirroring language in former 30 C.F.R. § 1206.257(e) was added "to clarify that if a lessee improperly determines value, the lessee would be liable for both the additional royalties and interest."  54 Fed. Reg. at 1,516.

In addition, the Court previously summarized the default provisions as "allow[ing] ONRR to decide the value of a lessee's oil, gas, or coal for royalty purposes if ONRR determines the lessee's valuation did not conform to the final Valuation Rule's requirements."  *Cloud Peak*, 415 F. Supp. 3d at 1048.  But that is a far better description of the pre-2016 rules than the Rule.  For example, while previously undefined, the agency viewed the regulatory term "misconduct" as requiring "intentional" wrongdoing to deprive the government of monies owed; an "unreasonably low price" was insufficient.  54 Fed. Reg. at 1,510-11.  The Rule, by contrast, could make any error—intentional or inadvertent—"misconduct" and thereby trigger ONRR replacing the lessee's value with whatever it wants.  As

discussed above, ONRR does not even need to find noncompliance by a lessee. ONRR thus removed the prior standard requiring demonstration of lessee intent to act in bad faith.  Similarly, the Rule removes (without any mention in the preamble) a former ONRR oil valuation provision which had expressly stated that a low price alone is "insufficient" to demonstrate breach of duty to market "unless ONRR finds additional evidence that the seller acted unreasonably or in bad faith in the sale of oil from the lease."  *See* former 30 C.F.R. § 1206.102(c)(2)(ii)(B) (2015).  In its place, the Rule imposes the arbitrary "10 percent" threshold discussed above.  30 C.F.R. § 1206.104(c)(2); *supra* Argument Section I.D.

Moreover, the Rule changes the remedy for reporting errors, or even misconduct, from lessee corrections under the regulations to ONRR revaluation outside the regulations.  Previously, in instances of demonstrated misconduct, even under arm's-length contracts, the remedy was that ONRR would order the lessee to re-value its production using the regulatory benchmarks.  *See* 54 Fed. Reg. at 1,510-11.  The pre-2016 rules thus still afforded the lessee certainty if ONRR rejected arm's-length gross proceeds, by requiring for example for oil, the lessee to re-value its production for valuation based on 30 C.F.R. § 1206.103, i.e., the NYMEX index price, the Alaska North Slope index price, or prices the lessee receives for its own production from the field or area, depending on where the lease is located geographically.  *See* former 30 C.F.R. § 1206.102(c)(2) (2015).

The 2016 Rule instead substitutes that "ONRR may decide your value" in questioning valuation in both arm's-length and non-arm's-length transactions.  *See, e.g.*, 30 C.F.R. § 1206.104(c).  It also deletes (again silently) a former regulation providing that ONRR would not "simply substitute its judgment" where it found breach of the lessee's duty to market.  *See* former 30 C.F.R. § 1206.102(c)(2)(ii)(A) (2015).  The salient issue here is not ONRR's authority to audit and verify lessees' valuations, or whether lessees should adhere to the regulations—but rather ONRR's lack of a cogent basis to change the direct valuation role that the agency placed on oil, gas, and coal lessees many years ago.

Whatever the scope of ONRR's discretion might be legally, it does not follow that ONRR can or should dispense with the established rules whenever it wants.  That is particularly true given ONRR's sudden reversal from decades of guarding against the pure agency discretion exemplified by the default provisions.  The Rule's substitution of this unexplained and circular approach for casting aside lessees' valuation violates the APA and the MLA.

## **CONCLUSION**

For the reasons above, the Court should grant the Petitions and vacate the 2016 Rule.

Dated this 4th day of December, 2020.

Respectfully submitted,

*/s/ Keith S. Burron*
Keith S. Burron, WSB No. 5-2884
The Burron Firm, P.C.
1695 Morningstar Road
Cheyenne, WY 82009
Phone:  (307) 631-7372
keith@burronlaw.com

Peter J. Schaumberg, *pro hac vice*
James M. Auslander, *pro hac vice*
BEVERIDGE & DIAMOND, P.C.
1350 I Street, NW, Suite 700
Washington, DC 20005-3311
Phone: (202) 789-6009
pschaumberg@bdlaw.com
jauslander@bdlaw.com

**ATTORNEYS FOR PETITIONERS AMERICAN PETROLEUM INSTITUTE, NATIONAL MINING ASSOCIATION, AND WYOMING MINING ASSOCIATION**

*/s/ Walter F. Eggers* (with permission)
Walter F. Eggers, III, WSB No. 6-3150
HOLLAND & HART LLP
2515 Warren Ave., Suite 450
Cheyenne, WY  82003-1347
Phone: (307) 778-4200
weggers@hollandhart.com

John F. Shepherd, *pro hac vice*
Tina Van Bockern, *pro hac vice*
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, Colorado 80202
Phone: (303) 295-8000

jshepherd@hollandhart.com
trvanbockern@hollandhart.com

**ATTORNEYS FOR PETITIONER CLOUD PEAK
ENERGY INC.**


*/s/ R. Kirk Muller* (with permission)
R. Kirk Muller, WSB No. 5-2420
Gail L. Wurtzler, *pro hac vice*
Kathleen C. Schroder, *pro hac vice*
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Phone: (303) 892-9400

**ATTORNEYS FOR PETITIONER TRI-STATE
GENERATION AND TRANSMISSION ASS'N
INC.**


*/s/ Rex E. Johnson* (with permission)
Rex E. Johnson, WSB No. 5-1845
Brian D. Artery, WSB No. 7-4819
SHERARD, SHERARD, ARTERY &
JOHNSON
602 10th Street
Wheatland, WY 82201
Phone: (307) 322-5555
rex@ssjwyolaw.com
bartery@ssjwyolaw.com

**ATTORNEYS FOR PETITIONERS BASIN
ELECTRIC POWER COOPERATIVE AND
WESTERN FUELS WYOMING, INC.**

## CERTIFICATE OF COMPLIANCE

I hereby certify that this joint brief complies with the type-volume limitation set forth L.R. 83.6(c) and the Court's October 26, 2020 Order, ECF No. 86 in the lead case, because this joint brief contains 22,691 words as calculated by Microsoft Word 2016, excluding parts of the brief exempted by Fed. R. App. P. Rule 32(f). This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14 point font in Microsoft Word 2016.

*/s/ Keith S. Burron*
Keith S. Burron

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of December, 2020, the foregoing Petitioners' Joint Opening Brief was served by filing a copy of the document with the Court's CM/ECF system, which will send notice of electronic filing to counsel of record.

*/s/ Keith S. Burron*
Keith S. Burron